REQUESTED ORAL ARGUMENT NOT SCHEDULED

UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF
COLUMBIA CIRCUIT

---

No.   11-7018

---

ERIC SHEPTOCK, RICHARD EMBDEN, EDWARD BALTIMORE,
REGINALD E. DUBOSE, TERRY E. HUFF, SAMUEL M. DAVIS, TOMMY
BENNETT, AND THE COMMITTEE TO SAVE FRANKLIN SHELTER

Appellants,

v.

ADRIAN FENTY, NEIL O. ALBERT, CLARENCE H. CARTER, AND
FRED SWAN

Appellees.

---

ON APPEAL FOR REVIEW OF A DECISION OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

---

SECOND CORRECTED APPENDIX OF APPELLANTS

---

GEORGE RICKMAN
 Pro Bono Attorney
P.O. Box 21267
Kalorama Station
Washington, D.C.  20009-21267
georgerick11@comcast.net
202-723-3955
*Counsel of Record for Appellants*

# APPENDIX

## TABLE OF CONTENTS

                                                                          **Page**

Docket Entries Civil Case No. 1:09-cv-00672-RBW ……………..… …A1

Docket No. 1, USDC Complaint April 10, 2009 ……………….…….......A11

USDC Hearing, February 22, 2011 Entire Transcript …. …..………..…A34

Docket No. 51, Order Dismissing Case, March 7, 2011 …………... …......A66

DCSC TRO Complaint, September 26, 2008 …………………….…..A70

DCSC TRO Hearing, Oct. 1, 2008 Transcript (pp 315-330) …………... A76

DCSC Amended Complaint, October 22, 2008   ……….. …………......A93

DCSC Amended Complaint, January 5, 2009 …………………..… A103

DCSC Hearing, Feb. 3, 2009 Transcript (p. 43)………………....…A121

DCSC Motion to Stay Proceedings, March 9, 2009………………..… A123

DCSC Memorandum Order and Judgment ……………….……..….. A141

DCCA Memorandum Order and Opinion  ……….……………..….. A156

Docket No.  25, USDC Order July 1, 2009  …………………..… A169

Docket No. 21, USDC Order Denying PI, May 22, 2009 …………... A171

Docket No. 31, Memorandum & Motion to Lift Stay, Dec. 10, 2009… A172

 Docket No. 40, Second Motion to Lift Stay, July 30, 2010 ………….. A186

Docket No. 22, Defendants' Motion to Dismiss the Complaint,
June 18, 2009  …………………………………………………. A199

Docket No. 23, USDC Motion to Amend Complaint, June 26, 2009…..A220

Docket No. 27, USDC Amended Complaint, July 10, 2009………….. A223

Certificate of Service …………………………………………...A224

APPEAL, CLOSED, JURY, TYPE–L

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:09–cv–00672–RBW

SHEPTOCK et al v. FENTY et al
Assigned to: Judge Reggie B. Walton
 Case:  1:10–cv–01790–PLF
 Case in other court:  USCA, 11–07018
Cause: Viol. of the Americans with Disabilities Act of 1990

Date Filed: 04/10/2009
Date Terminated: 07/01/2009
Jury Demand: Plaintiff
Nature of Suit: 446 Civil Rights:
Americans with Disabilities – Other
Jurisdiction: Federal Question

**Plaintiff**

**ERIC SHEPTOCK**
represented by **George E. Rickman**
P.O. Box 21267
Washington, DC 20009
(202) 723–3955
Email: georgerick11@comcast.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jane J. Zara**
1611 Monroe Street, NW
Washington, DC 20010
(202) 483–9303
Email: jjzara@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**COMMITTEE TO SAVE FRANKLIN SHELTER**
*On behalf of its members*
represented by **George E. Rickman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jane J. Zara**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RICHARD EMBDEN**
represented by **George E. Rickman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jane J. Zara**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EDWARD BALTIMORE**
represented by **George E. Rickman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jane J. Zara**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


A1

**Plaintiff**

**REGINALD E. DUBOSE**                    represented by    **George E. Rickman**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Jane J. Zara**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**TERRY E. HUFF**                         represented by    **George E. Rickman**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Jane J. Zara**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**SAMUEL M. DAVIS**                       represented by    **George E. Rickman**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Jane J. Zara**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**TOMMY BENNETT**                         represented by    **George E. Rickman**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Jane J. Zara**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**ADRIAN FENTY**                          represented by    **Denise J. Baker**
*In his individual and official capacities*                 Office of the Attorney General for District
                                                            of Columbia
                                                            Civil Litigation
                                                            441 4th Street NW 6th floor
                                                            Washington, DC 20001
                                                            (202) 724-7334
                                                            Fax: (202) 741-8800
                                                            Email: denise.baker@dc.gov
                                                            *TERMINATED: 01/27/2010*
                                                            *LEAD ATTORNEY*

                                                            **Sarah Ann Sulkowski**
                                                            OFFICE OF THE ATTORNEY

A2

GENERAL FOR THE DISTRICT OF
COLUMBIA
441 4th Street, NW
Suite 6 North 93
Washington, DC 20001
(202) 724-6627
Fax: (202) 730-1454
Email: sarah.sulkowski@dc.gov
*LEAD ATTORNEY*

**Defendant**

**NEIL O. ALBERT**                         represented by   **Jane J. Zara**
*In his individual and official capacities*                  (See above for address)
*Deputy Mayor for Planning and*                              *LEAD ATTORNEY*
*Economic Development*                                       *ATTORNEY TO BE NOTICED*

                                                           **Sarah Ann Sulkowski**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*

                                                           **Denise J. Baker**
                                                           (See above for address)
                                                           *TERMINATED: 01/27/2010*

**Defendant**

**CLARENCE H. CARTER**                     represented by   **Sarah Ann Sulkowski**
*In his individual and official capacities*                  (See above for address)
                                                           *LEAD ATTORNEY*

                                                           **Denise J. Baker**
                                                           (See above for address)
                                                           *TERMINATED: 01/27/2010*

**Defendant**

**FRED SWAN**                              represented by   **Sarah Ann Sulkowski**
*In his individual and official capacities*                  (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Denise J. Baker**
                                                           (See above for address)
                                                           *TERMINATED: 01/27/2010*

V.

**Interested Party**

**CATHOLIC CHARITIES**                     represented by   **Thomas L. McCally**
                                                           CARR MALONEY, P.C.
                                                           2000 L Street, NW
                                                           Suite 450
                                                           Washington, DC 20036
                                                           (202) 310-5506
                                                           Fax: (202) 310-5555
                                                           Email: tlm@carrmaloney.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 04/10/2009 | 1 | COMPLAINT against ADRIAN FENTY, NEIL O. ALBERT, CLARENCE H. CARTER, FRED SWAN filed by ERIC SHEPTOCK, COMMITTEE TO SAVE |



| | | |
|---|---|---|
| | | FRANKLIN SHELTER. (Attachments: #1 Civil Cover Sheet, #2 Exhibit 1, #3 Exhibit 2, #4 Exhibit 3, #5 Exhibit 4, #6 Exhibit 5, #7 Exhibit 6, #8 Exhibit 7, #9 Exhibit 8, #10 Exhibit 9, #11 Exhibit 10, #12 Exhibit 11, #13 Exhibit 12, #14 Exhibit 13, #15 Exhibit 14, #16 Exhibit 15, #17 Exhibit 16, #18 Exhibit 17, #19 Exhibit 18, #20 Exhibit 19, #21 Exhibit 20, #22 Exhibit 21, #23 Exhibit 22, #24 Exhibit 23)(td, ) (Additional attachment(s) added on 4/13/2009: #25 Exhibit Plaintiff's Praecipe Listing Exhibits Filed Under Seal) (td, ). (Entered: 04/13/2009) |
| 04/10/2009 | | SUMMONS Not Issued.(td, ) (Entered: 04/13/2009) |
| 04/10/2009 | 2 | MOTION for Leave to Proceed in forma pauperis by ERIC SHEPTOCK (td, ) (Entered: 04/13/2009) |
| 04/10/2009 | | FIAT ORDER granting 2 Motion for Leave to Proceed in forma pauperis. Signed by Judge John D. Bates on 4/2/09; ( See Docket Entry No. 2 to view image) (td, ) (Entered: 04/13/2009) |
| 04/10/2009 | 3 | MOTION for Leave to File documents under seal by ERIC SHEPTOCK (td, ) (Entered: 04/13/2009) |
| 04/10/2009 | | ORDER granting 3 Motion for Leave to File. FIAT. Signed by Chief Judge Royce C. Lamberth on 4/10/09; (See Docket Entry No. 3 to view image) (td, ) (Entered: 04/13/2009) |
| 04/16/2009 | 4 | ATTORNEY APPEARANCE by Joe Zara on behalf of Committee to Save Franklin Shelter. (td, ) (Entered: 04/17/2009) |
| 05/04/2009 | | Summons (5) Issued in individual and official capacities as to ADRIAN FENTY, NEIL O. ALBERT, CLARENCE H. CARTER, FRED SWAN and DC Attorney General. (td, ) (Entered: 05/06/2009) |
| 05/05/2009 | 5 | Amended MOTION for Preliminary Injunction by ERIC SHEPTOCK, COMMITTEE TO SAVE FRANKLIN SHELTER (Attachments: #1 Memorandum in Support Amended Memorandum In Support of Motion for Preliminary Injunction, #2 Text of Proposed Order Proposed Order)(Rickman, George) (Entered: 05/05/2009) |
| 05/05/2009 | 6 | NOTICE Amended Certificate of Service by ERIC SHEPTOCK, COMMITTEE TO SAVE FRANKLIN SHELTER re 5 Amended MOTION for Preliminary Injunction (Rickman, George) (Entered: 05/05/2009) |
| 05/07/2009 | 7 | AMENDED COMPLAINT against ADRIAN FENTY, NEIL O. ALBERT, CLARENCE H. CARTER, FRED SWAN filed by RICHARD EMBDEN, EDWARD BALTIMORE, REGINALD E. DUBOSE, TERRY E. HUFF, SAMUEL DAVIS, ERIC SHEPTOCK, COMMITTEE TO SAVE FRANKLIN SHELTER.(td, ) (Entered: 05/08/2009) |
| 05/07/2009 | 8 | MOTION for Leave to Proceed in forma pauperis by RICHARD EMBDEN (td, ) (Entered: 05/08/2009) |
| 05/07/2009 | 9 | MOTION for Leave to Proceed in forma pauperis by REGINALD E. DUBOSE (td, ) (Entered: 05/08/2009) |
| 05/07/2009 | 10 | MOTION for Leave to Proceed in forma pauperis by TERRY E. HUFF (td, ) (Entered: 05/08/2009) |
| 05/07/2009 | 11 | MOTION for Leave to Proceed in forma pauperis by SAMUEL M. DAVIS (td, ) (Entered: 05/08/2009) |
| 05/07/2009 | 12 | MOTION for Leave to Proceed in forma pauperis by EDWARD BALTIMORE (td, ) (Entered: 05/08/2009) |
| 05/13/2009 | 13 | NOTICE of Appearance by Denise J. Baker on behalf of all defendants (Baker, Denise) (Entered: 05/13/2009) |
| 05/14/2009 | | Set/Reset Hearings: Motion Hearing (Preliminary Injunction) set for 5/21/2009 09:00 AM in Courtroom 16 before Judge Reggie B. Walton. (mpt, ) (Entered: 05/14/2009) |



A 4

| 05/15/2009 | 14 | MOTION for Extension of Time to *Answer or otherwise Respond to Amended Complaint* by ADRIAN FENTY, NEIL O. ALBERT, CLARENCE H. CARTER, FRED SWAN (Attachments: #1 Text of Proposed Order, #2 Exhibit A−Superior Court Order of Dismissal, #3 Exhibit B−Judgment against Sheptock)(Baker, Denise) (Entered: 05/15/2009) |
|---|---|---|
| 05/15/2009 | 15 | Emergency MOTION for Discovery by ERIC SHEPTOCK, COMMITTEE TO SAVE FRANKLIN SHELTER (Attachments: #1 Memorandum in Support memorandum In Support of Mot for Exped Disc, #2 Text of Proposed Order Proposed Order, #3 Exhibit Exhibit A, #4 Exhibit Exhibit B, #5 Exhibit Exhibit C, #6 Exhibit Exhibit D, #7 Exhibit Exhibit E, #8 Exhibit Exhibit F, #9 Exhibit Exhibit G, #10 Exhibit Expedited Requests)(Rickman, George) (Entered: 05/15/2009) |
| 05/15/2009 | 16 | Emergency MOTION for Extension of Time to *Oppose Plaintiffs' Motion for Temporary Restraining Order, Preliminary or Permanent Injunction and a Continuance of Hearing on Preliminary Injunction set for May 21, 2009* by ADRIAN FENTY, NEIL O. ALBERT, CLARENCE H. CARTER, FRED SWAN (Attachments: #1 Text of Proposed Order)(Baker, Denise) (Entered: 05/15/2009) |
| 05/18/2009 | 17 | NOTICE of Appearance by Sarah Ann Sulkowski on behalf of all defendants (Sulkowski, Sarah) (Entered: 05/18/2009) |
| 05/19/2009 | 18 | Memorandum in opposition to re 16 Emergency MOTION for Extension of Time to *Oppose Plaintiffs' Motion for Temporary Restraining Order, Preliminary or Permanent Injunction and a Continuance of Hearing on Preliminary Injunction set for May 21, 2009*, 14 MOTION for Extension of Time to *Answer or otherwise Respond to Amended Complaint* filed by ERIC SHEPTOCK, COMMITTEE TO SAVE FRANKLIN SHELTER. (Rickman, George) (Entered: 05/19/2009) |
| 05/19/2009 | 19 | REPLY to opposition to motion re 15 Emergency MOTION for Discovery filed by ERIC SHEPTOCK, COMMITTEE TO SAVE FRANKLIN SHELTER. (Attachments: #1 Exhibit Exh A, #2 Exhibit Exh B, #3 Exhibit Exh C)(Rickman, George) (Entered: 05/19/2009) |
| 05/20/2009 | | MINUTE ORDER granting 14 District Defendants' Motion for Enlargement of Time to Answer or Otherwise Respond to Plaintiffs' Amended Complaint. The defendants' response is now due on June 19, 2009. Signed by Judge Reggie B. Walton on 05/20/09. (TH, ) (Entered: 05/20/2009) |
| 05/20/2009 | | Set/Reset Deadlines: Answer or respond to amended complaint due by 6/19/2009, (zmpt, ) (Entered: 05/20/2009) |
| 05/20/2009 | | MINUTE ORDER denying 16 Motion for Extension of Time to Respond to Hearing on Preliminary Injunction Set for May 21, 2009. Signed by Judge Reggie B. Walton on 05/20/09. (TH, ) (Entered: 05/20/2009) |
| 05/20/2009 | 20 | Memorandum in opposition to re 5 Amended MOTION for Preliminary Injunction filed by ADRIAN FENTY, NEIL O. ALBERT, CLARENCE H. CARTER, FRED SWAN. (Attachments: #1 Exhibit Judgment DC Superior Court, #2 Exhibit Docket 2008 CA 006954 B, #3 Exhibit Docket 2008 CA 007470 B, #4 Exhibit Declaration William Stewart, #5 Exhibit Declaration Althea Holford, #6 Exhibit Mayor's Order 2008−162, #7 Exhibit Declaration Fred Swan, #8 Exhibit Declaration Stacey Norris, #9 Exhibit Declaration Anwar Mahmood, #10 Text of Proposed Order)(Baker, Denise) (Entered: 05/20/2009) |
| 05/21/2009 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Motion Hearing held on 5/21/2009 re 5 Amended MOTION for Preliminary Injunction filed by COMMITTEE TO SAVE FRANKLIN SHELTER, ERIC SHEPTOCK, (Status Conference set for 6/26/2009 03:00 PM in Courtroom 16 before Judge Reggie B. Walton.). (Court Reporter Cathryn Jones.) (zmpt, ) (Entered: 05/22/2009) |
| 05/22/2009 | 21 | ORDER denying 5 Motion for Preliminary Injunction from the PI hearing held on May 21, 2009. Status conference set for June 26, 2009 at 3:00 p.m. Signed by Judge Reggie B. Walton on 05/22/09. (TH, ) Modified on 5/22/2009 (TH, ). (Entered: 05/22/2009) |



| 06/18/2009 | 22 | MOTION to Dismiss by ADRIAN FENTY, NEIL O. ALBERT, CLARENCE H. CARTER, FRED SWAN (Baker, Denise) (Entered: 06/18/2009) |
|---|---|---|
| 06/26/2009 | 23 | First MOTION to Amend/Correct *Complaint* by ERIC SHEPTOCK, COMMITTEE TO SAVE FRANKLIN SHELTER (Attachments: # 1 Memorandum in Support Memorandum In Support of Motion to Amend Complaint, # 2 Text of Proposed Order Proposed Order)(Rickman, George) (Entered: 06/26/2009) |
| 06/26/2009 | | Set/Reset Hearings: Status Conference reset for 7/1/2009 10:30 AM in Courtroom 16 before Judge Reggie B. Walton. (mpt, ) (Entered: 06/26/2009) |
| 06/30/2009 | 24 | Memorandum in opposition to re 23 First MOTION to Amend/Correct *Complaint* filed by ADRIAN FENTY. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sulkowski, Sarah) (Entered: 06/30/2009) |
| 07/01/2009 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Status Conference held on 7/1/2009, ( Amended Complaint due by 7/10/2009., Further Status Conference set for 10/7/2009 09:00 AM in Courtroom 16 before Judge Reggie B. Walton.). (Court Reporter Cathryn Jones.) (mpt, ) (Entered: 07/01/2009) |
| 07/01/2009 | 25 | ORDER. Signed by Judge Reggie B. Walton on 07/01/09. (TH, ) (Entered: 07/01/2009) |
| 07/10/2009 | 26 | ENTERED IN ERROR.....Amended MOTION to Amend/Correct 25 Order, Status Conference, Set Deadlines/Hearings,, by ERIC SHEPTOCK, RICHARD EMBDEN, EDWARD BALTIMORE, COMMITTEE TO SAVE FRANKLIN SHELTER, REGINALD E. DUBOSE, SAMUEL M. DAVIS (Rickman, George) Modified on 7/10/2009 (ztr, ). (Entered: 07/10/2009) |
| 07/10/2009 | 27 | Second AMENDED COMPLAINT against ADRIAN FENTY, NEIL O. ALBERT, CLARENCE H. CARTER, FRED SWAN filed by ERIC SHEPTOCK, RICHARD EMBDEN, EDWARD BALTIMORE, COMMITTEE TO SAVE FRANKLIN SHELTER, REGINALD E. DUBOSE, TERRY E. HUFF, SAMUEL M. DAVIS.(tr) (Entered: 07/10/2009) |
| 07/10/2009 | | NOTICE OF CORRECTED DOCKET ENTRY: re 26 Amended MOTION to Amend/Correct 25 Order, Status Conference, Set Deadlines/Hearings,,Amended MOTION to Amend/Correct 25 Order, Status Conference, Set Deadlines/Hearings,, was entered in error and the clerk has made the proper corrections to the docket. Counsel is advised in future filings to use the proper event or contact the Clerk's Office for further assistance. (tr) (Entered: 07/10/2009) |
| 07/28/2009 | 28 | MOTION for Leave to Proceed in forma pauperis by TOMMY BENNETT (td, ) (Entered: 07/31/2009) |
| 07/28/2009 | | FIAT. ORDER granting 28 Motion for Leave to Proceed in forma pauperis. Signed by Judge Reggie B. Walton on 7/28/09. (td, ); (See Docket Entry No.: 28 to view document) Modified on 7/31/2009 (td, ). (Entered: 07/31/2009) |
| 08/12/2009 | 29 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ADRIAN FENTY served on 6/26/2009, answer due 7/16/2009; NEIL O. ALBERT served on 6/26/2009, answer due 7/16/2009; CLARENCE H. CARTER served on 8/11/2009, answer due 8/31/2009; FRED SWAN served on 8/11/2009, answer due 8/31/2009, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on Attorney General 6/26/2009. Date of Service Upon Attorney General 6/26/09. (td, ) (Entered: 08/13/2009) |
| 10/07/2009 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Status Conference held on 10/7/2009. Oral request by the Plaintiff for a stay of the case, heard and denied. A further Status Conference is scheduled for 12/11/2009 at 11:15 A.M. in Courtroom 16 before Judge Reggie B. Walton. (Court Reporter Kathryn Jones.) (tg, ) (Entered: 10/07/2009) |
| 12/08/2009 | 30 | NOTICE *OF DENIAL OF STAY OF FEDERAL CLAIMS IN THE DISTRICT OF COLUMBIA COURT OF APPEALS* by NEIL O. ALBERT, CLARENCE H. CARTER, ADRIAN FENTY, FRED SWAN (Attachments: # 1 Exhibit A)(Baker, Denise) (Entered: 12/08/2009) |



| 12/10/2009 | 31 | Second MOTION to Lift Stay by EDWARD BALTIMORE, TOMMY BENNETT, COMMITTEE TO SAVE FRANKLIN SHELTER, SAMUEL M. DAVIS, REGINALD E. DUBOSE, RICHARD EMBDEN, TERRY E. HUFF, ERIC SHEPTOCK (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Rickman, George) (Entered: 12/10/2009) |
|---|---|---|
| 12/11/2009 | 32 | Memorandum in opposition to re 31 Second MOTION to Lift Stay filed by ADRIAN FENTY. (Sulkowski, Sarah) (Entered: 12/11/2009) |
| 12/11/2009 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Status Conference held on 12/11/2009, (Further Status Conference set for 3/19/2010 10:30 AM in Courtroom 16 before Judge Reggie B. Walton.). (Court Reporter Cathryn Jones.) (mpt, ) (Entered: 12/11/2009) |
| 12/11/2009 | 33 | REPLY to opposition to motion re 31 Second MOTION to Lift Stay filed by EDWARD BALTIMORE, TOMMY BENNETT, COMMITTEE TO SAVE FRANKLIN SHELTER, REGINALD E. DUBOSE, RICHARD EMBDEN, TERRY E. HUFF, ERIC SHEPTOCK. (Rickman, George) (Entered: 12/11/2009) |
| 12/15/2009 | 34 | ORDER. This Order is in accordance with the status conference held on December 11, 2009. Signed by Judge Reggie B. Walton on 12/15/09. (TH, ) (Entered: 12/15/2009) |
| 01/27/2010 | 35 | NOTICE OF WITHDRAWAL OF APPEARANCE as to NEIL O. ALBERT, CLARENCE H. CARTER, ADRIAN FENTY, FRED SWAN. Attorney Denise J. Baker terminated. (Baker, Denise) (Entered: 01/27/2010) |
| 03/19/2010 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Status Conference held on 3/19/2010, (Further Status Conference set for 6/25/2010 09:00 AM in Courtroom 16 before Judge Reggie B. Walton.). (Court Reporter Cathryn Jones.) (mpt, ) (Entered: 03/19/2010) |
| 06/25/2010 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Status Conference held on 6/25/2010, (Further Status Conference set for 8/4/2010 09:00 AM in Courtroom 16 before Judge Reggie B. Walton.). (Court Reporter Cathryn Jones.) (mpt, ) (Entered: 06/25/2010) |
| 06/30/2010 | 37 | MOTION to Quash by CATHOLIC CHARITIES; ("Leave to file is granted" by Judge Walton (td, ) Modified to add granted text on 7/9/2010 (td, ). (Entered: 07/09/2010) |
| 07/08/2010 | 36 | MEMORANDUM 37 by EDWARD BALTIMORE, TOMMY BENNETT, COMMITTEE TO SAVE FRANKLIN SHELTER, SAMUEL M. DAVIS, REGINALD E. DUBOSE, RICHARD EMBDEN, TERRY E. HUFF, ERIC SHEPTOCK. (Attachments: # 1 Text of Proposed Order)(Rickman, George) Modified to add linkage on 7/9/2010 (td, ). (Entered: 07/08/2010) |
| 07/09/2010 | 38 | Memorandum in opposition to re 37 MOTION to Quash filed by EDWARD BALTIMORE, TOMMY BENNETT, COMMITTEE TO SAVE FRANKLIN SHELTER, SAMUEL M. DAVIS, REGINALD E. DUBOSE, RICHARD EMBDEN, TERRY E. HUFF, ERIC SHEPTOCK. (Rickman, George) (Entered: 07/09/2010) |
| 07/19/2010 | 39 | REPLY to opposition to motion re 37 MOTION to Quash filed by CATHOLIC CHARITIES. (McCally, Thomas) (Entered: 07/19/2010) |
| 07/30/2010 | 40 | Second MOTION to Lift Stay by EDWARD BALTIMORE, TOMMY BENNETT, COMMITTEE TO SAVE FRANKLIN SHELTER, SAMUEL M. DAVIS, REGINALD E. DUBOSE, RICHARD EMBDEN, TERRY E. HUFF, ERIC SHEPTOCK (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit Exhibit A)(Rickman, George) (Entered: 07/30/2010) |
| 08/04/2010 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Status Conference held on 8/4/2010, (Further Status Conference set for 10/8/2010 09:00 AM in Courtroom 16 before Judge Reggie B. Walton.). (Court Reporter Cathryn Jones.) (mpt, ) (Entered: 08/04/2010) |



| | | |
|---|---|---|
| 08/12/2010 | 41 | Consent MOTION for Extension of Time to File Response/Reply as to 40 Second MOTION to Lift Stay by ADRIAN FENTY (Sulkowski, Sarah) (Entered: 08/12/2010) |
| 08/16/2010 | 42 | Memorandum in opposition to re 40 Second MOTION to Lift Stay filed by ADRIAN FENTY. (Attachments: # 1 Exhibit A)(Sulkowski, Sarah) (Entered: 08/16/2010) |
| 08/16/2010 | | MINUTE ORDER granting 41 Defendants' Consent Motion for Extension of Time. The defendants' response is now due on August 16, 2010. Signed by Judge Reggie B. Walton on 08/16/2010. (TH, ) (Entered: 08/16/2010) |
| 08/23/2010 | 43 | MOTION for Extension of Time to File Response/Reply as to 40 Second MOTION to Lift Stay by EDWARD BALTIMORE, TOMMY BENNETT, COMMITTEE TO SAVE FRANKLIN SHELTER, SAMUEL M. DAVIS, REGINALD E. DUBOSE, RICHARD EMBDEN, TERRY E. HUFF, ERIC SHEPTOCK (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Rickman, George) (Entered: 08/23/2010) |
| 08/24/2010 | | MINUTE ORDER granting nunc pro tunc to August 23, 2010 43 Plaintiffs' Consent Motion for Extension of Time to File Response/Reply to Second Motion to Lift Stay. The plaintiffs' Reply is now due on August 30, 2010.. Signed by Judge Reggie B. Walton on 08/24/2010. (TH, ) (Entered: 08/24/2010) |
| 08/24/2010 | | Set/Reset Deadlines: Response due by 8/30/2010 (mpt, ) (Entered: 08/24/2010) |
| 08/30/2010 | 44 | REPLY to opposition to motion re 40 Second MOTION to Lift Stay filed by EDWARD BALTIMORE, TOMMY BENNETT, COMMITTEE TO SAVE FRANKLIN SHELTER, SAMUEL M. DAVIS, REGINALD E. DUBOSE, RICHARD EMBDEN, TERRY E. HUFF, ERIC SHEPTOCK. (Attachments: # 1 Exhibit Exh B, # 2 Exhibit Exh A)(Rickman, George) (Entered: 08/30/2010) |
| 10/08/2010 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Status Conference held on 10/8/2010. Status Conference set for 11/19/2010 at 12:15 PM in Courtroom 16 before Judge Reggie B. Walton. (Court Reporter Cathryn Jones) (ad) (Entered: 10/08/2010) |
| 11/10/2010 | 45 | Emergency MOTION for Writ of Mandamus by EDWARD BALTIMORE (Zara, Jane) (Entered: 11/10/2010) |
| 11/17/2010 | | MINUTE ORDER denying without prejudice 40 Second Motion to Lift Stay. Per the Court's ruling at the status conference held on Ocotober 8, 2010, the Court will deny without prejudice the plaintiffs' second motion to lift the stay in light of the pending decision before the District of Columbia Court of Appeals. Signed by Judge Reggie B. Walton on 11/17/10. (TH, ) (Entered: 11/17/2010) |
| 11/17/2010 | | MINUTE ORDER denying 45 Petition for Writ of Mandamus. Upon review of the plaintiffs' petition, the Court concludes that it is outside of the Court's authority to grant the relief requested by the plaintiffs. Accordingly, the Court will deny the plaintiffs' petition. Signed by Judge Reggie B. Walton on 11/17/10. (TH, ) (Entered: 11/17/2010) |
| 11/19/2010 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Status Conference held on 11/19/2010. A Further Status Conference is set for 1/21/2011 at 11:00 AM in Courtroom 16 before Judge Reggie B. Walton. (Court Reporter Cathryn Jones) (ad) (Entered: 11/19/2010) |
| 12/21/2010 | 46 | NOTICE OF RELATED CASE by ADRIAN FENTY. Case related to Case No. 10−1790. (Sulkowski, Sarah) (Entered: 12/21/2010) |
| 01/10/2011 | 47 | NOTICE of Filing by EDWARD BALTIMORE, TOMMY BENNETT, COMMITTEE TO SAVE FRANKLIN SHELTER, SAMUEL M. DAVIS, REGINALD E. DUBOSE, RICHARD EMBDEN, TERRY E. HUFF, ERIC SHEPTOCK (Attachments: # 1 Exhibit DCCA Opinion)(Rickman, George) (Entered: 01/10/2011) |
| 01/17/2011 | 48 | Final MOTION to Lift Stay by EDWARD BALTIMORE, TOMMY BENNETT, COMMITTEE TO SAVE FRANKLIN SHELTER, SAMUEL M. DAVIS, REGINALD E. DUBOSE, RICHARD EMBDEN, TERRY E. HUFF, ERIC |


A8

| | | |
|---|---|---|
| | | SHEPTOCK (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Rickman, George) (Entered: 01/17/2011) |
| 01/19/2011 | | MINUTE ORDER. It is ORDERED that the parties shall file briefs as to their respective positions regarding why the instant matter before this Court is not now moot given the decision of the District of Columbia Court of Appeals by February 11, 2011. It is further ORDERED that the parties shall appear before the Court for a hearing on the issue on February 22, 2011 at 2:00 p.m. It is further ORDERED that the status conference scheduled for January 21, 2011, at 11:00 a.m. is cancelled. Signed by Judge Reggie B. Walton on 01/19/11. (TH, ) (Entered: 01/19/2011) |
| 01/20/2011 | | Set/Reset Hearings: Status Conference reset for 2/22/2011 02:00 PM in Courtroom 16 before Judge Reggie B. Walton. (mpt, ) (Entered: 01/20/2011) |
| 01/20/2011 | | Set/Reset Hearings: Motion Hearing set for 2/22/2011 02:00 PM instead of Status Conference in Courtroom 16 before Judge Reggie B. Walton. (mpt, ) (Entered: 01/20/2011) |
| 02/11/2011 | 49 | MEMORANDUM by ADRIAN FENTY NEIL O. ALBERT, CLARENCE H. CARTER, FRED SWAN. (Sulkowski, Sarah) Modified to add filers on 2/14/2011 (znmw, ). (Entered: 02/11/2011) |
| 02/11/2011 | 50 | MEMORANDUM by EDWARD BALTIMORE, TOMMY BENNETT, COMMITTEE TO SAVE FRANKLIN SHELTER, SAMUEL M. DAVIS, REGINALD E. DUBOSE, RICHARD EMBDEN, TERRY E. HUFF, ERIC SHEPTOCK. (Rickman, George) (Entered: 02/11/2011) |
| 02/22/2011 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Motion Hearing held on 2/22/2011. (Court Reporter Cathryn Jones) (ad) (Entered: 02/22/2011) |
| 03/04/2011 | 52 | NOTICE OF APPEAL as to 51 Order on Motion to Quash by ERIC SHEPTOCK. Fee Status: No Fee Paid. Parties have been notified. (td, ) (Entered: 03/07/2011) |
| 03/07/2011 | 51 | ORDER Dismissing Case and finding as moot 37 Motion to Quash. Signed by Judge Reggie B. Walton on 03/07/11. (TH, ) (Entered: 03/07/2011) |
| 03/07/2011 | | MINUTE ORDER finding as moot 48 Motion to Lift Stay. Signed by Judge Reggie B. Walton on 03/07/11. (TH, ) (Entered: 03/07/2011) |
| 03/07/2011 | 53 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Fee remains to be paid and another notice will be transmitted when the fee has been paid in the District Court re 52 Notice of Appeal. (td, ) (Entered: 03/07/2011) |
| 03/24/2011 | | USCA Case Number 11−7018 for 52 Notice of Appeal filed by ERIC SHEPTOCK. (mmh) (Entered: 03/24/2011) |
| 04/11/2011 | 54 | ORDER of USCA (certified copy) as to 52 Notice of Appeal filed by ERIC SHEPTOCK ; USCA Case Number 11−7018. ORDERED, on the court's own motion, that by May 12, 2011, appellant Committee to Save Franklin Shelter pay the $455 appellate docketing and filing fees to the Clerk of the District Court. (zsmm) (Entered: 04/14/2011) |
| 05/10/2011 | | USCA Appeal Fees received $ 455 receipt number 4616038643 re 52 Notice of Appeal filed by ERIC SHEPTOCK ; USCA case No.: 11−7018 (td, ) (Entered: 05/11/2011) |
| 05/11/2011 | 55 | Supplemental Record on Appeal transmitted to US Court of Appeals re 52 Notice of Appeal, USCA Appeal Fees, 54 USCA Order, ;USCA Case Number 11−7018. (td, ) (Entered: 05/11/2011) |
| 06/07/2011 | 56 | MOTION for Waiver *waive transcript fees* by NEIL O. ALBERT (Zara, Jane) (Entered: 06/07/2011) |
| 06/08/2011 | | MINUTE ORDER granting 56 Motion for Waiver. Upon consideration of the plaintiffs' motion and for good cause shown, it is hereby ORDERED that the motion is granted. Signed by Judge Reggie B. Walton on 06/08/11. (TH, ) |



(Entered: 06/08/2011)



**FILED**

APR 1 0 2009

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

Eric Sheptock (Homeless)        )
Dwuan Bean                      )
Terry E. Huff                   )
Junior Almozare                 )        Case: 1:09-cv-00672
Joseph Marshall                 )        Assigned To : Walton, Reggie B.
Charles Davis                   )        Assign. Date : 4/10/2009
Orrin Williams                  )        Description: Civil Rights-Non. Employ.
Richard Embden                  )
Edward Baltimore                )
Edward Hainsworth               )
Tommy Bennett                   )
Francwa Sims                    )
Lou Cannap                      )
Kevin Gallon                    )
TiRown                          )
Thomas Davis                    )
Phil Damus                      )
Maurice Cary                    )
Donald Mont                     )
Ronald Clayton                  )
Rodney Hill                     )
Melvin Belt                     )
John H. Wills, Jr.              )
    Formerly of 925 13ᵗʰ St., NW, )
    Washington, DC 2002,        )
                                )
Tom Ashley                      )
James Diggs                     )
Dennis Anderson                 )
    Homeless persons living on  )
    the streets of the District of Columbia, )
                                )
        and                     )
                                )
Committee to Save Franklin Shelter )
on behalf of its members,       )
Formerly of  925 13ᵗʰ Street, NW )
Washington, DC 20002,           )
                                )
            PLAINTIFFS           )

**RECEIVED**

MAR 2 5 2009

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1



A11

vs.                                          )
                                             )
Adrian Fenty,                                )
in his Individual and Official Capacities    )
1350 Pennsylvania Avenue, NW                 )
Washington, DC 20004                         )
                                             )
Neil O. Albert                               )
in his Individual and Official Capacities    )
Deputy Mayor                                 )
for Planning and Economic Development        )
Office of the Deputy Mayor                   )
for Planning and Economic Development        )
John A. Wilson Building                      )
1350 Pennsylvania Avenue, NW, Suite 317      )
Washington, DC 20004                         )
                                             )
Clarence H. Carter                           )
in his Individual and Official Capacities    )
Department of Human Services                 )
64 New York Avenue, NE, 6th Floor            )
Washington, DC 20002                         )
                                             )
Fred Swan, Administrator                     )
in his Individual and Official Capacities    )
Family Services Administration               )
2146 24th Pl NE                              )
Washington, DC 20018                         )
                                             )
_____     DEFENDANTS.     _____          )

## COMPLAINT

### JURISDICTION

1.   Plaintiffs bring this action pursuant to *The Americans With Disabilities Act*, 42

U.S.C. §§ 12101 *et seq.*, 12131, and 12132 ("ADA"), *The Fair Housing Act,* 42 U.S.C. §§

3601-3631 and 3604(f)(1)("FHA")  and the *District of Columbia Human Rights Act*, D.C.

Official Code §§ 2-1401.01 *et seq.* and 2-1402.21(a)(4) (place of residence discrimination)

("DCHRA"). This Court has original jurisdiction over all federal statutory claims pursuant to

2

A 12

28 U.S.C. § 1331 and supplemental jurisdiction over the claims arising under the laws of the District of Columbia.

## THE PARTIES

2.    Plaintiff, Eric Sheptock, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

3.    Plaintiff, DJuan Bean, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

4.    Plaintiff, Terry E. Huff, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

5.    Plaintiff, Joseph Marshall, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

6.    Plaintiff, Charles Davis, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

7.    Plaintiff, Orrin Williams, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

8.    Plaintiff, Richard Embden, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

9.    Plaintiff, Edward Baltimore, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

10.    Plaintiff, Edward Hainsworth is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

11.    Plaintiff, Tommy Bennett, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

3



12.    Plaintiff, Junior Almozare, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

13.    Plaintiff, John H. Wills, Jr., is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

14.    Plaintiff, Tom Ashley, is a natural person and homeless person living on the streets of the District of Columbia

15.    Plaintiff, Francwa Sims, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

16.    Plaintiff, Lou Cannao, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

17.    Plaintiff, Kevin Gallon, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

18.    Plaintiff, TyRown, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

19.    Plaintiff, Thomas Davis, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

20.    Plaintiff, Phil Damus, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

21.    Plaintiff, Maurice Cary, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

22.    Plaintiff, Donald Mont, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

4



23.    Plaintiff, Ronald Clayton, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

24.    Plaintiff, Rodney Hill, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

25.    Plaintiff, Melvin Belt, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

26.    Plaintiff, James Diggs, is a natural person and homeless person living on the streets of the District of Columbia.

27.    Plaintiff, Dennis Anderson, is a natural person and homeless person living on the streets of the District of Columbia.

28.    Plaintiff Committee to Save Franklin Shelter is an unincorporated nonprofit association under D.C. Code 29-971, the Uniform Unincorporated Nonprofit Associations Act.

29.    Plaintiff Committee to Save Franklin Shelter was formerly located at 925 13th Street, NW, Washington, DC, 20002.

30.    The interest Plaintiff Committee to Save Franklin Shelter seeks to protect is to ensure that those who have inhabited the shelter are able to remain there and have adequate services provided for them.

31.    Defendant Adrian Fenty is Mayor of the District of Columbia.

32.    Defendant Neil O. Albert is Deputy Mayor for Planning and Economic Development of the District of Columbia.

33.    Defendant Clarence H. Carter is Director of Department of Human Services of the District of Columbia.



34.    Defendant Fred Swan, Administrator is Administrator of Family Services Administration of the District of Columbia.

VENUE

35.    All parties either reside or work in the District of Columbia, and all complained of events took place in the District of Columbia. Franklin Shelter is located in the District of Columbia. Venue in therefore proper. 28 U.S.C. § 1391 *et seq.*

ALLEGATIONS

36.    The District of Columbia owned the property located at 925 13th Street, N.W. Washington D.C. known as the Franklin Shelter. Catholic Charities operated during Franklin Shelter during the relevant time period and provided services to the homeless described below.

37.    Plaintiffs, an organization representing the residents of the former Franklin Shelter and individually named plaintiffs, all were residents at the former Franklin Shelter, 925 13th Street, N.W., located in the 900 block of 13th Street in Northwest Washington, D.C. On the morning of September 26, 2008, at approximately 6:00am, the inhabitants of Franklin Shelter were awakened and informed that the shelter was closing. Once leaving the shelter, the men were separated from their belongings that remained in the shelter and the men told they could not gain reentry to the shelter. The inhabitants of Franklin Shelter were then scattered throughout the downtown area, and police shouted through a loudspeaker from a police car throughout the day to people attempting to enter the shelter, informing them that the shelter was closed. Many persons attempted to enter the shelter throughout the day of September 26. It rained throughout the day and the weekend that followed. Numerous

6



inhabitants of Franklin Shelter spent the weekend outside, in the rain, carrying their

belongings or losing them on the streets.

38.     On August 13, 2008, Council Chairperson Vincent Gray wrote a letter to Mayor

Fenty about the closure of Franklin Shelter, where he expressed "grave concern" about "steps

taken to reduce capacity, bar new admissions and prepare to close the Franklin Shelter."  Pl.

Ex. 10.

39.     On September 16, 2008, prior to the closing of the shelter, the Council had

hearings on, and passed the Franklin Shelter Closing Requirements Emergency Act of 2008,

B17-923 ("Emergency Act") (See also Franklin Shelter Closing Requirements Temporary

Act of 2008, B17-0924).

40.     The Emergency Act requires that the Mayor, prior to closing the Franklin Shelter,

provide a report that describes any expected increase or decrease in the need for low barrier

shelter space generally and, specifically, during the winter months,  and an accurate

assessment of the city's ability to seasonally increase capacity to reduce incidences of

hypothermia among the homeless population. Also included in the provisions of this act is

that the city provided coterminous services meeting the various needs addressed. The Mayor

signed the act into law on September 30, 2008, following the closing of the facility.

41.     This act contains various services and reporting requirements that have not been

met by the District. Sec 3(a) requirements of the Emergency Act have not been satisfied,

requiring the Mayor's report to be filed PRIOR to the closing of Franklin Shelter.  The

shelter was closed in hurried manner the morning of Sept. 26, 2008, the report was released

the evening of September 30, after close of business. Sec. 3(a)(1)(A)(i) requirements of the

Emergency Act have not been satisfied, requiring the documentation of each client's



supportive housing address. This has not been provided. Sec 3(a)(1)(A)(iv) requirements of
the Emergency Act have not been satisfied, requiring documentation of supportive services
provided to complement housing. On September 30, four days after closing the Shelter, and
after close of business, a Report on Supportive Housing Placements and Emergency Shelter
Capacity in the District of Columbia [*hereinafter* the "Mayor's Report"] was released.
http://dc.indymedia.org/usermedia/application/13/mayors_report_and_certification-
_franklin_closure.pdf

42.     The report merely mentions the organizations contracted, not an explanation of
which services are provided by need to which person. The report merely mentions the
promise of future transportation, no details of how the housed will reach their particular
services, especially when they are dispersed to the poorest and most violent areas of the city,
with the least amount of services available. Sec 3(a)(1)(B)(4) requirements of the Emergency
Act have not been satisfied, requiring a proper analysis of the impact of closing of the shelter
on the homeless population. No statistics of homeless needs are provided, especially in the
Franklin Park area after the closing of the shelter.

43. District of Columbia has one of the highest rates of homelessness in the country. *Pl. Ex.*
*1, esp. at page* 2. On a single night in January 2008, approximately 2,200 single adults
were chronically homeless. *Major Recommendations: Summary Report of the Urban*
*Institute's Assessment of the District of Columbia's Public Homeless Assistance System,*
June 2, 2008 at 2 [*hereinafter* "Summary Report 2008"].
http://www.urban.org/UploadedPDF/411696_assessment_dc_homeless.pdf A 2006
report identified that nearly 80% of the homeless population in the District of Columbia
consists of African Americans. *Pl. Ex. 1, page 1; Pl. Ex. 3, esp. at pages 2-3; Pl. Ex. 4,*



*p. 79.* Upon information and belief, this pattern persists to the present day, and that the population of Franklin Shelter was of similar proportions.

44.     Approximately 13,000 single adults and 530 families (2,800 adults and children) use emergency District-sponsored shelter facilities (known as "Continuum of Care" facilities) every year. And this was before the economic collapse that we are now witnessing. As a result of these financial, physical and psychological conditions, a great number of the District's homeless subpopulations are unable to utilize shelter space in locations that require transportation or are overcrowded or are otherwise perceived to be threatening, even when such space is available. Sec. 3(a)(1)(A)(i) requirements of the Emergency Act have not been satisfied, requiring the documentation of each client's supportive housing address. This has not been provided. Sec 3(a)(1)(A)(iv) requirements of the Emergency Act have not been satisfied, requiring documentation of supportive services provided to complement housing.

45.     The report merely mentions the organizations contracted, not an explanation of which services are provided by need to which person. The report merely mentions the promise of future transportation, no details of how the housed will reach their particular services, especially when they are dispersed to the poorest and most violent areas of the city, with the least amount of services available. Sec 3(a)(1)(B)(4) requirements of the Emergency Act have not been satisfied, requiring a proper analysis of the impact of closing of the shelter on the homeless population. No statistics of homeless needs are provided, especially in the Franklin Park area after the closing of the shelter.

*46.*     The Urban Institute reported that at least 13,000 single adults and 2,800 adults and children use emergency shelter in the District every year. The Urban Institute reported that that the shelters are in excess of capacity on a regular basis: 164% over capacity at New

9

York Ave., 125% over capacity at Franklin Shelter, 111% over capacity at 801 East, report illustrated the regular overcapacity of shelters prior to closing Franklin Shelter. *Pl. Ex. 5, pages 3-6.*

47.    Needs are not accurately reflected in the Mayor's Report. The numbers provided only reflect amount of beds made available by the city, independent of any accurate assessment of current needs. Furthermore, these numbers of available beds are based on a single data point (September 26, 2008, with time of day unspecified), and pertain to beds distributed throughout distant parts of the city, away from the downtown area, and are in distant parts of the city where the most vulnerable of the former Franklin Shelter inhabitants are unable or unlikely to be able to locate and obtain these services.

48.    The Inter-Agency Council on Homelessness (ICH) held its bi-monthly meeting on February 25, 2009, where Fred Swan reported that over 3,100 homeless singles and over 360 homeless families had completed assessment forms in efforts to obtain Permanent Supportive Housing, but only 414 singles and 1 family have been housed. (ICH Feb. 25, 2009 minutes in preparation). Of these, only a small subset (less than one fourth) of the 414 singles housed thus far, were housed from Franklin Shelter.

49.    Plaintiffs' evidence submitted herewith provides lists of services that were routinely provided to those in need in the Franklin Shelter facility, including but not limited to mental health counseling, job counseling and links to employment opportunities, guidance about how to access public transit, especially for disabled, psychiatric contacts for diagnoses, benefit referrals, substance abuse treatment and counseling referrals, detoxification access, psycho-social assessments, assistance with housing applications, and medical service referrals. *Pl.'s Ex. 22a and 22b; Pl. Ex. S-2.*

10



50.     The District of Columbia has the third highest poverty rate in the nation. Pl. Ex. 1,

page 2. Nearly one out of five of DC residents live at or below the poverty line. Pl. Ex. 1.

The rate of homelessness continues to rise in the District, attributed to an ever increasing lack

of affordable housing in the District, including high rents and mortgages, a rise in physical

and psychological abuses suffered by the homeless, stagnant wages and slashed public

assistance, the lack of adequate health care services, lack of health insurance, lack of

adequate mental health facilities and the lack of adequate day care facilities. Pl. Ex. 9.  In

DC, an estimated 71% of the homeless individuals suffer from either substance abuse or

mental illnesses. *Pl. Ex. 2, page 2; Pl. Ex. 4, page 78; See  Pl. Ex. 6 and 7 in their entirety;*

*Pl. Ex. 8, p. 2.*

51.     Former inhabitants of Franklin Shelter now report lack of available beds in

remaining shelters, poor transportation, long lines for shelters, and a lack of much needed

services. *Pl. Ex. 11, 12, 13, 19, 20, 23-26.*  The displacement of the homeless, and those in

need of services, to the poorest parts of the District makes it very difficult for former

Franklin inhabitants, especially those with mental or physical disabilities, to be able to get

services, gainful employment or even to be able to obtain two out of three basic meals a day.

*Id.; See also Pl. Ex. 21, Pl. Ex. S-1(a)-1(t).*

52.     The Table on pages 8-13 of the Mayor's Report shows that there are no

placements in the areas of town with the most resources available (Ward 2 and Ward 3). The

Table on pages 8-13 of the *Mayor's Report* shows that there are no placements in the areas of

town with the most resources available (Ward 2 and Ward 3). Most placements are occurring

in the poorest and most violent parts of town, and with the least services available for the

vulnerable and the homeless. Pl. Ex. 14-17. Overcrowding conditions in 801 East Shelter,

11

fire sprinkler systems blocked by extra beds, increased incidences of violence due to

overcrowding, unreliable transportation and the difficulty of maintaining or seeking

employment in the downtown area or other areas of opportunities, which are far removed

from Wards 7 and 8, long lines to enter the shelters, meals with little or no nutritional value,

unsanitary conditions (801 East often has feces and urine in the bathroom on the floors, etc

overnight. A meal is offered once daily, at 7 pm, and soup kitchens and food for the

homeless during the day are located at 5-6 miles from the shelter. *Pl. Ex. 12, 19, 21, 23-26,*

*S-1(a)-1(t).*

53.     Franklin Shelter has provided a stable resource to those seeking shelter in the

downtown area. *Pl. Ex. 22(a) and (b), Pl. Ex. S-2.* It has served the homeless community as

a continuum of care, as set forth in DC Code § 4-754.11, *et seq.* The shelter is located near

service providers for mental health and physical health care. It has provided shelter within

walking distance, and/or reasonable distance from places of employment for Shelter

inhabitants (e.g. within walking distance to day labor centers, Street Sense), enabling them to

seek and maintain employment. Many inhabitants have come to rely on the mental and

medical services required for their wellbeing, and within reasonable distance to Franklin

Shelter. *Pl. Ex. 23-26.*

54.     Many Franklin Shelter residents have been moved involuntarily out of Franklin

Shelter, and placed in parts of the city that lack adequate facilities to provide for their

physical and mental health needs, which place them and others in physical danger, and

impose large impediments in their ability to seek and maintain employment. Former

residents of Franklin Shelter include those with compromised physical and mental capacities,

and are now living on the streets of the Franklin Shelter area, without access to life saving



medicines, without access to case worker contact and supervision. Former residents of

Franklin Shelter include those now living on the streets of the Franklin Shelter area in order

to gain adequate access to their jobs so that they may continue being employed, or who now

sleep at or near their workplace in order to get to work on time and maintain their

employment. *Pl. Ex. 23-26, S-1(a)-1(t).*

55.    In a June 2, 2008 study commissioned by the District Government, the reviewers

found that almost every District-owned emergency shelter has serious deficiencies, including

but not limited to gaping holes, cracked ceilings, leaky pipes, unusable toilets and soiled

beds. *The Community Partnership and the District of Columbia's Public Homeless*

*Assistance System*, June 2, 2008 at 9.

http://www.urban.org/UploadedPDF/411694_community_partnership.pdf

56.    Currently designated warming centers are as many as five miles away from the

downtown area, and lack reasonable access to job opportunities, balanced meals, and much

needed physical and mental health services.

57.    Even when vans are provided to shuttle homeless persons to far flung warming

centers, this is not a realistic option for many members of the downtown homeless

population, who are afflicted by physical, mental, and emotional disabilities whose transport

is potentially highly problematic. *See, e.g., Pl. Ex. 12, 19, S-1(a)-(t).*

58.    Plaintiffs seek temporary and permanent injunctive relief compelling the District

Government to stop the closure of the Franklin Shelter and return the *status quo*, providing

adequate facilities in good condition to serve persons who are homeless during the

hypothermia season, with reasonable access to much needed mental health, health care

13



services, adequate staffing of case workers and counselors for addictions and other

disabilities, as well as employment counseling.

## COUNT I
### (Violation of Fair Housing Act Disparate Treatment - Race)

59.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if

fully set forth herein.

60.    Plaintiffs are a protected class under the FHA, African American men, while

others suffered harm as a result of the discriminatory actions of defendants.

61.    Defendants were/are housing providers as defined under the FHA.

62.    Defendants intentionally denied plaintiffs housing because of plaintiffs' race.

63.    Defendants are without justification for the complained of acts.

64.    Plaintiffs therefore seek compensatory and punitive damages in the amount of

$10,000.000.00, declaratory judgment, and such other relief deemed appropriate.

## COUNT II
### (Violation of Fair Housing Act Disparate Treatment--Disability)

65.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if

fully set forth herein.

66.    Plaintiffs are a protected class under the FHA, mentally disabled, physically

disabled and suffering from substance abuse. Others have suffered harm as a result of the

discriminatory actions of defendants.

67.    Defendants were/are housing providers as defined under the FHA.

68.    Defendants intentionally denied plaintiffs housing because of plaintiffs' disability.

69.    Defendants are without justification for the complained of acts.

70.    Plaintiffs therefore seek compensatory and punitive damages in the amount of

$10,000.000.00, declaratory judgment, and such other relief deemed appropriate.

14



### COUNT III
#### (Violation of Fair Housing Act Disparate Impact--Race)

71.     Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

72.     Plaintiffs are a protected class under the FHA, African American men, while others suffered harm as a result of the discriminatory actions of defendants.

73.     Defendants were/are housing providers as defined under the FHA.

74.     Defendants actions had a disproportionate impact on African Americans

75.     Defendants are without justification and less discriminatory means were available to achieve any purported interest.

76.     Plaintiffs therefore seek compensatory and punitive damages in the amount of $10,000.000.00, declaratory judgment, and such other relief deemed appropriate and consistent with Count I of this complaint.

### COUNT IV
#### (Violation of Fair Housing Act Disparate Impact - Disability)

77.     Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

78.     Plaintiffs are a protected class under the FHA, mentally disabled, physically disabled and suffering from substance abuse. Others have suffered harm as a result of the discriminatory actions of defendants.

79.     Defendants were/are housing providers as defined under the FHA.

80.     Defendants actions had a disproportionate impact on African Americans

81.     Defendants are without justification for these actions, and less discriminatory means were available to achieve any purported interest.

15



82.    Plaintiffs therefore seek compensatory and punitive damages in the amount of

$10,000.000.00, declaratory judgment, and such other relief deemed appropriate and

consistent with Count II of this complaint.

## COUNT V
### (Violation of Americans With Disabilities Act Disparate Treatment)

83.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if

fully set forth herein.

84.    Plaintiffs are a protected class under the ADA, mentally disabled, physically

disabled and suffering from substance abuse. Others have suffered harm as a result of the

discriminatory actions of defendants.

85.    Defendants are a governmental entity as defined under the ADA, and subject to it

s requirements.

86.    Defendants owned the property located at 925 13th Street, N.W. Washington, D.C.

known as Franklin Shelter. Services for disabled homeless were provided at Franklin Shelter.

87.    By closing Franklin Shelter, defendants intentionally and directly and proximately

denied plaintiffs needed services because of their disability, and further denied a reasonable

accommodation as required by law.

88.    Defendants are without justification for the complained of acts.

89.    Plaintiffs therefore seek compensatory and punitive damages in the amount of

$10,000.000.00, declaratory judgment, and such other relief deemed appropriate.

## COUNT VI
### (Violation of Americans With Disabilities Act Disparate Treatment)

90.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if

fully set forth herein.

16



91.    Plaintiffs are a protected class under the ADA, mentally disabled, physically disabled and suffering from substance abuse. Others have suffered harm as a result of the discriminatory actions of defendants.

92.    Defendants are a governmental entity as defined under the ADA, and subject to it s requirements.

93.    Defendants owned the property located at 925 13th Street, N.W. Washington, D.C. known as Franklin Shelter. Services for disabled homeless were provided at Franklin Shelter.

94.    By closing Franklin Shelter, defendants intentionally and directly and proximately denied plaintiffs needed services because of their disability, and further denied a reasonable accommodation as required by law.

95.    Defendants' actions had a disproportionate impact on the disabled.

96.    Defendants are without justification these actions, and less discriminatory means were available to achieve any purported interest.

97.    Plaintiffs therefore seek compensatory and punitive damages in the amount of $10,000.000.00, declaratory judgment, and such other relief deemed appropriate consistent with Count V of the complaint.

### COUNT VII
**(Violation of D.C. Human Rights Act,  Place of Residence Discrimination, Disparate Treatment)**

98.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

99.    Plaintiffs are/were residence of Northwest Washington, D.C. for the relevant time period.

100.    Defendants did intentionally discriminate against plaintiffs by closing Franklin Shelter.

101.    Other similarly situated shelters in remote areas of Wards 7 and 8 were treated differently by defendants.

17



102.    Defendants did so without justification.

103.    Plaintiffs therefore seek compensatory and punitive damages in the amount of

$10,000.000.00, declaratory judgment, and such other relief deemed appropriate.

### COUNT VIII
### (Violation of D.C. Human Rights Act, Place of Residence Discrimination, Disparate Impact)

104.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if

fully set forth herein.

105.    Plaintiffs are/were residents of Northwest Washington D.C. for the relevant time

period.

106.    Defendants' actions had a disproportionate impact on the residents of Northwest

Washington, D.C.

107.    Defendants are without justification these actions, and less discriminatory means

were available to achieve any purported interest.

108.    Plaintiffs therefore seek compensatory and punitive damages in the amount of

$10,000.000.00, declaratory judgment, and such other relief deemed appropriate

consistent with Count V of the complaint.

### COUNT IX
### (Violation of D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq.*, Disparate Treatment)

109.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if

fully set forth herein.

110.    Defendants did intentionally discriminate against plaintiffs by closing Franklin

Shelter and abruptly removing vital and other services.

18



111.    Plaintiffs are individuals with disabilities as defined in D.C. Code § 2-
1401.02(5A) and are entitled to all of the protections, rights and remedies of Title § 2-
1401.01 *et seq.* of the Code of the District of Columbia (the *Human Rights Act*).

112.    At all times relevant thereto, defendants violated the Plaintiffs' rights under the
Human Rights Act by refusing to accommodate their needs and requests for adequate
shelter from the rain, snow, ice and cold, as well as for accessible mental health and
health care services, adequate nutrition, and employment opportunity availability.

113.    Defendants' actions constitute violations of D.C. Code § 2-1401.01 *et seq.*

114.    As a direct result of the discriminatory acts of Defendants, Plaintiffs have suffered
the damages described herein.

115.    Defendants did so without justification.

116.    Plaintiffs therefore seek compensatory and punitive damages in the amount of
$10,000.000.00, declaratory judgment, and such other relief deemed appropriate.

**COUNT X**
**(Violation of D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq.*, Disparate Impact)**

117.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if
fully set forth herein.

118.    Defendants' actions had a disproportionate impact on the former inhabitants of
Franklin Shelter, by displacing them from much needed vital services, adequate nutrition,
and employment opportunities.

119.    Plaintiffs are individuals with disabilities as defined in D.C. Code § 2-
1401.02(5A) and are entitled to all of the protections, rights and remedies of Title § 2-
1401.01 *et seq.* of the Code of the District of Columbia (the *Human Rights Act*).



120.     At all times relevant thereto, defendants violated the Plaintiffs' rights under the

Human Rights Act by refusing to accommodate their needs and requests for adequate

shelter from the rain, snow, ice and cold, as well as for accessible mental health and

health care services, adequate nutrition, and employment opportunity availability.

121.     Defendants' actions constitute violations of D.C. Code § 2-1401.01 *et seq.*

122.     As a direct result of the discriminatory acts of Defendants, Plaintiffs have suffered

the damages described herein.

123.     Defendants did so without justification.

124.     Plaintiffs therefore seek compensatory and punitive damages in the amount of

$10,000.000.00, declaratory judgment, and such other relief deemed appropriate.

### COUNT XI
### (Procedural Due Process)

125.     Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if

fully set forth herein.

126.     On the facts alleged above, defendant Mayor Fenty is liable for violation under

color of law of plaintiffs' constitutional right to Due Process for the abrupt removal and

ongoing discontinuation of vital services for the most vulnerable residents of the District,

and for failing to provide proper notice and a fair hearing before denial of their property

and liberty interests in remaining in the shelter and having access to services.

127.     On the facts alleged above, defendant Mayor Fenty is liable for violation under

color of law of plaintiffs' constitutional right to Due Process for failing to provide proper

notice and a fair hearing before depriving them of their belongings and personal property

128.     On the facts alleged above, defendant Mayor Fenty is liable for violation under

color of law of plaintiffs' constitutional right to Due Process because the Mayor lacked

20



authority to close Franklin Shelter where the Franklin Shelter Closing Requirements

Emergency Act of 2008 had not been enacted into law at the time the Mayor closed the

shelter, nor does its closing comply with existing laws.

**COUNT XII**
**(Substantive Due Process)**

129.     Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if

fully set forth herein.

130.     ·    The District of Columbia owned and operated the property know as Franklin

Shelter as part of its statutory obligations to provide housing and services for plaintiffs.

Accordingly and consistent with the statutory obligations, the District created an interest

cognizable under the Due Process clause.

131.     On the facts alleged above, defendant Mayor Fenty is liable for violation under

color of law of plaintiffs' constitutional right to Due Process for the abrupt removal and

ongoing discontinuation of vital services for the most vulnerable residents of the District,

and for failing to provide proper notice and a fair hearing before denial of their property

and liberty interests in remaining in the shelter and having access to services.

132.     On the facts alleged above, defendant Mayor Fenty is liable for violation under

color of law of plaintiffs' constitutional right to Due Process because the Mayor lacked

authority to close Franklin Shelter where the Franklin Shelter Closing Requirements

Emergency Act of 2008 had not been enacted into law at the time the Mayor closed the

shelter, nor does its closing comply with existing laws. In so doing, the Mayor's conduct

was so opprobrious such that it "shocks the conscience" and violated plaintiff's right to

substantive due process of law.

21



Plaintiff's hereby demand a trial by jury for all claims so triable. Plaintiffs further demand all

such relief available, but specifically demanded.

March 25, 2009

Mayor Adrian Fenty
1350 Pennsylvania Ave., NW
Washington, DC  20004

Office of the Attorney General
Government of the District of Columbia
441 4th Street, NW
Washington, DC  20001

Neil O. Albert
Deputy Mayor for Planning and Economic Development
Office of Deputy Mayor for Planning and Economic Development
John A. Wilson Bldg.
1350 Pennsylvania, Ave., NW
Washington, DC  20004

Clarence H. Carter
Department of Human Services
64 New York Ave., NE, 6th floor
Washington, DC  20002

Fred Swan, Administrator,
Family Services Administration
2146 24th Pl., NE
Washington, DC 20018

Respectfully Submitted,

GEORGE E. RICKMAN, ESQ.
Bar # 433298
P.O. Box 21267
Kalorama Station
Washington, D.C.  20009-21267
202-723-3955
georgerick11@comcast.net
*Counsel for Plaintiffs*

A-32

JANE ZARA, ESQ.
DC Bar # 982392
1611 Monroe St., NW
Washington, DC 20010
202-483-9303
jjzara@aol.com
*Counsel for Plaintiffs*

1

1                **IN THE UNITED STATES DISTRICT COURT**

2                    **FOR THE DISTRICT OF COLUMBIA**

3    ERIC SHEPTOCK, et al.,              .
                         Plaintiffs,    .
4    vs.                                 .   Docket No. CV 09-672
                                         .
5    NEIL O. ALBERT, et al.,            .   Washington, D.C.
                                         .   Tuesday, February 22, 2011
6                         Defendants.    .
     . . . . . . . . . . . . . . . .x
7

8                    TRANSCRIPT OF MOTIONS HEARING

9         BEFORE THE HONORABLE JUDGE REGGIE B. WALTON

10                   UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiffs:  George Rickman, Esquire
                          P.O. Box 21267
13                        Washington, D.C. 20009

14                        Jane Zara, Esquire
                          1611 Monroe Street, NW
15                        Washington, D.C. 20010

16

17   For the Defendant:  Sarah Sulkowski, AAG
                         OFFICE OF THE ATTORNEY GENERAL
18                        of the District of Columbia
                          441 Fourth Street, NW, 6th Floor
19                        Washington, D.C. 20001

20
     Court Reporter:  Cathryn J. Jones, RPR
21                     Official Court Reporter
                       Room 6521, U.S. District Court
22                     333 Constitution Avenue, N.W.
                       Washington, D.C. 20001
23

24   Proceedings recorded by machine shorthand, transcript
     produced by computer-aided transcription.
25



2

1          P R O C E E D I N G S

2          THE DEPUTY CLERK:  Civil Action No. 09-672, Eric

3    Sheptock, et al., versus Neil Albright, et al.  Counsel, can

4    you please come forward, approach the lectern and identify

5    yourselves for the record.

6          MR. RICKMAN:  Good afternoon, Your Honor.  George

7    Rickman on behalf of Eric Sheptock, et al.

8          MS. ZARA:  Good afternoon, Your Honor.  Jane Zara

9    for Eric Sheptock, et al.

10          MS. SULKOWSKI:  Good afternoon, Your Honor.  Sarah

11    Sulkowski for the District of Columbia.

12          THE COURT:  Good afternoon.  I had requested that

13    counsel submit filings with me on the issue as to why this

14    case should not be dismissed on either res judicata or

15    collateral estoppel grounds.  I have reviewed the

16    submissions that were made by counsel and also reviewed the

17    D.C. Court of Appeals decision in *Baltimore versus District*

18    *of Columbia*.  And I'll hear from plaintiff's counsel as to

19    why it would be appropriate for me to review this matter at

20    this point.

21          Because it does seem to me reading the D.C. Court

22    of Appeals's opinion it's clear that this matter is barred

23    from proceeding in this court in light of the fact that an

24    action was filed in Superior Court that deals with the same

25    issues involved in this case.  And it seems to me the theory

A 35

1   of liability that's sought here albeit based upon different
2   legal grounds is nonetheless the same relief that
3   essentially was being sought over there. And as the D.C.
4   Court of Appeals noted in Footnote 23 of the opinion the
5   federal claims that are being pursued here are claims that
6   could have been pursued in Superior Court and they were not.

7          MR. RICKMAN: Well, your Honor, I think --

8          THE COURT: Otherwise, it seems to me a litigant
9   can cherrypick in bringing certain claims based upon the
10  same factual allegations in state court and then seek to
11  bring a matter in federal court based upon the same factual
12  scenario, but based upon allegations of alleged violations
13  of federal law and basically get two bites of the apple.

14         You don't prevail in state court so you only file
15  certain claims over there; although, you have the ability as
16  the Court of Appeals said to file those same federal claims
17  in federal court but you don't do so, so if you lose there
18  you get a second bite of the apple here. As I understand
19  that's something that the law does not permit. Obviously,
20  because if you do that you're wasting valuable judicial time
21  litigating the same issue that could have been litigated in
22  the first instance in state court.

23         And the same thing is true. I mean those claims
24  could have been initiated here. The state claims could have
25  been filed here along with the federal claim as appendage

1    claims.  And if a determination was made that the claims
2    were appropriately filed in this court under federal law
3    then the court obviously could have litigated the local
4    claims along with the federal claims and vice verse as it
5    relates to what was brought over initially in Superior
6    Court.

7         MR. RICKMAN:  Your Honor, I think during the
8    course of the litigation the numerous motions filed
9    detailing plaintiff's theories regarding that particular
10   issue.  I think there are a number of issues, first of all,
11   the *Indian Reservation*.  The plaintiffs in fact did reserve.
12   I don't think there's any hard and fast rule that requires
13   plaintiffs to file first in federal court before an
14   extension is entered by the federal court to how the
15   conclusion of the state claims in the state court.

16        THE COURT:  I agree, you don't have to necessarily
17   pick federal court first, but it seems to me if you pick
18   state court and if you can pursue your federal claims in
19   state court then you have an obligation to pursue all of
20   those claims in that one proceeding rather than splitting
21   the claims and taking up valuable judicial resources over
22   there.  And then when you don't prevail you seek to
23   essentially gain the same remedy from this court that you
24   could have sought over there.

25        MR. RICKMAN:  I think that there are two things

5

1   that work here. First of all, the state claims over in

2   Superior Court were germane to state issues. They were

3   obviously violations of the Homeless Services Reform Act,

4   violations of the Franklin Closure Act. And those were

5   pretty much had to be decided by the D.C. Court of Appeals.

6   I mean that's the court with the particular expertise.

7   That's the court that could define whether or not there was

8   any requirement for the District to comply with the --

9           THE COURT: You're not suggesting those claims

10  could not have been brought here along with the federal

11  claims?

12          MR. RICKMAN: Well, perhaps --

13          THE COURT: And if there's no law on the issue

14  obviously I could certify the case to the Court of Appeals

15  for them to give an opinion as to how those issues should be

16  resolved.

17          MR. RICKMAN: Or the Court could do as it did in

18  this case could abstain from resolving federal issues

19  pending resolution by the state court, stay issues that were

20  particularly germane to state issues and how they would

21  impact in the federal claims.

22          THE COURT: What about what the Court of Appeals

23  said in Footnote 23? You would have brought the federal

24  claims in Superior Court also.

25          MR. RICKMAN: Well I don't -- as detailed in our

438

1  motion before the D.C. Court of Appeals, and we feel very
2  strongly about this, that the D.C. Court of Appeals would
3  not have been the best or amenable forum to litigate these
4  claims.

5          THE COURT:   Why?

6          MR. RICKMAN:   These are particularly federal
7  claims.

8          THE COURT:   As the Court of Appeals said and as
9  the Supreme Court articulated state courts are presumedly
10  competent to handle federal claims just like this court.

11          MR. RICKMAN:   Well they may be presumptive and
12  competent to handle --

13          THE COURT:   And I don't think I've acquired any
14  enhanced intellectual capacity as a result of being
15  appointed to this court as compared to what my capacity was
16  over there.

17          MR. RICKMAN:   Well the capacity of this court is
18  broader with respect to discovery issues and the evidentiary
19  rules are applied different here as they pertain to the
20  federal claims.

21          And I return to the issue of discovery.   This
22  court has a well developed body of law for discovery.   To my
23  knowledge the Superior Court has none.   This court has
24  detailed, not only detailed rules concerning the discovery
25  or the broad base discovery but electronic discovery but

A39

1    there's numerous opinions for guiding litigants in pursuing
2    such broad base discovery.

3         THE COURT:   I'm absolutely certain that my
4    brethren and sister over in the Superior Court are equally
5    qualified to assess discovery issues based upon E-discovery.
6    I'm sure with modern technology and the type of litigation
7    they have over there that although they may not have rules
8    that specifically deal with E-discovery, I don't know if
9    that's the case or not, but I take your representation that
10   is the case that I'm sure they deal with E-discovery all the
11   time.

12        MR. RICKMAN:   Well I know from my experience and
13   from my knowledge of the law that as a litigant I would like
14   to notwithstanding the court's expertise and knowledge but
15   as a litigant fashion in proceeding with the litigation it
16   certainly benefits me to be able to have an idea what the
17   ground rules are and what the rules are for discovery.

18        THE COURT:   I don't know of any case authority
19   that you cite that would support the proposition that
20   assuming for the sake of argument you're correct in
21   reference to the discovery issue that somehow that avoids
22   the implications of collateral estoppel or res judicata.

23        MR. RICKMAN:   _Indian Reservations_, I think _England_
24   _versus Louisiana State Board of Medical Examiners_ is clearly
25   on point on that particular issue.   When a federal court

1    abstains to allow a state court to make determinations of

2    state law we reserve our right to determine the federal

3    court to -- federal claims.  I think it's very clear.

4          THE COURT:  Were those federal claims that could

5    have been brought in state court?

6          MR. RICKMAN:  I don't think -- there was some --

7    in *England* they even considered that under the Winsur rule

8    where someone had filed in state court, had state court

9    claims just decided to decide federal claims.  Under *England*

10   the federal court would not be precluded even in light of

11   the state court decision on the federal claim to revisit the

12   federal claims.

13         I think that what's clear is that under the

14   Pullman extension when there is assertion of an extension as

15   this court has done in this case because we could have you

16   know engaged in a race to judgment to see who could have

17   gotten there first.  Instead, the court elected to abstain

18   its ruling pending outcome of the state court.

19         THE COURT:  Because I didn't think it would be

20   appropriate for that court to be litigating the same factual

21   issues that are involved in this case at the same time.

22         MR. RICKMAN:  Well, and I think we pointed out

23   that even under -- these are not identical factual scenarios

24   that are being litigated.

25         THE COURT:  How are they different?

9

1           MR. RICKMAN:  First of all, under the FHA there's
2    the discrimination claim.

3           THE COURT:  I mean they are competent to deal with
4    discrimination claims over there.

5           MR. RICKMAN:  But the point is is that these
6    independent claims under *England* we are, we reserve the
7    right to return to federal court once the state court makes
8    the determination to litigate independent federal claims
9    under -- hotel, under *England*.  Once we have shown that they
10   are independent and the Court has vested jurisdiction that
11   the Court can assert jurisdiction under -- then we are
12   entitled to go forward with our federal claims in federal
13   court.

14          I think in the report the plaintiff's filed with
15   the Court we detailed factually as well as under legal
16   theories how distinct these claims truly are.  The only
17   thing the Court of Appeals decided is that it was not a
18   violation of the HSRA because the mayor closed the building
19   before signing the bill and it -- within six months there
20   would no longer have been in effect and therefore he was
21   under no obligation to file any reports whatsoever with the
22   city council.

23          Equally so they found out there's no right to
24   housing or no right for any services provided under the HSRA
25   by its reading of the HSRA.  That has nothing to do with the

A 42

1   Fair Housing Act.  That has nothing to with the Americans

2   with Disabilities Act.  And that has nothing to do with the

3   claims that were filed subsequent in the amended claim which

4   addresses issues that subsequent to the closing and were

5   not, no one was even remotely aware of at the time that the

6   Superior Court case was being litigated.  So you have

7   actually two sets of claims here going forward.

8          In that light there's also the issue of *Gillis*

9   *versus Ware* where the District of Columbia applies a waiver

10  of res judicata and collateral and estoppel.  The first time

11  the District ever mentions collateral estoppel is in the

12  most recent -- the only other objections they raise is forum

13  shopping.  That's not adequate notice of *Gillis versus Ware*

14  to adequately preserve the defenses of collateral estoppel.

15  Thirdly, as I said there's the *Statton* issue as to whether

16  or not there is subsequent claims regarding the ADA and the

17  subsequent operation of the homeless system regarding the

18  Franklin claims.  So there are actually three theories as to

19  why this case should be allowed to go forward.

20         Primarily, we're relying on *England versus*

21  *Louisiana* and -- *Hotel*.  The District may argue that well,

22  we didn't file first in the federal court so we're somehow

23  precluded but that's not dispositive.  What is dispositive

24  is whether or not the federal court entered an extension

25  under the *Pullman* or *Colorado River*.  And we reserve and put

*A43*

1   them on notice that we would be reserving our right to

2   proceed with the federal claims.  And that we've met every

3   element of what's required under the Reservation doctrine to

4   go forward with the federal claims.

5            THE COURT:  I just don't think you can cherrypick

6   like that.  I mean I think having decided you were going to

7   initiate your claims in Superior Court, and in light of the

8   fact that you were in no way precluded from pursuing these

9   federal claims in Superior Court, I just don't think you can

10  decide well, I'm going to pursue certain claims in Superior

11  Court and then pursue other claims in Federal court.  And

12  you get in effect two bites at the apple regarding the same

13  factual scenario.

14           And you say they're different.  They clearly arise

15  out of the same factual allegations that the city

16  inappropriately whether it be under state law or federal law

17  closed this facility.  And as a result of that I assume

18  you're seeking I don't know what at this point what remedy

19  you're asking for.  I guess you'd be asking either to

20  require the city to reopen that facility or to open another

21  facility in that part of the city.

22           And that would be the relief that you have sought

23  I would assume in Superior Court.  And that's the same

24  relief I assume you're seeking here.

25           MR. RICKMAN:  In part that's the same relief.

A44

12

1          THE COURT:    What's the difference in the remedy

2     that you're seeking?    Your allegation of discrimination

3     obviously could conceivably result in a damage award if you

4     prevailed under your ADA claim.    But again, that could have

5     been pursued in Superior Court also.    You could have

6     received damages by way of a ADA claim that was brought over

7     there.

8          So if you're seeking damages that could have been

9     acquired over there.    If you're seeking some type of

10    affirmative injunctive relief requiring the city to either

11    reopen the old facility or open a new facility in the same

12    neighborhood again, it seems to me both remedies were

13    available there as they would have been available here if

14    you had initiated your claim here first before you filed

15    over there.

16          MR. RICKMAN:    Your Honor, I think what's clear on

17    the record is that what was filed in Superior Court were

18    claims entirely germane at the time --

19          THE COURT:    I understand, but you're still not

20    dealing with the issue of why you weren't able to file those

21    other there.    The Court of Appeals said you could have.    And

22    I don't see why that couldn't have been done over there.    I

23    mean the only argument you've raised in reference to why you

24    could reserve not filing over there and still have a right

25    to file federal claims here is the discovery theory.    I

A 45

13

1   don't buy that.

2          I think judges over there are just as competent to
3   deal with any type of discovery issues that we have to deal
4   with here.  And if you're talking about whether the judges
5   over there are competent enough to handle federal claims I
6   think as the Supreme Court has said they are presumedly
7   qualified.  And having served over there I know they're
8   qualified to deal with federal claims.  And I don't think I
9   am anymore competent to address those issues because I sit
10  as a federal judge as they are to assess those issues as
11  DC judges.

12         MR. RICKMAN:  Your Honor, again, let me restate
13  what happened.  State claims were filed in Superior Court.
14  As the case progressed the patterns of discrimination began
15  to emerge and we elected to file those claims in federal
16  court asking the Superior Court to stay any action pending
17  resolution of the federal claims.  For whatever reason the
18  Superior Court denied the motion.

19         THE COURT:  I guess you could have either asked to
20  amend over there if you wanted, didn't want to do that you
21  could have dismissed over there and then filed over here.

22         MR. RICKMAN:  Well for procedural reasons
23  dismissing was not available.  And regardless, regardless we
24  filed over here.  The Court entered an extension to await
25  resolution of the state claims because the Court's own words

A46

1    that the Court did not want to do anything contrary to what

2    the Superior Court decided regarding state law claims.

3    Fine, well and good.

4         The state, the DCCA has ruled on the state law

5    claims; there's no entitlement to housing under the HSRA.

6    And even took it a step further and said well, because we've

7    decided that there's nothing mandatory within the statute

8    requiring the District to do X Y and Z with regards to

9    homeless services, we're going to say that there's no

10   procedural issue.

11        THE COURT:   When you filed over here why are you

12   saying you could not have filed those same claims over in

13   Superior Court through an amended complaint?

14        MR. RICKMAN:   Well we could have filed an amended

15   complaint, but in order to reserve under the -- *Hotel* we

16   could not do anything to advance those interests over there

17   if we wanted to return to this court and file our claims

18   over here.

19        THE COURT:   I'm not saying -- you know -- what I'm

20   saying is that at the time you filed over here what

21   precluded you legally from amending your complaint and

22   filing those federal claims along with the state claims over

23   in Superior Court?

24        MR. RICKMAN:   The Court denied our motion to amend

25   even though -- well, denied our motion to stay.   We had

1   filed our motion to stay.

2           THE COURT:  That's right.

3           MR. RICKMAN:  We had filed a motion to stay.

4           THE COURT:  I'm sure the court over there under

5   Rule 15 just as the law is over there -- is here they have

6   to liberally grant a request to amend.  Was there an effort

7   made to amend over there that was denied?

8           MS. ZARA:  Yes, yes.

9           THE COURT:  No, no.  Was there a request made over

10  there before you filed over here to amend not to stay?

11  Before you filed over here?

12          MR. RICKMAN:  No, no.  We filed over here and the

13  Court asserted jurisdiction as it should have and staying

14  await ruling of the state, the Superior Court to rule on

15  what were then obviously germane to state law issues and

16  awaited to see what effect they would have on the federal

17  issues.  Under the fully extension --

18          THE COURT:  I'll let you respond.  Let me hear

19  from the government.  I have a meeting I have to attend at

20  three.

21          MS. SULKOWSKI:  Thank you, Your Honor.  As a

22  preliminary matter I'm looking back in the District's motion

23  to dismiss.  I don't know whether we addressed this

24  expressly in the motion to dismiss, but my recollection is

25  in the D.C. court proceedings there was a motion to amend

A48

1   the complaint filed and then withdraw voluntarily by the

2   plaintiffs.  I can check that in the briefing to the Court.

3            THE COURT:  I do remember something to that

4   effect.  And is your recollection that in that motion to

5   amend that the federal claims are being asserted over there?

6            MS. SULKOWSKI:  Maybe not all of them, but

7   certainly some of them and it was voluntarily withdrawn when

8   they elected to try to proceed over here instead without

9   dismissing the state court case.

10           Another preliminary matter the plaintiffs asserted

11  that the District never raised res judicata and collateral

12  estoppel.  But, in fact, in the motion to dismiss it's the

13  very first argument we raised res judicata and collateral

14  estoppel, so it's been the center of our argument from the

15  very inception of this litigation.

16           With regard to *England Reservation* despite the

17  plaintiff's arguments the *England*, the way the *England*

18  decision reads the entire purpose of this ruling was to

19  ensure that plaintiffs who had federal claims and chose to

20  pursue those federal claims in a federal forum wouldn't be

21  forced to go to state court with them.  So I read that to

22  say they do have to file their federal claims in federal

23  court first.  And then when a federal court says well we

24  think these federal claims resolve on a question of state

25  law we'll wait for the state courts to decide that and see

449

1   if there's anything federal left.

2          That's very different from the plaintiff's
3   choosing their forum in the first instant, going to state
4   court when they had a choice to go to federal court.  And
5   not only going to state court but asserting a federal claim
6   in state court.  They asserted a constitutional due process
7   claim in the D.C. court, Count I, of their client there and
8   litigated it to conclusion and through appeal.  They never
9   attempted to withdraw it in that court's jurisdiction and
10  bring it here.  So the contention that they didn't think
11  federal claims were appropriate for adjudication over there
12  is false on the record.

13         Moreover, this is the first time I understand
14  plaintiffs to have raised England Reservation.  I didn't see
15  it in their response to the District's motion to dismiss.
16  And therefore I argue that it's waived.  Furthermore, the
17  due process argument that the plaintiffs raised here rests
18  on two allegations that have already been resolved by the
19  state court.  One, that their personal belongings were taken
20  without due process; and two, that the closure violated the
21  Franklin Shelter Closing Requirements Emergency act which is
22  a state law that never went into effect until after the
23  closure, but those were expressly resolved by the D.C. Court
24  of Appeals.

25         Now as Your Honor said all the remaining factual



18

1    events underlying the plaintiffs' FHA and ADA claims were
2    also resolved by the D.C. Court of Appeals.  And to the
3    extent that the legal theories are premised on any factual
4    allegations that don't appear below they are entirely
5    unsupported.

6         The plaintiffs have not to date pleaded anything
7    that would show that there was a disparate impact racially
8    or with regard to disability of the closure of this shelter
9    as opposed to the rest of the homeless population or the
10   population of DC at large.  They have done nothing to show
11   that any of these individual plaintiffs was disabled, what
12   the race was of any of these individuals not even the
13   factual pleading in the effected complaint.

14        They now attempt to invoke the fire code for the
15   first time apparently realizing that there is no relevant
16   difference in the facts between what's been litigated in the
17   state court and what's at issue here.  They are now raising
18   factual allegations for the first time without acknowledging
19   that they're doing so.  And the District submits that it's
20   not only impermissible to do this, but it shows that there's
21   really nothing left to litigate here.

22        I'd like to just conclude unless the Court has any
23   questions by noting a passage from the *England* decision.
24   This is at 375 US at 419.  Again remembering that these
25   plaintiffs have litigated a federal constitutional claim to



1   conclusion in the state court, the Supreme Court said, "We

2   see no reason why a party after unreservedly litigating his

3   federal claims in the state court although not required to

4   do so should be allowed to ignore the adverse state decision

5   and start all over again in the District Court."

6          That's exactly what Your Honor has said.  That's

7   what the plaintiffs are trying to do here and it's just not

8   permissible.  The Supreme Court has expressly rejected this

9   kind of attempt.  As Your Honor noted there's a judicial

10   efficiency concern here.  And as the Supreme Court said such

11   a rule would not only count as an unnecessary increase in

12   the length and cost of the ligation it would also be a

13   potential source of friction between the state and federal

14   courts.

15          The District didn't understand Your Honor to

16   abstain from this litigation to see whether the resolution

17   of a state law issue would make federal adjudication

18   unnecessary.  Interestingly to stay the law because they

19   were the exact same claims.  And Your Honor didn't see fit

20   to attempt to as the plaintiffs said race to judgment with

21   the court that first had jurisdiction over these claims.

22   They've been resolved.  They've had their day in court at

23   least once.  We submit multiple times after filing twice in

24   the Superior Court and once in the D.C. Court of Appeals and

25   then here.  We'd ask Your Honor to dismiss the case.

A52

```
 1              THE COURT:  I don't know if the report reflects
 2    this but had there been at the time, because I do recall
 3    that there had been a motion to amend over there that was
 4    voluntarily withdrawn and then the complaint was filed over
 5    here.  I don't know if the record reflects whether there had
 6    been adverse determinations made by Judge Hedge or some
 7    other judge over there at the time that decision was made.
 8    I don't know.
 9              MS. SULKOWSKI:  I don't think so.  I think there
10    had been arguments on disposition motions and that that's
11    what perhaps prompted the motion to amend, but I don't think
12    any disposition opinion had been issued.
13              THE COURT:  Okay.  Thank you.
14              MS. SULKOWSKI:  Thank you.
15              THE COURT:  Reply.
16              MR. RICKMAN:  Well, again, with plaintiffs
17    primarily relying on England that we did in fact reserve --
18    a motion to amend the complaint had been voluntarily
19    withdrawn over in Superior Court.  And it was
20    contemporaneous with the filing of the complaint here at the
21    time the Court first asserted jurisdiction over the claims.
22    The Court then stays --
23              THE COURT:  I never asserted over the claims.  I
24    think that's a misstatement of what actually occurred.  You
25    filed over here.  There wasn't a dismissal on jurisdictional
```

1    grounds at that time because that issue I don't believe was
2    ever really raised at that time.  The complaint was filed
3    here.  I had been made aware that claims had been filed over
4    in Superior Court that related to the same situation.  And
5    therefore I stayed these proceedings until the courts over
6    there could resolve the matter that's brought there.

7        MR. RICKMAN:  Well, regardless, I think
8    jurisdiction would still be appropriate because the District
9    is not pointing to one single fact consequence to the FHA,
10   ADA claim.  That was ever resolved or even litigated or
11   brought forward in the Superior Court.  And to restate the
12   course of the litigation the plaintiffs were not aware early
13   on as to the availability of the federal claims when they
14   first filed the complaint over there and whenever litigation
15   had transpired through the course of Superior Court.  Only
16   later --

17       THE COURT:  You obviously became aware at some
18   point of the potential federal claims because you filed over
19   here.  So I mean at that point seems to me you could have
20   filed an amended complaint over there.

21       MR. RICKMAN:  Exactly.  Well as I said you know we
22   filed over here.  The court abstained.  We put the District
23   on notice.  We put the Superior Court on notice that we
24   wanted to file our federal claims over here.  We asked them
25   to stay.  They did not stay.

A54

1       THE COURT: You could have dismissed over there,
2  too, right?
3       MR. RICKMAN: We couldn't have dismissed because
4  there was a prior dismissal of the same claims over in
5  Superior Court, two dismissals we would have been out of the
6  court altogether, so we couldn't have dismissed over there.
7       THE COURT: You're saying you couldn't -- at the
8  time when you filed over here you could not have dismissed
9  those claims and appended those claims to your federal
10 claims here?
11      MR. RICKMAN: No, I don't believe so because it
12 would have been two dismissals in Superior Court.
13      THE COURT: Why would that preclude you from --
14      MR. RICKMAN: Because under the rules that
15 precludes -- it's called the Two Dismissal Rules under the
16 Superior Court rules.
17      THE COURT: No, I'm talking about over here, what
18 would have precluded you from filing over here?
19      MR. RICKMAN: My understanding that has to be
20 effective judgment. When you file and violate the Two
21 Dismissal Rules in Superior Court it's a dismissal --
22      THE COURT: One moment.
23      [Brief pause.]
24      THE COURT: Okay. Go ahead.
25      MR. RICKMAN: So effectively we did everything we



1   could to effect, to bring the litigation.

2               THE COURT:  What was the first dismissal?

3               MR. RICKMAN:  I wasn't in the case then, I can't

4   describe what went on back then.  I came in the case later.

5   I really couldn't speak intelligently as to the course of

6   the litigation and the negotiations that were going on at

7   that particular point, how that exactly resolved or worked

8   out.

9               But suffice it to say Superior Court was put on

10  notice of our desire to litigate these claims over here.  We

11  asked them to stay the litigation over there so we could

12  proceed over here.  The Superior Court said no, we elected

13  not to stay the litigation.  We came over here.  Court

14  stayed to resolve -- we filed nothing.  We did nothing to

15  advance these claims over in the Superior Court.  The

16  Superior Court resolved the state law issues.  And while we

17  admit that you know it certainly would have some effect over

18  here, we wouldn't ask the Court to redecide the procedurally

19  process claims.

20              So I think in our report we kind of detailed those

21  claims that we thought we should be available to go forward

22  with, those being under the FHA.  Those being under the ADA

23  and those being under substantive due process.  And we

24  played by the rules.  That's what the law says.  That's what

25  *England* provides for.

A56

24

1          THE COURT:  *England* is a little different I think.

2          MR. RICKMAN:  I think *England* is, it's kind of

3    along the same lines.  I think that -- one distinction is

4    whether or not the plaintiffs filed first mistake or filed

5    first in federal court and then there was an extension.  But

6    subsequent circuits don't find that, you know, substantive

7    distinction.  Some circuits will say it doesn't matter where

8    you file first as long as there's a valid extension with the

9    understanding that the plaintiffs can return to litigate

10   their federal claims in federal court once the state law

11   resolves the state law issues.

12          And that is the expertise of the D.C. Court of

13   Appeals to decide what district statute says.  Do decide

14   what they mean, to decide whether or not they were

15   required -- the District had requirements under the Home

16   Reserve Reform Act.  And whether or not there were

17   requirements under the Franklin Closure Act or whether or

18   not they were, fine they resolved that.

19          THE COURT:  But if what you say is true then it

20   would basically eviscerate the prescription about only

21   filing state claims in state court and then filing federal

22   claims based upon the same allegations in federal court and

23   like I say get two bites at the apple.  If we set a

24   precedent for that to be done everybody would do that.  As a

25   litigator I sure would have done that.  And that would just

*A57*

1   overburden the court with dual litigation.

2           And as the *England* case said would up the ante as

3   far as the amount of money it cost to litigate cases which

4   is already prescriptive in some reasons significantly.  I

5   mean the District is not a bottomless pit either as far as

6   money is concerned.  And if this can be done that's just

7   going to sap more money out of the citizens of the District

8   of Columbia to have to defend cases on two playing fields

9   when those issues can all be addressed in one suit.

10          MR. RICKMAN:  Your Honor, this is not atypical.

11  *Pullman Extension*, *England* has been around for 20, 30 years.

12          THE COURT:  I have never -- maybe it happens in

13  other courtrooms.  I have never in the nine years I've been

14  on this court or the time I spent over there ever seen a

15  situation where litigation has been split this way.  I've

16  never seen it.

17          MR. RICKMAN:  I understand that but this Court

18  entered an extension.  It stayed under the *Colorado River*.

19  My understanding of the record is that that's the rationale

20  the Court stayed with the understanding what impact, if any,

21  the state law determination of the state law claims would

22  have on the pending federal matters.  Otherwise, you know,

23  we could have proceeded.  We could have objected to any

24  stay.  We could have asked to go forward.

25          THE COURT:  I wouldn't have gone forward anyhow.

A58

26

1          MR. RICKMAN:  I'm just saying, but this is not
2    atypical.

3          THE COURT:  I'm looking for this Two Dismissal
4    Rule you were talking about.

5          MR. RICKMAN:  I don't recall -- it's there.  These
6    cases have been around for quite awhile.  These cases that
7    I've personally reviewed coming from the various circuits
8    and various district courts throughout the country that look
9    at *England*.

10          I think through the course of the proceedings I've
11    cited to any number of them applied the same way.  You know,
12    whether it be filed first in federal court or first in state
13    court when we put parties on notice of our desire to seek to
14    litigation federal claims then fine.  We should be able to
15    do so and that's the case here.

16          The District could well have not opposed the stay
17    over in Superior Court and said fine, go to federal court
18    lets litigate it over there.  The District made its choice
19    to oppose the stay over there.  That was their choice.  That
20    was their tactical decision.  They understood what was going
21    on.  And I don't understand, you know, how they can sit back
22    and start saying that this is res judicata, collateral
23    estoppel when the only objections they made over in Superior
24    Court was that this is forum shopping when obviously it was
25    not.

459

1          The reason we stated for the record why we prefer

2   federal courtroom are very clear and very tangible and very

3   culpable.  It has nothing to do with forum shopping.  It has

4   nothing to do with questioning the competence of judges over

5   there.  It had a lot to do with the availability of the case

6   law here, availability of the federal rules here, the

7   evidentiary standards to be applied when litigating a

8   federal civil rights claim.  All of those are very culpable

9   reasons for wanting to litigate a case of such complexity in

10  a federal forum.  Has nothing to do with forum shopping.

11  Has a lot to do with availability of the forum.

12          And therefore I don't see how the District can sit

13  back and call this forum shopping and all of a sudden

14  re-assert when they should have been asserting at the time

15  when they were made aware of our intention to seek federal

16  forum to then sit back and say well, we raise res judicata

17  and we couldn't do it at the time they were suppose to do

18  it.

19          The point of *Gillis versus Ware* is to give

20  plaintiffs an opportunity to put on notice as to the

21  defendant's intentions to say res judicata and file it as a

22  defense.  They didn't do --

23          THE COURT:  I understand your position, counsel.

24  I'm looking at Rule 41, Dismissal of Actions and Rule 40

25  (1)(a) Involuntary Dismissal by a Plaintiff.  And I see



1   where it does say if there was a prior voluntary dismissal
2   by a plaintiff that a second dismissal by the plaintiff
3   unless the notice or a stipulation of dismissal states
4   otherwise then it can operate as an adjudication on the
5   merits.  But that doesn't deal with the reality that, and
6   we're talking about dual double dismissals voluntarily by
7   the plaintiff.  That doesn't deal with the situation however
8   where there's a request made of the Court for a dismissal, a
9   second dismissal and the Court grants it.

10          As I read the Rule that would not operate as an
11   adjudication on the merits.  So even if there was a
12   voluntary dismissal earlier on in the Superior Court case by
13   the plaintiff, I am confident, although Judge Hedge would
14   not grant the request for a stay, I can't believe that she
15   would not have said well, we'll grant the motion for
16   dismissal, but she never had that opportunity.  So as I read
17   the Rule you could have made a request of Judge Hedge,
18   whoever was handling the case over there for a dismissal, so
19   that all the claims could be consolidated and pursued in one
20   case over here in federal court.  And that if she had
21   granted that request as I read the Rule that would not have
22   been an adjudication on the merits.

23          MR. RICKMAN:  Well, it's my understanding at that
24   particular point that there were two voluntary dismissals.
25   The earlier voluntary dismissal is that for us to go and

A 61

1  seek another voluntary dismissal --

2          THE COURT:   It wouldn't have been voluntary --

3          MR. RICKMAN:   But we did, we did ask the Court to

4  stay.

5          THE COURT:   But you didn't ask her to dismiss so

6  that you could consolidate those claims with the federal

7  claims that you were going to file over here.

8          MR. RICKMAN:   As with other procedures where I've

9  seen this happen.  And in my years of litigating cases I

10  have seen this done before, judge.  I have seen one case

11  filed in Superior Court as a prison case where another

12  attorney entered the case and asked the Superior Court to

13  stay any action.  And Superior Court granted the motion to

14  stay and they promptly filed federal claims over here in

15  federal court.

16          THE COURT:   I assume along with the local claims?

17          MR. RICKMAN:   No.

18          THE COURT:   So you file an assault and battery

19  case over there based upon alleged police misconduct and you

20  file a 1983 over here.  And you're saying that you could

21  stay the claim over there, pursue your claim over here.  If

22  you get an adverse ruling over here then you can go back to

23  state court and pursue your state claim or vice verse.  You

24  would file over here or file over here, and again, lose over

25  there and then proceed over here based upon the same factual

A 62

1   allegations but on a different theory of liability.

2           MR. RICKMAN:  Case of *Deale*, yes, sir.  The

3   situation was there was a wrongful death action and the time

4   had tolled.  And they asked the Court to stay everything in

5   the Superior Court and they promptly filed over in federal

6   court.

7           THE COURT:  Including the state claim?

8           MR. RICKMAN:  No, because they're out of time on

9   that.  So, but regardless it's not that it hasn't happened.

10  It's not that it's so --

11          THE COURT:  Maybe you can convince the Court of

12  Appeals that your position is correct.  I just don't see it.

13  I just think that as I said it increases litigation.  I

14  think as it relates to collateral estoppel and res judicata

15  if you're able to pursue claims in one litigation you can't

16  avoid doing that, and then seek to file in a sense those

17  same claims again and as I say get a second bite of the

18  apple.  That's what I see occurring here.

19          And I just am not going to permit that.  If the

20  Court of Appeals tells me I have to then so be it.  I just

21  as the Court of Appeals over there, D.C. Court of Appeals

22  said, these federal claims could have been filed with the

23  state claims over there.  And for whatever reason that was

24  not done.  And it seems to me that the same type of

25  assessments that I would have to make here are the

A 63

1   assessments that could have been made there. And a decision
2   to pursue the claims over there could have been made and it
3   wasn't. And I just think that you know sometimes you're
4   stuck with the tactical decisions that you make.

5          But I just don't think you can take a chance and
6   roll the dice over there and if you don't get the result
7   that you want there that you seek to file over there. And
8   as I say is it could be wrong in that regard, but it seems
9   to me there was no prohibition against requesting that the
10  court over there if you made an assessments that there were
11  federal claims that you wanted to litigate here and they
12  related to the factual allegations that were brought over
13  there that you could not at that point ask the judge over
14  there to dismiss those claims so that you could pursue in
15  one litigation those claims over here. I have to believe
16  that the court would have granted that request.

17         So that wasn't done, so now we're left in a
18  situation where litigation has gone forward over there and
19  now as I say I think you're seeking to get a second bite at
20  the apple over here. If the Court of Appeals tells me I
21  have to let you have that bite I'll do it, but they're going
22  to have to do that.

23         MR. RICKMAN: Just to be clear on the record we
24  did ask the Court to stay all proceedings over there so we
25  could pursue federal rules.



1           THE COURT:  But you didn't ask for dismissal over

2    there.  I would think the judge over there would have said

3    well, you know, why should you be able to preserve your suit

4    over here by way of a stay having chosen the District of

5    Columbia courts as the first court that you were going to

6    proceed in and then file something over here and have the

7    Court stay what was going on over there while you sought to

8    litigate the same factual scenario over here.

9           But I have to believe that there would have been a

10   different result if there had been a request for dismissal

11   over there so that you could pursue your claims over here

12   rather than Superior Court and that wasn't done.  I

13   understand your position.  I assume you'll appeal.  And if

14   the Court of Appeals wants to disagree with me they can do

15   that.

16          I know there's a motion that was filed in

17   reference to Catholic Charities for the -- there was a

18   subpoena issued and there's been a motion filed to quash the

19   subpoena by Catholic Charities and I will rule that that

20   motion is now moot and I'll deny it.  So I'll have to

21   dismiss the case on collateral estoppel grounds.  Thank you.

22          [Thereupon, the proceedings adjourned at 2:41

23          p.m.]

24

25

1                                    CERTIFICATE

2                  I, Cathryn J. Jones, an Official Court Reporter

3    for the United States District Court of the District of

4    Columbia, do hereby certify that I reported, by machine

5    shorthand, the proceedings had and testimony adduced in the

6    above case.

7                  I further certify that the foregoing 32 pages

8    constitute the official transcript of said proceedings as

9    transcribed from my machine shorthand notes.

10                 In witness whereof, I have hereto subscribed my

11   name, this the 27th day of March, 2012.

12

13
                                         /s/
14                                       Cathryn J. Jones, RPR
                                         Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25



# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Eric Sheptock, <u>et al.</u>,                    :
                                                :
        Plaintiffs,          :
                                                :
                                                :     Civil Action No. 09-00672 (RBW)
        v.                   :
                                                :
Adrian Fenty, <u>et al.</u>,[1]                  :
                                                :
        Defendants.          :
                                                :

## <u>ORDER</u>

On April 10, 2009, the plaintiffs commenced this action against Adrian Fenty, then-

Mayor of the District of Columbia ("D.C."), Neil O. Albert, Deputy Mayor for Planning and

Economic Development, Clarence H. Carter, Director of the D.C. Department of Human

Services, and Fred Swan, Administrator of the D.C. Family Services Administration.[2] The

plaintiffs challenge the closure of the Franklin Shelter,[3] which occurred on September 26, 2008,

alleging that the closure violated the Americans With Disabilities Act ("ADA"), the Fair

Housing Act ("FHA"), and the District of Columbia Human Rights Act ("DCHRA").  Second

Amended Complaint ¶ 1.

---

[1] The plaintiffs' Amended Complaint, filed May 7, 2009, names Adrian Fenty, at that time Mayor for the District of Columbia, as the lead defendant in this civil case. The Court has substituted Mayor Vincent C. Gray as the lead defendant in lieu of former Mayor Fenty pursuant to Federal Rule of Civil Procedure 25(d)(1). Presumably, the other named defendants are no longer in their positions following former Mayor Fenty's unsuccessful campaign for re-election and will have to be substituted in their official capacities. However, former Mayor Fenty and the other named defendants remain as defendants in this case, as they were all sued in both their official and individual capacities.

[2] Each of the named defendants were sued in both their individual and official capacities.

[3] Franklin Shelter was a temporary homeless shelter previously located at 925 13th Street, N.W., Washington, D.C.



Prior to commencing this action, on September 26, 2008, the plaintiffs filed Civil Action

No. 2008 CA 00694 B in the Superior Court of the District of Columbia ("Superior Court"),

seeking to enjoin the Franklin Shelter closure. Defendants' Motion to Dismiss Amended

Complaint ("Defs.' Mot. to Dismiss") at 6. Then, on October 22, 2008, while the first action was

still pending, the plaintiffs filed a second civil action in the Superior Court, Civil Action No.

2008 CA 007470 B. Id. On November 3, 2008, the plaintiffs moved to dismiss the earlier-filed

Superior Court case, and the case was dismissed pursuant to Rule 41(a)(1). Id. at 6. On March

9, 2009, the plaintiffs moved to stay the second Superior Court proceedings in the Civil Action

No. 2008 CA 007470 B, "[p]ending [d]iscovery and [p]ending [s]ubmission of [f]ederal [c]laims

in the United States District Court." Id. at 7.

On May 7, 2009, the plaintiffs filed their Amended Complaint in this Court, asserting the

same due process violations that they alleged earlier the Superior Court, along with claims for

violations under the FHA, ADA, and the DCHRA.[4] On May 11, 2009, the Superior Court

denied the plaintiffs' motion for a stay so that they could pursue their federal claims in this

Court,[5] and also granted summary judgment in favor of the defendants in that case; the plaintiffs

appealed the decision. Id.

On June 18, 2009, the defendants filed a Motion to Dismiss the Amended Complaint in

this case. Id. at 1. Following oral argument on July 1, 2009, this Court denied the defendants'

motion to dismiss and ordered that the case be stayed and administratively closed "pending a

---

[4] These claims were also included in the plaintiff's Second Amended Complaint, filed on July 10, 2009. Second Amended Complaint ¶¶ 41-151.

[5] The Court notes, that at no time did the plaintiffs request that the Superior Court dismiss their claims in Civil Action No. 2008 CA 007470 B so that they could pursue the entire matter in this forum.



decision by the D.C. Court of Appeals in [the] matter [that had been decided by the Superior

Court and arose] out of the same event that is the subject of this litigation." July 1, 2009 Order

(Walton, J).

On January 6, 2011, the District of Columbia Court of Appeals affirmed the ruling of the

Superior Court granting summary judgment to the defendants. See Baltimore v. D.C., 10 A.3d

1141 (D.C. 2011).[6]

Because the proceeding in the Superior Court arose out of the identical events that are the

subject of this litigation, and because the claims therein were rejected by the D.C. Court of

Appeals, this Court finds that the plaintiffs' claims in this case are barred by the doctrine of

collateral estoppel.[7] Accordingly, consistent with oral rulings made by this Court at the

---

[6] The Court of Appeals held that the District of Columbia Homeless Services Reform Act does not create a direct or implied entitlement to any particular service besides shelter in severe weather, that homeless individuals do not have a protected property right in medical or other services provided by the District of Columbia, and that the plaintiffs failed to establish "legally viable claims for negligence per se, intentional infliction of emotional distress, or conversion." Baltimore, 10 A.3d at 1143-44.

[7] The D.C. Court of Appeals stated:

> Appellants take issue with the trial court's denial of their motion to stay the proceedings in this action pending discovery and the submission of federal claims in the United States District Court for the District of Columbia. We are convinced that the trial court did not abuse its discretion in denying the motion. At the time they filed their motion, appellants already had lodged and subsequently voluntarily dismissed one complaint regarding the issues before us, and in the midst of the trial court's consideration of its second complaint, appellants decided the federal court would be a better forum for causes of action pertaining to two federal statutes, the Americans With Disabilities Act ("ADA") and the Fair Housing Act ("FHA"), along with an additional District statute, the District of Columbia Human Rights Act ("DCHRA"). These causes of action could have been filed in the instant action and appellants offer no persuasive reason why they were not. See Yellow Freight System v. Donnelly, 494 U.S. 820, 823 (1990) ("State courts . . . are . . . presumptively competent to adjudicate claims arising under the laws of the United States.") (citations omitted). Moreover, plaintiffs could have filed a motion in Superior Court under Super. Ct. Civ. R. 56(f) to the extent they believed discovery was necessary to oppose the District's motion to dismiss or in the alternative for summary judgment.

(continued...)



conclusion of the hearing held on February 22, 2011, it is hereby

**ORDERED** that the defendants' motion to dismiss is granted, on the grounds that the

plaintiffs' claims are barred by the doctrine of collateral estoppel.  It is further

**ORDERED** that non-party Catholic Charities' motion to quash subpoena is denied on

the grounds that the motion is now moot.

**SO ORDERED**, <u>nunc pro tunc</u> to February 22, 2011.

REGGIE B. WALTON
United States District Judge

---

[7](...continued)
<u>Baltimore</u>, 10 A.3d at 1156 n.23

4



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Eric Sheptock
925 13th Street, NW
Washington, DC 20002

DJuan Bean (202) 553-4859
925 13th Street, NW
Washington, DC 20002

Terry E. Huff (202) 289-2525
925 13th Street, NW
Washington, DC 20002

Committee to Save Franklin Shelter
925 13th Street, NW
Washington, DC 20002

v

Adrian Fenty, in his official capacity as
Mayor, District of Columbia
1350 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. This is an action for declaratory and injunctive relief pursuant to Rule 65,
   Superior Court Civil Rules, for the purpose of determining whether the actions of
   the D.C. government, by and through the Mayor, Adrian Fenty, violated D .C.
   Code § 10-801 and D .C. Code § 4-731 (formerly DC Code 1981 § 3-621), under
   authority pursuant to DC Code § 7-204, the Frigid Temperature Protection
   Amendment Act of 1988.

2. Plaintiffs, for their complaint herein, respectfully state as follows:

   JURISDICTION

3. The jurisdiction of this Court is founded on D.C. Code § 11-921, D .C. Code §
   10-801 and D .C. Code § 4-731 (formerly DC Code 1981 § 3-621), under
   authority pursuant to DC Code § 7-204, the Frigid Temperature Protection
   Amendment Act of 1988, and the D.C. Administrative Procedure Act, D.C. Code
   §§ 2-501 through 2-562.



PARTIES

4.  Plaintiff, Eric Sheptock, is a natural person and inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

5.  Plaintiff, DJuan Bean, is a natural person and inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

6.  Plaintiff, Terry E. Huff, is a natural person and inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

7.  Plaintiff, Committee to Save Franklin Shelter, is an unincorporated, non-profit membership organization, located at 925 13th Street, NW, Washington, DC, 20002. Its reason for existence is to organize the community to save Franklin Shelter from closure, so that those in need and who have inhabited the shelter be able to remain there and have adequate services provided for them. Among its members are homeless persons in DC who are seeking and will seek shelter before and after the onset of the frigid season of 2008 and thereafter.

8.  Each of the Plaintiffs is adversely affected and aggrieved by the actions of the District of Columbia government identified herein

9.  Defendant, Adrian Fenty, is mayor of the District of Columbia.

**Factual and Legal Background:**

10. D .C. Code § 10-801(b)(6)(b-1)(1)(2), requires relevant government entities to describe the manner in which economic factors are weighted and evaluated, including estimates of the monetary benefits and costs to the District that will result from the change in the disposition of real property. Defendants, in their capacity as D.C. officials, have failed to provide any rationale, or economic analysis for closing Franklin Shelter at this time. The Mayor has not complied with the law, D .C. Code § 10-801, regarding the immediate change in the disposition of this public property, wherein plaintiffs' belongings have been separated from plaintiffs' persons, and plaintiffs have been told to not return to Franklin Shelter, where they have resided.

11. D .C. Code § 4-731 (formerly DC Code 1981 § 3-621), under authority pursuant to DC Code § 7-204, the Frigid Temperature Protection Amendment Act of 1988, requires relevant government entities to provide shelter in district buildings, provided those in need to the right to overnight shelter, under the Frigid Temperature Protection Amendment Act.

12. Defendants, in their capacity as D.C. officials, have failed to comply with these laws.



13. DC has the third highest poverty rate in the nation. Nearly one out of five of DC residents live at or below the poverty line. The rate of homelessness continues to rise in the District, attributed to an ever increasing lack of affordable housing in the District, a rise in physical and psychological abuses suffered by the homeless, stagnant wages and slashed public assistance, the lack of adequate health care services, lack of health insurance, lack of adequate mental health facilities and the lack of adequate day care facilities.

14. In DC, 71% of the homeless individuals suffer from either substance abuse or mental illnesses. Without question, Plaintiffs will suffer irreparable injury unless the closure of Franklin Shelter is immediately enjoined, a proper inventory of the needs for shelter commence, and adequate facilities for those in need be accommodated.

15. The season of hypothermia is upon us, the city has not provided an accurate, up-to-date assessment of the numbers of homeless that are to seek shelter during the hypothermic season, and how the city will accommodate rising needs for shelter.

16. Plaintiffs are residents of Franklin Shelter. Many Franklin Shelter residents have been moved involuntarily out of Franklin Shelter, and placed in parts of the city that lack adequate facilities to provide for their physical and mental health needs, which place them and others in physical danger, and impose large impediments in their ability to seek and maintain employment.

17. The conditions reported by residents that have been displaced and involuntarily moved from the shelter include reports that replacement housing is dangerous, rodent and roach infested, and unhealthy, and health and mental health facilities are unavailable.

PLAINTIFFS ALLEGE THE FOLLOWING COUNTS:

COUNT I
18. D.C. government entities and Trustees have violated the Real Property Disposition Economic Analysis Amendment Act, and the Amended Act of 2006, D .C. Code § 10-801, which requires the Mayor to describe the manner in which economic factors are weighted and evaluated, including estimates of the monetary benefits and costs to the District that will result from the change in the disposition of real property.

19. Defendants, in their capacity as D.C. officials, have failed to provide any rationale, or economic analysis for immediately closing Franklin Shelter, and have failed to include "continuous community input" as required by law.

20. A change in the disposition includes the abrupt removal of services operating in Franklin Shelter, and immediate removal and displacement of its residents, and



closure of the shelter, where it will lie unoccupied while there is great and growing public need of its current facilities as a shelter.

**COUNT II**

21. D.C. government entities and Trustees have violated D .C. Code § 4-731 (formerly DC Code 1981 § 3-621), the Frigid Temperature Protection Amendment Act of 1988, which requires relevant government entities to provide shelter in district buildings, and to provide those in need to the right to adequate overnight shelter.

22. Defendants, in their capacity as D.C. officials, have failed to provide an up to date and accurate assessment of the shelter needs for the hypothermic season, and how those needs will be fulfilled.

**COUNT III**

23. D.C. government entities and Trustees fail to comply with the procedural requirements of Due Process Clause of the U.S. Constitution, amendment V, which provides that the government shall not deprive a person of life, liberty or property without due process of law. U.S. Const. amend. V; Bolling v. Sharpe, 347 U.S. 497, 499-500, 98 L.Ed. 884 (1954).

24. Due process right exists concerning the treatment of and access to public property, and for the safety and wellbeing of the residents of Franklin Shelter. Case law is replete with the consideration of the publics' due process rights in dealing with property that is in the public domain.

25. See Hartford Park Tenants Association v. Rhode Island Dept. of Environ. Management, Sup. Ct. Rhode Island, WL 2436227 at 55-56 (2005) (Holding that plaintiffs had a protected property interest in municipal defendants giving proper notice for public participation prior to commencement of investigatory activities in environmental safety of newly built public schools.) "[N]o process cannot equal due process."

26. See also Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920, 936 (1968) "The approach we have taken is consistent with our decision in Gart v. Cole, 263 F.2d 244 (2 Cir.), cert denied 359 U.S. 978 (1959). "We concluded that the sections allegedly establishing the requirements were 'designed to protect not the interests of landowners or tenants in a redevelopment area, but those of the public at large…'"

27. See also Anthony v. the State of Texas, 209 S.W.3d 296, 307 (2006) (holding that a policy of excluding a member of the community from a public park violated procedural due process.) "In analyzing a claim of deprivation of procedural due process, we apply a two-part test: (1) whether the plaintiff had a liberty or property interest entitled to procedural due process; and (2) if so, what process is due."



A 74

28. Plaintiffs also have a property interest in their ability to seek equal employment opportunities and to provide for their own safety and wellbeing, which is compromised by the city's continued failure to properly and accurately access the shelter needs of the District, to house residents of Franklin Shelter in dangerous conditions around the city, where there is inadequate access to mental and physical health facilities, and the continued failure to adequately provide the shelter and other wrap around services necessary for those in need.

**RELIEF SOUGHT:**

29. Wherefore, Plaintiffs request that this Court enter judgment, including preliminary and permanent injunctive relief against Defendant as follows:

30. Plaintiffs are entitled to a preliminary and permanent injunction of the closure of Franklin Shelter.

31. Plaintiffs are entitled to a proper and accurate assessment of the needs for shelter for the impending hypothermic or frigid season, and adequate accommodations based on the assessment of needs.

32. Wherefore, Plaintiffs request that Counts I through III be considered in light of Plaintiffs' arguments and evidence provided herewith.

33. Awarding any and all other relief the Court deems just and equitable.



1                SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2                            CIVIL DIVISION

3    - - - - - - - - - - - - - - - x

4    ERIC SHEPTOCK, et al,          :   Case Number: CA-6954-08

5              Plaintiffs,          :

6              vs.                   :

7    MAYOR ADRIAN FENTY             :

8                   Defendant.      :   Volume II of II

9

10   - - - - - - - - - - - - - - - x

11                                      Washington, D.C.

12                                      Wednesday, October 1, 2008

HEARING TRANSCRIPT ................................................................................................PAGES 315-330

A 76

 1 | record, which means here in the courtroom, and not
 2 | everybody is going to agree with the way I go on this,
 3 | so I just want to prepare you all that I'm not going to
 4 | grant the motion.

 5 | So, people may be unhappy about that and I do
 6 | need to tell you why and put my reasons on the record
 7 | and then perhaps in the course of doing that I am going
 8 | to address some of the things that I think really
 9 | haven't been addressed here.

10 | And just so you understand, this is a motion
11 | for a Temporary Restraining Order which would only be
12 | good for 10 days and the next step in the process is
13 | that if the Plaintiffs want to continue to pursue a
14 | motion for a preliminary injunction, they are entitled
15 | to have a hearing on that as well.

16 | **RULING**

17 | THE COURT:  Okay.  So, first of all, let me
18 | say that in deciding whether to issue a Temporary
19 | Restraining Order, there is case law from our Court of
20 | Appeals that says that the Court should consider the
21 | following factors in exercising its discretion.

22 | And what the Court should consider is whether
23 | the moving party has clearly demonstrated that there is
24 | a substantial likelihood that party, meaning the
25 | Plaintiff, will prevail on the merits; that the

-315-

1  Plaintiff is in danger of suffering irreparable harm
2  during the pendency of the action; that more harm will
3  result to the Plaintiff from the denial of the
4  injunction than will result to the Defendant from its
5  grant; and in appropriate cases, that the public
6  interests will not be disserved by the issuance of the
7  requested Order.

8           And some of the cases that talk about this
9  standard are <u>Zirkle vs District of Columbia</u>, 830 A.2d
10 1250 and <u>Don't Tear It Down, Inc. vs. District of</u>
11 <u>Columbia</u> at 395 A.2d 388 and <u>Wieck vs. Sterenbuch</u> at 350
12 A.2d 384.

13          So, first of all, with regard to the
14 substantial likelihood that the Plaintiffs would
15 prevail on the merits and the Plaintiffs need to
16 demonstrate that, clearly demonstrate that to get this
17 relief and I don't think that the Plaintiffs have
18 clearly demonstrated that.

19          There have been -- first of all, I mentioned
20 earlier today that I thought that the association
21 itself which is an unincorporated association doesn't
22 have the right to bring a lawsuit and I already cited a
23 case for that proposition.

24          So, I think that it really comes down to that
25 there are two individual Plaintiffs right now in this

-316-

1 case and it may be that down the road that there might
2 be others, but in any event, it's really private
3 individuals that are bringing the lawsuit. I need to
4 look at what's the basis for the private individuals
5 being able to bring such a lawsuit.

6           And as the District has pointed out, there is
7 law out there that allows for shelter during certain
8 circumstances. It requires shelter under certain
9 circumstances and that's D.C. Code 4-753.01(c) and
10 that's the Homeless Services Reform Act of 2005 and
11 that requires that whenever the actual or forecasted
12 temperature including the wind chill factor falls below
13 32 degrees Fahrenheit or whenever the actual or
14 forecasted temperature or heat index rises above 95
15 degrees Fahrenheit the District shall make available
16 appropriate space in District of Columbia public or
17 private buildings and facilities for any person in the
18 District who is homeless and cannot access other
19 shelter.

20           In doing so, the District shall not use
21 District of Columbia public school buildings currently
22 being used for educational purposes without the prior
23 approval of the Board of Education.

24           So, this is a law that is in existence. It
25 already says that the District has to house people

-317-

1 under certain circumstances depending on what the
2 temperature is.  It doesn't say that the District has to
3 house people when the temperature is anything other
4 than what is set out in this law.

5          So, I don't see a statute that gives anyone
6 an actual right to housing other than this statute and
7 this statute I don't see as being implicated right now
8 because the temperature is not here in these levels and
9 it's not always going to be in those levels.

10          There's only certain times of the year when
11 it will be and when it is in those levels, the District
12 does have to provide housing.

13          Does that mean that sometimes people may be
14 out in the rain or may be out when it is cold or may be
15 out when it is hot?  Yes, it does mean that.  The
16 District hasn't passed a law that entitles everyone to
17 shelter at all times or during the rain.

18          So, I don't see that law provides a basis for
19 the Plaintiffs to prevail in the case.

20          Then there's the disposition of Real Property
21 Act and that was cited by the Plaintiffs and that's
22 under D.C. Code 10-801.  The District argues that
23 there's no private right of action, no private cause of
24 action under that statute meaning that an individual
25 can't come in and complain about a failure on the part

[A 80]
-318-

 1  of the Mayor to comply with that statute.

 2          I did not find a case and I don't think

 3  anyone has cited a case to me and if I'm wrong on that,

 4  let me know, that squarely addresses that issue but it

 5  seems to me from reading the statute that it's not the

 6  type of statute that sets forth the private cause of

 7  action.  But even if it does, I don't see that the

 8  closing of this shelter violates that specific Act.

 9          It's interesting that the City Council passed

10  this new legislation which, to me, is, an indication

11  that they thought they needed this new regulation in

12  order to regulate how the Franklin Shelter was closed

13  because there really isn't another statute out there

14  that does do that.

15          So, I don't think that there was an existing

16  law that provided a private cause of action that

17  prevented the closing of the Franklin Shelter.

18          I do not need to address in this case whether

19  D.C. Code 4-753.01(c), which is the law that protects

20  people under certain temperatures, creates a private

21  cause of action because we're not there and I

22  specifically decline to say that it does not just so

23  we're clear.

24          I'm not saying that there is no private cause

25  of action under that statute.  I don't need to reach

1 | that question today and I am not saying that there is.
2 | Okay.

3 | So then I looked at the new law, the Franklin
4 | Shelter Closing Requirements Emergency Act of 2008.
5 | Now, keep in mind, that this is a new law and
6 | specifically under its wording it did not go into law
7 | until the Mayor had an opportunity, a set time limit to
8 | veto it.

9 | So, at the time that the shelter was closed,
10 | this law was not yet in effect. It went into effect as
11 | of the time, last night, when the Mayor went ahead and
12 | signed it.

13 | The Mayor has submitted a report to the City
14 | Council in compliance now with that new law. Now, when
15 | I say "in compliance", I mean that he has turned over a
16 | report and he has provided a lot of information in that
17 | report.

18 | Will the City Council deem that report to
19 | fully comply with what it's asked for? I don't know.
20 | But I think at least, as a preliminary matter, the City
21 | Council needs to be the one to say yes, Mayor, this is
22 | good enough or no, Mayor, this isn't good enough and I
23 | think it would be premature for the judiciary to
24 | interject itself and say Mayor, this isn't good enough.
25 | I think at least for now, in this litigation, the City

-320-

 1 Council needs to have an opportunity to do that.

 2          Should the City Council say Mayor, your

 3 response is in adequate, then that should be brought to

 4 the attention of the Judge in the motion for the

 5 preliminary injunction hearing.

 6          So, I don't see that there has been a

 7 violation of any statute and I don't see that there is a

 8 constitutional right to housing or to housing at a

 9 particular shelter.

10          I haven't seen any case law that actually

11 says that you have the right to housing in a particular

12 shelter or that -- other than this law which provides

13 certain requirements on the part of the Mayor that he

14 has to report before he can close the Franklin Shelter

15 which wasn't in place at the time that he actually did

16 close it.

17          So, for those reasons, I don't think that

18 there is a substantial likelihood at this stage of the

19 litigation from what I see that the Plaintiffs will

20 prevail.

21          Should the City Council say down the road,

22 Mayor, you didn't do what you were supposed to do, that

23 may change, but right now, I don't see that.

24          Now, there has been some question by the

25 Plaintiffs as to the motives of the Mayor. Why did he

                                                    -321-

1  or his representatives close the shelter before October

2  1st when several people have said that it was their

3  understanding it was going to close October 1st?

4         Now, I don't -- this may be something that

5  will be explored more in the course of the litigation.

6  At this point in the litigation, I don't see that there

7  has been proof that there was a bad motive on the part

8  of the Mayor.  I don't have enough evidence one way or

9  the other as to that.

10         What I do know is this from the testimony of

11  Mr. Swan and I will say that I had an opportunity to

12  hear from Mr. Swan and I thought he provided some pretty

13  detailed testimony as well as a detailed declaration

14  which he adopted and swore to under oath as part of his

15  testimony.

16         You know, of course, none of us know anybody

17  just from the first time that you see them and so we can

18  only make our best assessments of people from what we

19  hear and see.  But he did seem to be an individual who

20  was on top of the situation, interested in the

21  situation, knowledgeable about the situation.  He did

22  seem to be responsive to the concerns expressed by the

23  individuals who testified.

24         For example, he said he was going to go ahead

25  and make arrangements to have the foot lockers put

-322-

1  under the beds at 801.  Now, whether that actually
2  happens, I don't know.

3         So, he heard what some of the complaints were
4  and what some of the needs were.  So, over the next few
5  days, we'll see whether there's a response to those
6  complaints and those needs.

7         But what he did say was that the beds at
8  Franklin Shelter had gradually been closed down so that
9  as of the time that the shelter closed there were only
10 50 beds that were able to be in use at that time.  And
11 he said that 300 people -- over 300 people, according to
12 him, and over 300, according to the report prepared by
13 the Mayor, have now been put in Permanent Supportive
14 Housing.

15        Now, it's been pointed out that Permanent
16 Supportive Housing is a brand new program.  Concern has
17 been expressed as to why is it starting now kind of late
18 in the fall as opposed to earlier.  We've heard that
19 there is a requirement for a public comment period and
20 the writing of regulations, so I don't know why it's
21 starting now.  That's certainly a question that can be
22 addressed as further inquiries are made.  It may be
23 because of the need to make regulations and public
24 comment and it may be for other reasons.  I don't know.
25        Some people have said that they don't think

-323-

1  this is -- that they think that this is a Government
2  failure and it's not a well run process.  I think it's
3  premature to say that.

4          Other people when they've been hearing that
5  maybe they could get into such housing that is
6  available are expressing an interest in being
7  considered for it and being put into it.  So, it's brand
8  new.  If it works, it might be great.  If it doesn't
9  work, then obviously we have a problem, a serious
10 problem.

11         So, we are still in the brand new
12 experimental stage with this.  But it's certainly not
13 unreasonable for the Mayor to look for a new solution to
14 the problem of homelessness and this is an attempt to do
15 that.

16         And you heard from Mr. Swan as to why they
17 think it would be a better solution than shelters and it
18 is within their purview as the Mayor is an elected
19 official and other Government officials that he
20 appoints to perform the tasks that are within his
21 purview to -- it is within their right to try something
22 like this.

23         So, I don't have at this point a basis to
24 think that the Mayor has got a bad motive and even if I
25 did have that basis, I don't see how that creates a

-324-

 1 | cause of action still for the Plaintiffs.

 2 | I do think from what we've heard today that
 3 | more information needs to be given out to the public
 4 | about the whole process and how to apply for it and
 5 | hopefully the District will do that having heard today
 6 | what we've discussed and a couple of times they have
 7 | said this particular thing is a good idea so I'm
 8 | assuming that they will make efforts to, you know, to
 9 | do that.

10 | And also, they heard from everybody who has
11 | testified and they themselves have said that this is a
12 | very poignant situation that a lot of people that have
13 | testified find themselves in, that there are clearly
14 | people here in need of services and want those services
15 | and are willing to accept them.

16 | So, I think they understand this is a very
17 | big deal that we have going on here in the city with
18 | people who are homeless and in need of services.  And
19 | they say that they have been putting in a lot  more
20 | effort into having a variety of services available to
21 | people.

22 | So, I think they need to get that word out to
23 | everyone about what exactly is in place and how to
24 | benefit from it.

25 | So, let me move on.  I've talked a lot about

-325-

1  the first factor.  Let me move on to the second factor
2  which is the danger of suffering irreparable harm
3  during the pendency of the action.  I've touched upon
4  that a bit today.

5          I don't think there's a danger that
6  irreparable harm will be suffered in the next few days
7  between now and an opportunity for a preliminary
8  injunction hearing.

9          As the weather gets colder, obviously, if the
10 situation gets more urgent, now there's still, as I
11 have said, is a statute in place that allows for housing
12 when the weather gets to a certain temperature, gets
13 down to a certain temperature.

14         Does that mean that irreparable harm could
15 occur before the weather gets down to that temperature?
16 It may be that the Plaintiff will be able to prove that.

17         Right now, although it's crowded, there is
18 shelter space at 801 from what I have heard so far.
19 Now, there was some speculation if the fire marshal
20 came in he might find that it's too crowded in there so
21 that it's not safe but I haven't heard any such evidence
22 yet from anybody in a position like a fire marshal to
23 say that, anybody with authority to say that.

24         So, right now, I have to say that there are
25 other shelters even though the conditions are not as --

-326-

1  they are more crowded, at least at 801 than they were at
2  the Franklin Shelter.

3          The third factor is will more harm result to
4  the Plaintiff from the denial of the injunction than
5  will result to the Defendant from its grant.

6          I have to say that I don't really feel that
7  much evidence has been presented about what harm would
8  result to the Defendant.

9          There's been argument made that the Defendant
10  has the right to control its finances and that's
11  certainly true, but I haven't really been given much in
12  the way of facts and figures, none of us really have.

13          I'm assuming -- I don't know.  I don't know
14  what the 300 units of housing is costing because in some
15  instances, people are going to be paying a portion of
16  the lease.  It's not unreasonable to think that might
17  cost more than what the Franklin Shelter cost to
18  operate but I don't know that.  So, I think that at the
19  next hearing, the District needs to be prepared to
20  address that factor in more detail.

21          Now, I will say that, you know, as we have
22  said, the burden is on the Plaintiff here.  I just don't
23  -- no one has really gotten into this in enough detail
24  for me to be able to say how much harm would result to
25  the Defendant if I granted this injunction.

-327-

1           So, I feel like -- even if -- so I feel that I

2  don't have much information to make as good a decision

3  on that factor, so for purposes of resolving this

4  motion, what I've done is said well, I'm going to find

5  that there's more harm to the Plaintiff than to the

6  Defendant, okay, and consider that to be the case for

7  now.

8           Then the next factor is that the public

9  interests will not be disserved by the issuance of the

10 requested Order.  And again, I don't have a reason to

11 think that the public interests would be disserved if I

12 issued the Order so I would go ahead and consider that

13 to be a factor in favor of the Plaintiffs as well.

14          Again, there may be some evidence that the

15 District would be able to present on that, what are the

16 consequences.

17          I mean, we heard that the building -- Mr.

18 Swan said it was dilapidated, infested and crumbling,

19 but when actually on the stand what he said about that

20 was that it needs a new roof and it needs new windows

21 and it's got problems with the plumbing.

22          I don't know how bad the new roof is.  He

23 didn't say anything else about crumbling.  He said it

24 wasn't within his purview to really say exactly what

25 was wrong with the infrastructure.

                        A 90

                                                      -328-

1             So it may be a very bad situation it may not

2  be.  And we really didn't hear much about it being

3  infested either and the gentlemen that testified about

4  the conditions there didn't complain about that.

5             So, at this point, I am going to view this as

6  the public interests would not be disserved if I

7  granted the motion.

8             But the greatest issues, to me, the first two

9  factors, I don't think support the granting of the

10 motion and I think that those are when you're weighing

11 the factors, the likelihood of success on the merits

12 and the danger of irreparable harm seem to me to be more

13 significant and the circumstances of this case.

14            I don't feel it would be appropriate to grant

15 the Temporary Restraining Order because I just at this

16 point don't see the Plaintiffs prevailing on the

17 merits.

18            Should the City Council, like I say, say the

19 Mayor's response is inadequate and should the Mayor not

20 address any such inadequacies that are pointed out, we

21 have obviously a different situation.

22            I do want to say that I very much appreciate

23 everybody's presentations here and I appreciate having

24 heard the testimony of the individuals who have

25 appeared here today and it's obvious that there are

                   ⏦491⏦

                                                    -329-

1 people here who I haven't heard from but I can tell from
2 what they've been doing by, you know, bringing in
3 documents to Ms. Zara, that they've been interviewing
4 some of the people who have come here and helped Ms.
5 Zara with being able to call those people to the stand
6 and have them explain their circumstances.

7           And I would say that many of you are in very
8 difficult circumstances and I hope that the District
9 having heard personally from all of you will increase
10 its efforts even more to get as many of you placed as
11 possible in appropriate housing.

12           I do want to see your situations addressed
13 and allow you to live lives in which you're comfortable
14 and able to support yourselves and free of danger.

15           So, I think all of us hope that is how this
16 can turn out for many of you and we probably all wish
17 that's how it could turn out for all of us and we're not
18 there yet; that's for sure.

19           So, I do remain willing to help in any way,
20 if you wish, you know, any sort of mediation or
21 whatever.  I'm happy to do that.  You all can just
22 contact me about that.

23           I'm going to see what Judge Retchin's
24 chambers says about a date and ask them whether they
25 want to set a status or they want to just go ahead and

-330-

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | | |
|---|---|---|
| Eric Sheptock, | ) | |
| DJuan Bean, | ) | |
| Terry E. Huff, | ) | Case No. _____ |
| Joseph Marshall, | ) | |
| Charles Davis, | ) | |
| Orrin Williams, | ) | |
| Richard Embden, | ) | |
| Edward Baltimore, | ) | |
| Edward Hainsworth, | ) | |
| Tommy Bennett, | ) | |
| Francwa Sims, | ) | |
| Lou Cannao, | ) | |
| Kevin Gallon, | ) | |
| TiRown | ) | |
| Thomas Davis | ) | |
| Phil Damus | ) | |
|    Formerly of 925 13th St., NW, | ) | |
|    Washington, DC 2002, | ) | |
| | ) | |
| Junior Almozare | ) | |
| Tom Ashley, | ) | |
|    Homeless persons living on | ) | |
|    the streets of the District of Columbia, | ) | |
| | ) | |
|      and | ) | |
| | ) | |
| Committee to Save Franklin Shelter | ) | |
| on behalf of its members, | ) | |
|    Formerly of 925 13th Street, NW | ) | |
|    Washington, DC 20002, | ) | |
| | ) | |
|      PLAINTIFFS | ) | |
|     vs. | ) | |
| | ) | |
| Adrian Fenty, | ) | |
| in his official capacity as Mayor, | ) | |
|    1350 Pennsylvania Avenue, NW | ) | |
|    Washington, DC 20004 | ) | |
| | ) | |
|      DEFENDANT | ) | |
| | ) | |
| | ) | |



<u>COMPLAINT</u>
<u>FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

1. Plaintiffs, for their complaint herein, respectfully state as follows:

<u>THE PARTIES</u>

2. Plaintiff, Eric Sheptock, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

3. Plaintiff, DJuan Bean, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

4. Plaintiff, Terry E. Huff, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

5. Plaintiff, Joseph Marshall, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

6. Plaintiff, Charles Davis, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

7. Plaintiff, Orrin Williams, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

8. Plaintiff, Richard Embden, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

9. Plaintiff, Edward Baltimore, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

10. Plaintiff, Edward Hainsworth is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

11. Plaintiff, Tommy Bennett, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

12. Plaintiff, Junior Almozare, is a natural person and homeless person living on the streets of the District of Columbia

13. Plaintiff, Tom Ashley, is a natural person and homeless person living on the streets of the District of Columbia

14. Plaintiff, Francwa Sims, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002



15. Plaintiff, Lou Cannao, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

16. Plaintiff, Kevin Gallon, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

17. Plaintiff, TyRown, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

18. Plaintiff, Thomas Davis, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

19. Plaintiff, Phil Damus, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

20. Plaintiff Committee to Save Franklin Shelter is an unincorporated nonprofit association under D.C. Code 29-971, the Uniform Unincorporated Nonprofit Associations Act.

21. Plaintiff Committee to Save Franklin Shelter was formerly located at 925 13th Street, NW, Washington, DC, 20002.

22. The interest Plaintiff Committee to Save Franklin Shelter seeks to protect is to ensure that those who have inhabited the shelter are able to remain there and have adequate services provided for them.

23. Members of Plaintiff Committee to Save Franklin Shelter include homeless persons in DC who are seeking and will seek shelter before and after the onset of the frigid season of 2008 and thereafter.

24. Members of Plaintiff Committee to Save Franklin Shelter develop the policies of the association.

25. Defendant Adrian Fenty is Mayor of the District of Columbia.

## JURISDICTION

26. The jurisdiction of this Court is founded on D .C. Code § 11-921(a) and Rule 65, Superior Court Civil Rule.

## NOTICE OF RELATED CASES

On September 30, 2008 and October 1, 2008 a hearing was held on a Motion for a Temporary Restraining Order to keep Franklin Shelter open, Case No. 2008 CA 006954 B, over which Judge Duncan-Peters resided. The TRO was denied on October 1, 2008.



A 95

Submissions for Voluntary Dismissal on actions regarding pending Motions for Preliminary and Permanent Injunctions were filed with the Court on October 21, 2008. Motion for Preliminary and Permanent Injunctions are submitted herewith.

<u>FACTS AND LEGAL BACKGROUND</u>

27. On August 13, 2008, Council Chairperson Vincent Gray wrote a letter to Mayor Fenty about the closure of Franklin Shelter, where he expressed "grave concern" about "steps taken to reduce capacity, bar new admissions and prepare to close the Franklin Shelter."

28. On September 16, 2008, the Council had hearings on, and passed The Franklin Shelter Closing Requirements Emergency Act of 2008, B17-923 [*hereinafter* the "Emergency Act"].

29. The Emergency Act requires that the Mayor, prior to closing the Franklin Shelter, provide a report that describes any expected increase or decrease in the need for low barrier shelter space generally and, specifically, during the winter months, and an accurate assessment of the city's ability to seasonally increase capacity to reduce incidences of hypothermia among the homeless population.

30. No public hearings were conducted concerning the closing of Franklin Shelter.

31. The city has spent over $2 million dollars over the past two years installing heating and cooling systems, new water heating systems, fire alarm systems, and other repairs in Franklin Shelter.

32. Franklin Shelter has a staff trained and experienced in dealing with hypothermic season emergency needs. That staff is needed to deal with the traumatic conditions associated with the hypothermic season.

33. On the morning of September 26, 2008, at approximately 6:00am, inhabitants of Franklin Shelter were awakened and informed that the shelter was closing. Once leaving the shelter, the men were separated from their belongings that remained in the shelter and the men told they could not gain reentry to the shelter.

34. Numerous inhabitants, among them plaintiffs, have not been able to retrieve all of their belongings or personal property since the abrupt closing of the Shelter.

35. The inhabitants of Franklin Shelter were then scattered throughout the downtown area, and police shouted through a loudspeaker from a police car throughout the day to people attempting to enter the shelter, informing them that the shelter was closed.

36. Many persons attempted to enter the shelter throughout the day of September 26. It rained throughout the day and the weekend that followed. Numerous inhabitants of Franklin Shelter spent the weekend outside, in the rain, carrying their belongings or



A 96

losing them on the streets.

37. The Mayor, at the time of closing the shelter, had not provided a report of needs and provisions for shelter as required by the Emergency Act.

38. On September 30, four days after closing the Shelter, and after close of business, a Report on Supportive Housing Placements and Emergency Shelter Capacity in the District of Columbia [*hereinafter* the "Mayor's Report"] was released.

39. The Mayor then signed the Emergency Act into law (formerly B17-923, now A17-0518) on the evening of September 30, 2008, after close of business.

40. Sec 3(a) requirements of the Emergency Act have not been satisfied, requiring the Mayor's report to be filed PRIOR to the closing of Franklin Shelter. The shelter was closed in hurried manner the morning of Sept. 26, 2008, the report was released the evening of September 30, after close of business.

41. Sec. 3(a)(1)(A)(i) requirements of the Emergency Act have not been satisfied, requiring the documentation of each client's supportive housing address. This has not been provided.

42. Sec 3(a)(1)(A)(iv) requirements of the Emergency Act have not been satisfied, requiring documentation of supportive services provided to complement housing. The report merely mentions the organizations contracted, not an explanation of which services are provided by need to which person. The report merely mentions the promise of future transportation, no details of how the housed will reach their particular services, especially when they are dispersed to the poorest and most violent areas of the city, with the least amount of services available.

43. Sec 3(a)(1)(B)(4) requirements of the Emergency Act have not been satisfied, requiring a proper analysis of the impact of closing of the shelter on the homeless population. No statistics of homeless needs are provided, especially in the Franklin Park area after the closing of the shelter.

44. The Urban Institute reported that at least 13,000 single adults and 2,800 adults and children use emergency shelter in the District every year..

45. The Urban Institute reported that that the shelters are in excess of capacity on a regular basis: 164% over capacity at New York Ave., 125% over capacity at Franklin Shelter, 111% over capacity at 801 East, report illustrated the regular overcapacity of shelters prior to closing Franklin Shelter.

46. Needs are not accurately reflected in the Mayor's Report. The numbers provided only reflect amount of beds made available by the city, independent of any accurate assessment of current needs. Furthermore, these numbers of available beds are based on a single data point (September 26, 2008, with time of day unspecified), and pertain to



beds distributed throughout distant parts of the city, away from the downtown area, and are in distant parts of the city where the most vulnerable of the former Franklin Shelter inhabitants are unable or unlikely to be able to reach.

47. Services for mental health and physical health needs are not available at the far flung places to which the homeless are being bussed, and adequate and reliable transportation services have not been proven to be effective, and do not meet the needs of those at shelters far away from downtown.

48. Sec 3(a)(1)(B)(5) requirements of the Emergency Act have not been satisfied, requiring an analysis of the expected increase or decrease in need for low barrier shelter space generally and with regard to winter months.

49. The permanent supportive housing program is a pilot program in its very early stages. Most placements in this new program have occurred within the last month. There is no verification of placed persons retaining their residence after placement. Some men have already left their placements because of uninhabitable conditions, and danger in the neighborhoods in which they were placed.

50. The Table on pages 8-13 of the Mayor's Report shows that there are no placements in the areas of town with the most resources available (Ward 2 and Ward 3). Most placements are occurring in the poorest and most violent parts of town, and with the least services available for the vulnerable and the homeless.

51. It is unclear how the new placements in Supportive Housing, removed directly from jail, mental facilities, the street and shelters, are able to cope with the requirements to cook, clean and maintain a living space, and what resources are in place to help them cope. This is in light of the increases in cost of food, cost of commuting and no clarity on what subsidies or employment opportunities they also received.

52. It is also unclear what priorities were used to determine placement in the Permanent Supportive Housing Initiative, since the most vulnerable of the Franklin Shelter inhabitants are not currently part of the program, but are now sleeping in the parks and streets near the Franklin Shelter.

53. Table on page 7 of the Mayor's Report, purporting an increase in capacity during hypothermia season, fails to adjust the figures in light of the data from Table 5 of the Mayor's Report, which shows the actual available beds in the existing shelters. When the correction is made, the number of total hypothermia night beds is reduced from a purported total of 1388 to 474, after compensating for the existing capacity situation at these shelters.

54. The Mayor's Report states on page 7 (bridging paragraph at top of page) that it is "impossible to know" what the needs will be for shelter during the winter.

6



55. The Mayor's Report also states that there are no expectations that utilization rates will increase (page 7, bridging paragraph at top of page). This assumption is not supported by any facts, especially in light of the very high rents in the District, as well as the mortgage and economic collapses that we are now witnessing. (See attached article entitled "Cities Face Alarming Homeless Numbers").

56. The city has provided no sound or credible evidence that the needs for low barrier shelters will be met by the emergency hypothermic beds that are offered under emergency conditions.

57. Former inhabitants of Franklin Shelter now report lack of available beds in remaining shelters including New York Ave. Shelter, overcrowding conditions in 801 East Shelter, fire sprinkler systems blocked by extra beds, and increased incidences of violence due to overcrowding.

58. The Supportive Housing program is in its initial stages, and its success will not be verified by the time of onset of hypothermia season.

59. DC has the third highest poverty rate in the nation. Nearly one out of five of DC residents live at or below the poverty line. The rate of homelessness continues to rise in the District, attributed to an ever increasing lack of affordable housing in the District, including high rents and mortgages, a rise in physical and psychological abuses suffered by the homeless, stagnant wages and slashed public assistance, the lack of adequate health care services, lack of health insurance, lack of adequate mental health facilities and the lack of adequate day care facilities.

60. In DC, an estimated 71% of the homeless individuals suffer from either substance abuse or mental illnesses.

61. Plaintiffs will suffer irreparable injury unless the closure of Franklin Shelter is immediately enjoined, a proper inventory of the needs for temporary shelter commence, and adequate facilities for those in need be accommodated.

62. Franklin Shelter has provided a stable resource to those seeking shelter in the downtown area. It has served the homeless community as a continuum of care, as set forth in DC Code § 4-754.11, *et seq*. The shelter is located near service providers for mental health and physical health care. It has provided shelter within walking distance, and/or reasonable distance from places of employment for Shelter inhabitants (e.g. within walking distance to day labor centers, Street Sense), enabling them to seek and maintain employment.

63. Many inhabitants have come to rely on the mental and medical services required for their wellbeing, and within reasonable distance to Franklin Shelter.

64. Many Franklin Shelter residents have been moved involuntarily out of Franklin Shelter, and placed in parts of the city that lack adequate facilities to provide for their physical



and mental health needs, which place them and others in physical danger, and impose large impediments in their ability to seek and maintain employment.

65. The conditions reported by residents that have been displaced and involuntarily moved from the shelter include reports that replacement housing is dangerous, rodent and roach infested, and unhealthy, and health and mental health facilities are unavailable.

66. Former residents of Franklin Shelter include those with compromised physical and mental capacities, and are now living on the streets of the Franklin Shelter area, without access to life saving medicines, without access to case worker contact and supervision.

67. Former residents of Franklin Shelter include those now living on the streets of the Franklin Shelter area in order to gain adequate access to their jobs so that they may continue being employed, or who now sleep at or near their workplace in order to get to work on time and maintain their employment.

68. Other shelters now housing former Franklin Shelter residents, especially 801 East Shelter, are now experiencing over crowding conditions, and are experiencing increased incidents of violence as a result of the Franklin Shelter closing.

## COUNT I:
## DUE PROCESS

69. On the facts alleged above, defendant Mayor Fenty is liable for violation under color of law of plaintiffs' constitutional right to Due Process for failing to provide proper notice and a fair hearing before denial of their property and liberty interests in remaining in the shelter and having access to services.

70. On the facts alleged above, defendant Mayor Fenty is liable for violation under color of law of plaintiffs' constitutional right to Due Process for failing to provide proper notice and a fair hearing before depriving them of their belongings and personal property

71. On the facts alleged above, defendant Mayor Fenty is liable for violation under color of law of plaintiffs' constitutional right to Due Process because the Mayor lacked authority to close Franklin Shelter where the Franklin Shelter Closing Requirements Emergency Act of 2008 had not been enacted into law at the time the Mayor closed the shelter.

## COUNT II:
## TAKINGS CLAUSE

72. On the facts alleged above, defendant Mayor Fenty is liable for violation under color of law of plaintiffs' constitutional right to just compensation for the taking of their belongings and personal property.

## COUNT III:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS



73. On the facts alleged above, defendant Mayor Fenty is liable to plaintiffs for intentional infliction of emotional distress when he closed the only shelter in the downtown area, depriving the most vulnerable of Shelter inhabitants access to shelter and safety from harm, intentionally or recklessly causing severe emotional distress, sleeplessness, and other physical and mental disorders associated with suddenly losing shelter.

74. Defendant's behavior was extreme and outrageous, and beyond the bounds of decency. As a direct and proximate result of Defendant's behavior, plaintiffs did suffer sever emotional distress.

COUNT IV:
CONVERSION

75. On the facts alleged above, defendant Mayor Fenty is liable to plaintiffs for conversion where their personal belongings were intentionally taken from the plaintiffs, and not returned.

COUNT V:
NEGLIGENCE PER SE

76. On the facts alleged above, defendant Mayor Fenty is liable to plaintiffs for negligence *per se* in his failure to abide by the aforementioned statutes, DC Code §§ 4-754.11, 12, 21, 22, 24, 41 and 42, § 4-753.01, § 10-801, and the Emergency Act, causing plaintiffs severe emotional distress, sleeplessness, and other physical and mental disorders associated with suddenly losing shelter and related services.

COUNT VI:
VIOLATION FOR IMPROPERLY PASSING B17-923, AND FOR VIOLATING THE
FRANKLIN SHELTER CLOSING REQUIREMENTS EMERGENCY ACT OF 2008

77. On the facts alleged above, defendant Mayor Fenty is liable for violating the Franklin Shelter Closing Requirements Emergency Act of 2008. The Mayor could not have acted on the law as law, because the Bill was not passed into law correctly. The Mayor has failed to satisfy the prerequisites for closing Franklin Shelter that are required by the Emergency Act.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request of this Court:

(1) a declaration that the Mayor violated the plaintiffs' constitutional rights;

(2) a declaration that the Mayor exceeded his authority in closing Franklin Shelter when and how he did;



(3) a preliminary and permanent injunction directing the Mayor to reopen Franklin Shelter until all statutory requirements have been satisfied for its closing;

(4) an injunction ordering the Mayor to conduct a proper and accurate assessment of the needs for shelter for the impending hypothermic or frigid season, and provide adequate accommodations based on the assessment of needs

(5) an injunction ordering the Mayor to return the plaintiffs' personal possessions and belongings, or to provide compensatory damages in an amount appropriate to the proof adduced at trial;

(6) such other and further relief which the Court deems proper.

Respectfully Submitted,

October 22, 2008                              _____

Jane Zara
Attorney for Plaintiffs
D.C. Bar # 982392
1611 Monroe St., NW
Washington, DC 20010
(202) 483-9303

jjzara@aol.com



Filed
D.C. Superior Court
09 Jan 05 P01:22
Clerk of Court

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | | |
|---|---|---|
| Eric Sheptock | ) | |
| DJuan Bean | ) | |
| Terry E. Huff | ) | Case No. 007470-08 |
| Joseph Marshall | ) | |
| Charles Davis | ) | |
| Orrin Williams | ) | |
| Richard Embden | ) | |
| Edward Baltimore | ) | |
| Edward Hainsworth | ) | |
| Tommy Bennett | ) | |
| Francwa Sims | ) | |
| Lou Cannao | ) | |
| Kevin Gallon | ) | |
| TiRown | ) | |
| Thomas Davis | ) | |
| Phil Damus | ) | |
| Maurice Cary | ) | |
| Donald Mont | ) | |
| Ronald Clayton | ) | |
| Rodney Hill | ) | |
| Melvin Belt | ) | |

Formerly of 925 13th St., NW,
    Washington, DC 2002,

Junior Almozare
Tom Ashley
James Diggs
Dennis Anderson
    Homeless persons living on
    the streets of the District of Columbia,

    and

Committee to Save Franklin Shelter
on behalf of its members,
Formerly of 925 13th Street, NW
Washington, DC 20002,

            PLAINTIFFS
        vs.



A 103

Adrian Fenty,                                                              )
in his official capacity as Mayor                                         )
1350 Pennsylvania Avenue, NW                                              )
Washington, DC 20004                                                      )
                                                                          )
Neil O. Albert                                                            )
Deputy Mayor for Planning and Economic Development                        )
Office of the Deputy Mayor for Planning and Economic Development          )
John A. Wilson Building                                                   )
1350 Pennsylvania Avenue, NW, Suite 317                                   )
Washington, DC 20004                                                      )
                                                                          )
Clarence H. Carter                                                        )
Department of Human Services                                              )
64 New York Avenue, NE, 6th Floor                                         )
Washington, DC 20002                                                      )
                                                                          )
Fred Swan, Administrator                                                  )
Family Services Administration                                           )
2146 24th Pl NE                                                           )
Washington, DC 20018                                                      )
                                                                          )
            DEFENDANTS                                                     )
_____)

## SUPPLEMENTAL & AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF AND JURY DEMAND

1. Plaintiffs, for their amended and supplemental complaint herein, respectfully state as follows:

## THE PARTIES

2. Plaintiff, Eric Sheptock, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

3. Plaintiff, DJuan Bean, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

4. Plaintiff, Terry E. Huff, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

5. Plaintiff, Joseph Marshall, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

6. Plaintiff, Charles Davis, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002



7. Plaintiff, Orrin Williams, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

8. Plaintiff, Richard Embden, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

9. Plaintiff, Edward Baltimore, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

10. Plaintiff, Edward Hainsworth is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

11. Plaintiff, Tommy Bennett, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

12. Plaintiff, Junior Almozare, is a natural person and homeless person living on the streets of the District of Columbia

13. Plaintiff, Tom Ashley, is a natural person and homeless person living on the streets of the District of Columbia

14. Plaintiff, Francwa Sims, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

15. Plaintiff, Lou Cannao, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

16. Plaintiff, Kevin Gallon, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

17. Plaintiff, TyRown, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

18. Plaintiff, Thomas Davis, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

19. Plaintiff, Phil Damus, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

20. Plaintiff, Maurice Cary, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

21. Plaintiff, Donald Mont, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.



22. Plaintiff, Ronald Clayton, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

23. Plaintiff, Rodney Hill, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

24. Plaintiff, Melvin Belt, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002.

25. Plaintiff, James Diggs, is a natural person and homeless person living on the streets of the District of Columbia.

26. Plaintiff, Dennis Anderson, is a natural person and homeless person living on the streets of the District of Columbia.

27. Plaintiff Committee to Save Franklin Shelter is an unincorporated nonprofit association under D.C. Code 29-971, the Uniform Unincorporated Nonprofit Associations Act.

28. Plaintiff Committee to Save Franklin Shelter was formerly located at 925 13th Street, NW, Washington, DC, 20002.

29. The interest Plaintiff Committee to Save Franklin Shelter seeks to protect is to ensure that those who have inhabited the shelter are able to remain there and have adequate services provided for them.

30. Members of Plaintiff Committee to Save Franklin Shelter include homeless persons in DC who are seeking and will seek shelter before and after the onset of the frigid season of 2008 and thereafter.

31. Members of Plaintiff Committee to Save Franklin Shelter develop the policies of the association.

32. Defendant Adrian Fenty is Mayor of the District of Columbia.

33. Defendant Neil O. Albert is Deputy Mayor for Planning and Economic Development of the District of Columbia.

34. Defendant Clarence H. Carter is Director of Department of Human Services of the District of Columbia.

35. Defendant Fred Swan, Administrator is Administrator of Family Services Administration of the District of Columbia.

### JURISDICTION

36. The jurisdiction of this Court is founded on D .C. Code § 11-921(a) and Rule 65, Superior Court Civil Rule.



## COMPLIANCE WITH RULE 15(A) OF THE D.C. SUPERIOR COURT RULES OF CIVIL PROCEDURE

In compliance with Rule 15(a) of the D.C. Superior Court Rules of Civil Procedure, consent was sought for the filing of this Amended Motion on December 19, 2008 from Denise Baker. Consent was denied on December 19, 2008

### NOTICE OF RELATED CASES

37. On September 30, 2008 and October 1, 2008 a hearing was held on a Motion for a Temporary Restraining Order to keep Franklin Shelter open, Case No. 2008 CA 006954 B, over which Judge Duncan-Peters resided. The TRO was denied on October 1, 2008. Submissions for Voluntary Dismissal on actions regarding pending Motions for Preliminary and Permanent Injunctions were filed with the Court on October 21, 2008. An Amended and Supplemental Motion for Preliminary and Permanent Injunctions is submitted herewith.

### FACTS AND LEGAL BACKGROUND

38. On August 13, 2008, Council Chairperson Vincent Gray wrote a letter to Mayor Fenty about the closure of Franklin Shelter, where he expressed "grave concern" about "steps taken to reduce capacity, bar new admissions and prepare to close the Franklin Shelter."

39. On September 16, 2008, the Council had hearings on, and passed The Franklin Shelter Closing Requirements Emergency Act of 2008, B17-923 [*hereinafter* the "Emergency Act"].

40. The Emergency Act requires that the Mayor, prior to closing the Franklin Shelter, provide a report that describes any expected increase or decrease in the need for low barrier shelter space generally and, specifically, during the winter months, and an accurate assessment of the city's ability to seasonally increase capacity to reduce incidences of hypothermia among the homeless population.

41. No public hearings were conducted concerning the closing of Franklin Shelter.

42. The city has spent over $2 million dollars over the past two years installing heating and cooling systems, new water heating systems, fire alarm systems, and other repairs in Franklin Shelter.

43. Franklin Shelter had a staff trained and experienced in dealing with hypothermic season emergency needs. That staff is needed to deal with the traumatic conditions associated with the hypothermic season.

44. On the morning of September 26, 2008, at approximately 6:00am, inhabitants of Franklin Shelter were awakened and informed that the shelter was closing. Once leaving the shelter, the men were separated from their belongings that remained in the shelter and the men told

5



they could not gain reentry to the shelter.

45. Numerous inhabitants, among them plaintiffs, have not been able to retrieve all of their belongings or personal property since the abrupt closing of the Shelter.

46. The inhabitants of Franklin Shelter were then scattered throughout the downtown area, and police shouted through a loudspeaker from a police car throughout the day to people attempting to enter the shelter, informing them that the shelter was closed.

47. Many persons attempted to enter the shelter throughout the day of September 26. It rained throughout the day and the weekend that followed. Numerous inhabitants of Franklin Shelter spent the weekend outside, in the rain, carrying their belongings or losing them on the streets.

48. The Mayor, at the time of closing the shelter, had not provided a report of needs and provisions for shelter as required by the Emergency Act.

49. On September 30, four days after closing the Shelter, and after close of business, a Report on Supportive Housing Placements and Emergency Shelter Capacity in the District of Columbia [*hereinafter* the "Mayor's Report"] was released.

50. The Mayor then signed the Emergency Act into law (formerly B17-923, now A17-0518) on the evening of September 30, 2008, after close of business.

51. Sec 3(a) requirements of the Emergency Act have not been satisfied, requiring the Mayor's report to be filed PRIOR to the closing of Franklin Shelter. The shelter was closed in hurried manner the morning of Sept. 26, 2008, the report was released the evening of September 30, after close of business.

52. Sec. 3(a)(1)(A)(i) requirements of the Emergency Act have not been satisfied, requiring the documentation of each client's supportive housing address. This has not been provided.

53. Sec 3(a)(1)(A)(iv) requirements of the Emergency Act have not been satisfied, requiring documentation of supportive services provided to complement housing. The report merely mentions the organizations contracted, not an explanation of which services are provided by need to which person. The report merely mentions the promise of future transportation, no details of how the housed will reach their particular services, especially when they are dispersed to the poorest and most violent areas of the city, with the least amount of services available.

54. Sec 3(a)(1)(B)(4) requirements of the Emergency Act have not been satisfied, requiring a proper analysis of the impact of closing of the shelter on the homeless population. No statistics of homeless needs are provided, especially in the Franklin Park area after the closing of the shelter.



55. The Urban Institute reported that at least 13,000 single adults and 2,800 adults and children use emergency shelter in the District every year.

56. The Urban Institute reported that that the shelters are in excess of capacity on a regular basis: 164% over capacity at New York Ave., 125% over capacity at Franklin Shelter, 111% over capacity at 801 East, report illustrated the regular overcapacity of shelters prior to closing Franklin Shelter.

57. Needs are not accurately reflected in the Mayor's Report. The numbers provided only reflect amount of beds made available by the city, independent of any accurate assessment of current needs. Furthermore, these numbers of available beds are based on a single data point (September 26, 2008, with time of day unspecified), and pertain to beds distributed throughout distant parts of the city, away from the downtown area, and are in distant parts of the city where the most vulnerable of the former Franklin Shelter inhabitants are unable or unlikely to be able to reach.

58. Services for mental health and physical health needs are not available at the far flung places to which the homeless are being bussed, and adequate and reliable transportation services have not been proven to be effective, and do not meet the needs of those at shelters far away from downtown.

59. Sec 3(a)(1)(B)(5) requirements of the Emergency Act have not been satisfied, requiring an analysis of the expected increase or decrease in need for low barrier shelter space generally and with regard to winter months.

60. After passing the Frigid Temperature Protection Amendment Act, the D.C. City Council amended it in 2005, and renamed it the "Homeless Services Reform Act" (the "HSRA"). The HSRA unambiguously imposes upon the Mayor an unequivocal statutory mandate to open up District-owned buildings to the persons who are homeless as warming centers when the temperature drops below 32° Fahrenheit:

61. Whenever the actual or forecasted temperature, including the wind chill factor, falls below 32° Fahrenheit, … the District shall make available appropriate space in District of Columbia public or private buildings and facilities for any person in the District who is homeless and cannot access other shelter. D.C. Code § 4-753.01(c) (emphasis added).

62. Plaintiffs bring this action because the District Government has failed to fulfill this statutory obligation. Warming centers are not reasonably accessible to the persons they are intended to serve, e.g., persons who are homeless and residing downtown. Shelters are not geographically located in appropriate places where homeless populations routinely congregate, or where they have access to regular meals, job opportunities, or much needed physical and mental health services.


A 109

63. The transportation services offered are not adequate to accommodate downtown homeless residents, especially those with physical and/or mental disabilities, as well as those who are forced to abandon their personal property in order to be transported to another location..

64. Washington, D.C. has one of the highest rates of homelessness in the country. On a single night in January 2008, approximately 2,200 single adults were chronically homeless. <u>Major Recommendations: Summary Report of the Urban Institute's Assessment of the District of Columbia's Public Homeless Assistance System</u>, June 2, 2008 at 2. Approximately 13,000 single adults and 530 families (2,800 adults and children) use emergency District-sponsored shelter facilities (known as "Continuum of Care" facilities) every year. And this was before the economic collapse that we are now witnessing.

65. As a result of these financial, physical and psychological conditions, a great number of the District's homeless subpopulations are unable to utilize shelter space in locations that require transportation or are overcrowded or are otherwise perceived to be threatening, even when such space is available.

66. Absent shelter, the District of Columbia's homeless population is at risk for developing hypothermia when the weather turns cold.

67. The potential risks of harm increase when exposed persons are disabled by substance abuse or mental illness, as are many persons who are homeless and residing in the District, for they may be unaware that their body temperature has dropped to the point of danger.

68. Once a homeless person becomes hypothermic, he or she must be removed from the street immediately, which often requires medical intervention.

69. The HSRA was enacted "to assure that persons who are homeless are protected from injury and death from hypothermia by providing shelters for them" and "requires that the Mayor provide public buildings to serve as warming centers during the hypothermia period." Office of the Mayor, District of Columbia Hypothermia Procedures, Order No. 2001-161, at 2 (October 2001) ("Hypothermia Procedures").

70. The District Government has stated repeatedly that it anticipates a decrease in the demand for shelter because of a "Permanent Supportive Housing Initiative" that is being implemented by the District Government. However, the District's expectations are unreasonable and present a serious risk that District residents will not receive adequate shelter during this hypothermia season. Over five million dollars has been slashed from this housing program recently by the Council.

71. Multitudes of homeless residing in the streets of the downtown area, and around the city, have applied and have actively pursued inclusion in this housing program. Some of the homeless have been told by the office of Sheila Armstrong to call back every day to check their status, but to no avail.



72. Plaintiffs' evidence submitted herewith provides lists of services that were routinely provided in the Franklin Shelter facility, including but not limited to mental health counseling, job counseling and links to employment opportunities, guidance about how to access public transit, especially for disabled, psychiatric contacts for diagnoses, benefit referrals, substance abuse treatment and counseling referrals, detox access, psycho-social assessments, assistance with housing applications, and medical service referrals.

73. Plaintiffs' evidence submitted herewith provides documents showing extreme callousness toward the inhabitants of Franklin Shelter. Found were documents, left abandoned in the rain (some of which were shredded, some intact) containing personal information about former Franklin Shelter inhabitants, including permanent supportive housing applicants, which abandoned documents included sensitive medical and mental health information, family information, and, in some cases, social security numbers. (See attached exhibits).

74. It is unclear why the District Government has provided such false hope to the homeless.

75. It is also unclear what criteria are being used to determine who is accepted into this program.

76. It is also unclear what the success or failure rates, or problems encountered with this program are, since no information has been provided by the District Government regarding the attrition rates for this program, where the participants reside, and what services they are receiving in order to function as productive and healthy members of society. (See attached evidence of episodes of increased exposure to violence upon placement in supportive housing).

77. The District's Permanent Supporting Housing Initiative cannot alleviate the lack of hypothermia shelter that will result as a result of Franklin Shelter's closing. Especially in light of the fact that the District has failed to identify another adequate warming center reasonably accessible to Downtown homeless men, including those with mental and physical disabilities.

78. In the absence of available, designated warming space in or reasonably accessible to the Downtown area, the Downtown homeless population often has nowhere else to go. Some of the existing, year-round homeless shelters – which have sometimes also served as hypothermia centers in the past – are all ready overcrowded, dilapidated and in need of renovations and repairs.

79. In a June 2, 2008 study commissioned by the District Government, the reviewers found that almost every District-owned emergency shelter has serious deficiencies, including but not limited to gaping holes, cracked ceilings, leaky pipes, unusable toilets and soiled beds. *The Community Partnership and the District of Columbia's Public Homeless Assistance System*, June 2, 2008 at 9.

80. Currently designated warming centers are as many as five miles away from the downtown area, and lack reasonable access to job opportunities, balanced meals, and much needed physical and mental health services.



81. Even when vans are provided to shuttle homeless persons to far flung warming centers, this is not a realistic option for many members of the downtown homeless population, who are afflicted by physical, mental, and emotional disabilities whose transport is potentially highly problematic. (See evidence attached herewith of problematic transportation to designated shelters).

82. In sum, the District Government's past efforts to provide space for warming centers for any person needing shelter have been neither timely nor adequate, and certainly fails to satisfy the requirements of the HSRA.

83. The permanent supportive housing program is a pilot program in its very early stages. Most placements in this new program have occurred within the last month. There is no verification of placed persons retaining their residence after placement. Some men have already left their placements because of uninhabitable conditions, and danger in the neighborhoods in which they were placed.

84. The Table on pages 8-13 of the Mayor's Report shows that there are no placements in the areas of town with the most resources available (Ward 2 and Ward 3). Most placements are occurring in the poorest and most violent parts of town, and with the least services available for the vulnerable and the homeless.

85. It is unclear how the new placements in Supportive Housing, removed directly from jail, mental facilities, the street and shelters, are able to cope with the requirements to cook, clean and maintain a living space, and what resources are in place to help them cope. This is in light of the increases in cost of food, cost of commuting and no clarity on what subsidies or employment opportunities they also received.

86. It is also unclear what priorities were used to determine placement in the Permanent Supportive Housing Initiative, since the most vulnerable of the Franklin Shelter inhabitants are not currently part of the program, but are now sleeping in the parks and streets near Franklin Shelter.

87. Table on page 7 of the Mayor's Report, purporting an increase in capacity during hypothermia season, fails to adjust the figures in light of the data from Table 5 of the Mayor's Report, which shows the actual available beds in the existing shelters. When the correction is made, the number of total hypothermia night beds is reduced from a purported total of 1388 to 474, after compensating for the existing capacity situation at these shelters.

88. The Mayor's Report states on page 7 (bridging paragraph at top of page) that it is "impossible to know" what the needs will be for shelter during the winter. This is in clear violation of the Emergency Act.

89. The Mayor's Report also states that there are no expectations that utilization rates will increase (page 7, bridging paragraph at top of page). This assumption is not supported by any facts, especially in light of the very high rents in the District, as well as the mortgage and economic collapses that we are now witnessing. (See attached article entitled "Cities Face



Alarming Homeless Numbers").

90. The city has provided no sound or credible evidence that the needs for low barrier shelters will be met by the emergency hypothermic beds that are offered under emergency conditions.

91. Former inhabitants of Franklin Shelter now report lack of available beds in remaining shelters including New York Ave. Shelter and Adams, overcrowding conditions in 801 East Shelter, fire sprinkler systems blocked by extra beds, increased incidences of violence due to overcrowding, unreliable transportation and the difficulty of maintaining or seeking employment in the downtown area or other areas of opportunities, which are far removed from Wards 7 and 8, long lines to enter the shelters, meals with little or no nutritional value, unsanitary conditions (801 East often has feces and urine in the bathroom on the floors, etc overnight. A meal is offered once daily, at 7 pm, and soup kitchens and food for the homeless during the day are located at 5-6 miles from the shelter. This makes it very difficult for inhabitants, especially those with mental or physical disabilities, to be able to get two out of three basic meals a day. (see attached correspondence from Fred Swan to Eric Sheptock about meal availability at 801 East Shelter).

92. The Supportive Housing program is in its initial stages, and its success will not be verified by the time of onset of hypothermia season.

93. DC has the third highest poverty rate in the nation. Nearly one out of five of DC residents live at or below the poverty line. The rate of homelessness continues to rise in the District, attributed to an ever increasing lack of affordable housing in the District, including high rents and mortgages, a rise in physical and psychological abuses suffered by the homeless, stagnant wages and slashed public assistance, the lack of adequate health care services, lack of health insurance, lack of adequate mental health facilities and the lack of adequate day care facilities.

94. In DC, an estimated 71% of the homeless individuals suffer from either substance abuse or mental illnesses.

95. D .C. Code § 4-731 (formerly DC Code 1981 § 3-621), under authority pursuant to DC Code § 7-204, the Frigid Temperature Protection Amendment Act of 1988, requires relevant government entities to provide shelter in district buildings, provided those in need to the right to overnight shelter, under the Frigid Temperature Protection Amendment Act.

96. Defendants, in their capacity as D.C. officials, have failed to comply with D .C. Code § 4-731.

97. Plaintiffs will suffer irreparable injury unless the closure of Franklin Shelter is immediately enjoined, a proper inventory of the needs for temporary shelter commence, and adequate facilities for those in need be accommodated.

98. Franklin Shelter has provided a stable resource to those seeking shelter in the downtown area. It has served the homeless community as a continuum of care, as set forth in DC Code



§ 4-754.11, *et seq.* The shelter is located near service providers for mental health and physical health care. It has provided shelter within walking distance, and/or reasonable distance from places of employment for Shelter inhabitants (e.g. within walking distance to day labor centers, Street Sense), enabling them to seek and maintain employment.

99. Many inhabitants have come to rely on the mental and medical services required for their wellbeing, and within reasonable distance to Franklin Shelter.

100. Many Franklin Shelter residents have been moved involuntarily out of Franklin Shelter, and placed in parts of the city that lack adequate facilities to provide for their physical and mental health needs, which place them and others in physical danger, and impose large impediments in their ability to seek and maintain employment.

101. The conditions reported by residents that have been displaced and involuntarily moved from the shelter include reports that replacement housing is dangerous, rodent and roach infested, and unhealthy, and health and mental health facilities are unavailable.

102. Former residents of Franklin Shelter include those with compromised physical and mental capacities, and are now living on the streets of the Franklin Shelter area, without access to life saving medicines, without access to case worker contact and supervision.

103. Former residents of Franklin Shelter include those now living on the streets of the Franklin Shelter area in order to gain adequate access to their jobs so that they may continue being employed, or who now sleep at or near their workplace in order to get to work on time and maintain their employment.

104. Other shelters now housing former Franklin Shelter residents, especially 801 East Shelter, are now experiencing over crowding conditions, and are experiencing increased incidents of violence as a result of the Franklin Shelter closing.

COUNT I:
DUE PROCESS

105. On the facts alleged above, defendant Mayor Fenty is liable for violation under color of law of plaintiffs' constitutional right to Due Process for failing to provide proper notice and a fair hearing before denial of their property and liberty interests in remaining in the shelter and having access to services.

106. On the facts alleged above, defendant Mayor Fenty is liable for violation under color of law of plaintiffs' constitutional right to Due Process for failing to provide proper notice and a fair hearing before depriving them of their belongings and personal property

107. On the facts alleged above, defendant Mayor Fenty is liable for violation under color of law of plaintiffs' constitutional right to Due Process because the Mayor lacked authority to close Franklin Shelter where the Franklin Shelter Closing Requirements Emergency Act of 2008 had not been enacted into law at the time the Mayor closed the shelter.



COUNT II:
TAKINGS CLAUSE

108.   On the facts alleged above, defendant Mayor Fenty is liable for violation under color of
      law of plaintiffs' constitutional right to just compensation for the taking of their belongings
      and personal property.

109.   Because "any person in the District who is homeless and cannot access other shelter" is
      legally and unqualifiedly entitled to space in District buildings during freezing weather, such
      persons – including Plaintiffs - have a constitutionally protected property interest in the
      receipt of that shelter.

110.   The Mayor's failure to identify and provide space for warming centers with sufficient
      capacity; that are in adequate condition; and are reasonably accessible through District-
      provided transportation or otherwise to the District's homeless population, has deprived and
      is depriving Plaintiffs of property without due process of law in violation of the Fifth
      Amendment, as enforceable under 42 U.S.C. § 1983.

COUNT III:
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

111.   On the facts alleged above, defendant Mayor Fenty is liable to plaintiffs for intentional
      infliction of emotional distress when he closed the only shelter in the downtown area,
      depriving the most vulnerable of Shelter inhabitants access to shelter and safety from harm,
      intentionally or recklessly causing severe emotional distress, sleeplessness, and other
      physical and mental disorders associated with suddenly losing shelter.

112.   Defendant's behavior was extreme and outrageous, and beyond the bounds of decency.
      As a direct and proximate result of Defendant's behavior, plaintiffs did suffer sever
      emotional distress.

COUNT IV:
CONVERSION

113.   On the facts alleged above, defendant Mayor Fenty is liable to plaintiffs for conversion
      where their personal belongings were intentionally taken from the plaintiffs, and not
      returned.

COUNT V:
NEGLIGENCE PER SE

114.   On the facts alleged above, defendant Mayor Fenty is liable to plaintiffs for negligence
      *per se* in his failure to abide by the aforementioned statutes, DC Code §§ 4-754.11, 12, 21,
      22, 24, 41 and 42, § 4-753.01, § 10-801, and the Emergency Act, causing plaintiffs severe
      emotional distress, sleeplessness, and other physical and mental disorders associated with

13



suddenly losing shelter and related services.

## COUNT VI:
### VIOLATION FOR IMPROPERLY PASSING B17-923, AND FOR VIOLATING THE FRANKLIN SHELTER CLOSING REQUIREMENTS EMERGENCY ACT OF 2008

115.   On the facts alleged above, defendant Mayor Fenty is liable for violating the Franklin Shelter Closing Requirements Emergency Act of 2008. The Mayor could not have acted on the law as law, because the Bill was not passed into law correctly. The Mayor has failed to satisfy the prerequisites for closing Franklin Shelter that are required by the Emergency Act.

### PLAINTIFFS RESPECTFULLY REQUEST CONSIDERATION OF THE FOLLOWING ADDITIONAL COUNTS:

## COUNT VII:
### VIOLATION OF THE AMENDED FRIGID TEMPERATURE PROTECTION AMENDMENT ACT OF 1988, D.C. CODE § 4-753.01
### FAILURE TO PROVIDE ADEQUATE SHELTER, OR MAKE AVAILABLE APPROPRIATE AND ADEQUATE SPACE FOR WARMING CENTERS IN DISTRICT BUILDINGS

116.   Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

117.   On the facts alleged above, defendant Mayor Fenty has violated D .C. § 4-753.01 (formerly DC Code 1981 § 3-621 and § 4-731, the Frigid Temperature Protection Amendment Act of 1988), by failing to provide shelter in district buildings, and failure to provide to those in need the right to adequate, accessible and appropriate overnight shelter when temperatures reach 32° Fahrenheit or below.

118.   The past efforts of the city have been neither timely nor adequate, and fail to satisfy the requirements of § 4-753.01.

119.   The HSRA provides that "[w]henever the actual or forecasted temperature, including wind chill factor, falls below 32 degrees Fahrenheit…the District shall make available appropriate space in [District] public or private buildings and facilities for any person in the District who is homeless and cannot access other shelter." D.C. Code § 4-753.01(c).

120.   To date, the District Government has identified certain District buildings to serve as space for warming centers, largely consisting of existing year-round shelters. These identified existing shelters for the District's homeless population are unable to provide shelter for all homeless men who need it during freezing weather, specifically those who reside in the Downtown area, especially those with physical and mental disabilities.



121.    As a direct and proximate result of the District's failure to identify and provide appropriate space in the Downtown area to serve as a warming center, Plaintiffs are being unnecessarily and unreasonably exposed to the risks of hypothermia. Moreover, Plaintiffs are suffering and will continue to suffer emotional harm as a consequence of not knowing if and/or when the District Government intends to designate appropriate warming centers accessible to them, as it is required to do by law.

122.    The HSRA provides that "[w]henever the actual or forecasted temperature, including wind chill factor, falls below 32 degrees Fahrenheit, … the District shall make available appropriate space in [District] public or private buildings and facilities for any person in the District who is homeless and cannot access other shelter." D.C. Code § 4-753.01(c).

123.    In addition, the HSRA sets forth specific standards that warming centers must meet including, but not limited to: "…24 hour, properly functioning toilet facilities; Cool water, available via water cooler, fountain, or other means; and [] Properly functioning heat systems." D.C. Code § 4-754.22.

124.    Under the Mayor's 2001 Order outlining the Hypothermia Procedures, "[t]ransportation services shall include both moving people to shelters and moving supplies to the street for those who do not accept shelter…" Hypothermia Procedures at XIII (A). Further, whenever "a person needs shelter, a van shall be dispatched and an assessment made of where the person should be sheltered." *Id.* at XII (B)(4).

125.    Because "any person in the District who is homeless and cannot access other shelter" is legally and unqualifiedly entitled to space in District buildings during freezing weather, such persons – including Plaintiffs - have a constitutionally protected property interest in the receipt of that shelter.

126.    The Mayor's failure to identify and provide space for warming centers with sufficient capacity; that are in adequate condition; and are reasonably accessible through District-provided transportation or otherwise to the District's homeless population, has deprived and is depriving Plaintiffs of property without due process of law in violation of the Fifth Amendment, as enforceable under 42 U.S.C. § 1983.

127.    Defendants, in their capacity as D.C. officials, have failed to provide an up to date and accurate assessment of the shelter needs for the hypothermic season, and how those needs will be fulfilled.

<u>COUNT VIII:</u>
<u>VIOLATION OF THE HOMELESS SERVICES REFORM ACT, D.C. CODE § 4-754.22</u>

128.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

129.    The Homeless Services Reform Act of 2005 (*hereinafter* the *HSRA*), D.C. Official Code § 4-751 *et seq.* concerns the provision of services to individuals who are homeless, or who are threatened with becoming homeless. The Act establishes rights and responsibilities for clients. §§ 4-754.11 through 4-754.39. In addition, the Act establishes a Continuum of Care



to provide supportive services, including health care and treatment for alcohol and drug abuse, with the goal of eliminating barriers faced by clients seeking to obtain permanent housing. The Act contains detailed standards governing how a provider of shelter services may terminate those services, and establishes specific rights for clients who wish to challenge any decision to terminate those rights. A shelter seeking to expel a client must give them oral and written notice to do so. § 4-743.33(c).

130.    D.C. Code § 4-753.22 requires additional standards for providers of severe weather shelter: when severe weather conditions continue overnight, basic needs and other supportive services, as well as information about where to obtain such basic needs and supportive services **shall** be provided, in addition to those services ensured by 4-754.21.

131.    The Department of Human Services (DHS), as the Mayor's designee, must "offer the client or client representative an opportunity for an administrative review by the Department of the decision that is the subject of the fair hearing request. The provisions of the Act leave no doubt about the Council's intent that client that is discharged from a shelter has a right to a hearing to review the shelter's decision to terminate its services. § 4-754.11. The fair hearing provision contains an express recognition of the right to a fair hearing proceeding (§ 4-754.41(d)), and recipients of shelter and supportive housing, while being excluded from the hearing right granted by § 743.41(b)(2), <u>are given the right to a stay pending completion of a fair hearing proceeding.</u>

132.    By providing a stay of the termination of shelter services pending the outcome of fair hearing proceedings, the Act implicitly provides that such proceedings must be available in shelter termination cases. See §§ 4-754.11 and 754.41(d)" "[E]ach provision of the statue should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous.' *District of Columbia v. Morrissey*, 668 A.2d 792, 798 (D.C. 1995) (internal citations omitted).

133.    The District's Permanent Supporting Housing Initiative cannot alleviate the lack of hypothermia shelter resulting from the closing of Franklin Shelter. The existing shelters aside from Franklin Shelter are up to five miles away from the downtown area, and are difficult to reach by persons with limited mental and physical facilities.

134.    Hypothermia has been a cause of death for the homeless in previous years. The needed space cannot be established overnight, and must be prepared properly with trained specialized staff capable of dealing with the associated conditions of hypothermia. Franklin Shelter is already staffed with such skilled persons and it is in the public good that the Shelter remains open for the duration of the hypothermia season.

135.    Plaintiffs seek temporary and permanent injunctive relief compelling the District Government to (a) postpone the closure of the Franklin Shelter until the end of the 2008-2009 hypothermia season or until the District Government identifies and makes available an alternate Downtown shelter facility that is reasonably located and will provide adequate facilities in good condition to serve persons who are homeless during the hypothermia season.

16



136.   On the facts alleged above, defendant Mayor Fenty is liable for violating DC Code §§ 4-754.11, 12, 21, 24, 41 and 42, for failure to provide the rights of continuum of care to the inhabitants of Franklin Shelter, who have come to depend on Franklin Shelter as a *de facto* provider of Continuum of Care, and to depend on reasonable access to mental and health care services necessary for their health and well being.

137.   On the facts alleged above, defendant Mayor Fenty has violated D .C. § 4-754.22 of the HSRA for failure to provide adequate shelter and supportive services, including life saving medicines, mental health and medical services for those in dire need of them, and for failure to adequately assess the needs of the homeless, including former Franklin Shelter residents, at the advent of hypothermia season.

138.   The past efforts of the city have been neither timely nor adequate, and fail to satisfy the requirements of § 4-754.22.  On the facts alleged above, defendant Mayor Fenty has violated D .C. § 4-754.22.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request of this Court:

(1) a declaration that the Mayor violated the plaintiffs' constitutional rights;

(2) a declaration that the Mayor exceeded his authority in closing Franklin Shelter when and how he did;

(3) a preliminary and permanent injunction directing the Mayor to reopen Franklin Shelter until all statutory requirements have been satisfied for its closing and the immediate renewal of social, mental and physical health services previously provided there;

(4) an injunction ordering the Mayor to conduct a proper and accurate assessment of the needs for shelter for the impending hypothermic or frigid season, and provide adequate accommodations based on the assessment of needs;

(5) an injunction ordering the immediate compliance with FDA nutritional requirements for meals made available in all shelters, and three meals per day in compliance with these standards provided in shelters that are more than walking distance from the downtown food distribution center, McPherson Square;

(6) an injunction ordering the immediate compliance, in all shelters, with DOH sanitation requirements for public safety, especially the prompt removal of feces and urine from public restrooms;

(7) the provision of employment opportunities to shelter inhabitants, and appropriate training opportunities for work in and around the shelters;

17



(8) an injunction ordering the Mayor to return the plaintiffs' personal possessions and belongings, or to provide compensatory damages in an amount appropriate to the proof adduced at trial;

(9) an injunction ordering an accurate and updated determination of hypothermia conditions, using hourly links and adjusting for wind chill using the following links: http://www.weather.gov/data/obhistory/KDCA.html, and an automatic wind chill calculator http://www.srh.noaa.gov/elp/wxcalc/windchill.shtml

(10)    reasonable attorneys' fees and costs incurred in the prosecution of this action, as authorized by 42 U.S.C. § 1988;

(11)    such other and further relief which the Court deems proper.


<u>JURY DEMAND</u>

Plaintiffs, through Counsel, request a trial by a 12-person jury on all of the above claims.


Respectfully Submitted,

December 19, 2008

Jane Zara

DC Bar # 982392

1611 Monroe St., NW

Washington, DC  20010

(h)202-483-9303(c)202-390-2449

jjzara@aol.com


A 120

```
 1              SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

 2                            CIVIL DIVISION

 3      ----------------------------x
        ERIC SHEPTOCK, et al.,       :
 4                                    :
                     Plaintiffs      :   Civil Action No.
 5                                    :
                 v.                  :   2008-CA-007470B
 6                                    :
        ADRIAN FENTY, et al.,        :
 7                                    :   ORIGINAL
                     Defendants.     :
 8      ----------------------------x

 9                                       Washington, D.C.

10                                       Tuesday, February 3, 2009
```

HEARING TRANSCRIPT ...........................................................................................................PAGE 43



1          MS. ZARA:  -- torts claims, if I may.

2          Okay.  Regarding the takings claim, defendants say

3     that we haven't satisfied the public use of the taking of

4     their property according to Kelo.  We -- we think we have

5     satisfied it on the night the city took the possessions of

6     the people in the shelter in order to clear the public space.

7     We don't know -- we don't necessarily agree philosophically

8     that it was -- satisfied a public use to shutter the

9     building, but the property was taken from people in order to

10    clear the building.  So we say it satisfies the Kelo

11    requirement for what happened to that property.

12          It was taken and it was put somewhere else, it's out

13    of possession of the plaintiffs and --

14          THE COURT:  And some of your clients got their

15    property from the place it was taken to.

16          MS. ZARA:  Some of them did, but, again, some of

17    them didn't and some of the named plaintiffs still haven't --

18    haven't gotten them.  So --

19          THE COURT:  But none of them were prevented by the

20    government from retrieving their property.

21          MS. ZARA:  They were prevented from reentering the

22    building once they were awakened at --

23          THE COURT:  No.  Once the property was taken to

24    Saint Elizabeths, to the new site, some your clients picked

25    up the property, correct?

43

Filed
D.C. Superior Court
09 Mar 09 A09:47
Clerk of Court

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

ERIC SHEPTOCK, *et al.,*     )
             )
             )
v.              )     Civil Action No. 2008 CA 007470 B
             )     Judge Hedge
             )
ADRIAN FENTY, *et al.,*     )
             )
      Defendants.     )

## MOTION TO STAY PROCEEDINGS PENDING DISCOVERY AND PENDING SUBMISSION OF FEDERAL CLAIMS IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA *or* IN THE ALTERNATIVE MOTION TO AMEND COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIONS

Plaintiffs, individually named and the Committee to Save Franklin Shelter, *et al,*

("Plaintiffs"), by and through undersigned counsel, hereby move this Court to stay proceedings

on defendant's motion for dismissal or summary judgment pending discovery, and motion to stay

proceedings pending plaintiffs' submission of federal claims, herein submitted as Counts I-X, in

the United States District Court for the District of Columbia in the entry of a preliminary and

permanent injunction in violation of *The Americans With Disabilities Act*, 42 U.S.C. §§ 12101 *et*

*seq.*, 12131, and 12132 ("ADA"), *The Fair Housing Act*, 42 U.S.C. §§ 3601-3631 and 3604(f)(1)

("FHA"), the *District of Columbia Human Rights Act*, D.C. Official Code §§ 2-1401.01 *et seq.*

and 2-1402.21(a)(4) (place of residence discrimination) ("DCHRA"), or, in the alternative,

Plaintiffs' motion for an amended complaint for Preliminary and Permanent Injunctions is

submitted herewith.

As reasons why this relief should be granted, plaintiffs state the following:



## JURISDICTION

The jurisdiction of this Court is founded on D .C. Code § 11-921(a), SCR-Civil Rule 65, 42 U.S.C. § 1983, *The Americans With Disabilities Act*, 42 U.S.C. §§ 12101 *et seq.*, 12131, and 12132 ("ADA"), *The Fair Housing Act,* 42 U.S.C. §§ 3601-3631 and 3604(f)(1) ("FHA"), the *District of Columbia Human Rights Act*, D.C. Official Code §§ 2-1401.01 *et seq.* and 2-1402.21(a)(4) (place of residence discrimination) ("DCHRA"). Jurisdiction of this Court is asserted thereby.

## INTRODUCTION

Plaintiffs have requested documents and information from defendants concerning the provision of vital services to former Franklin Shelter residents since the abrupt closing of the shelter. The record to date raises substantial doubt as to the adequacy of the District's provision of vital services to the former inhabitants of Franklin Shelter. This doubt can only be resolved through the discovery authorized by SCR-Civil Rule 56(f). Therefore, Plaintiffs respectfully move that further proceedings on defendants' motion for dismissal and summary judgment be stayed pending discovery as to the adequacy of the provision of these vital services. In addition, plaintiffs are in the process of seeking relief in the United States District Court for the District of Columbia in the entry of a preliminary and permanent injunction in violation of *The Americans With Disabilities Act*, 42 U.S.C. §§ 12101 *et seq.*, 12131, and 12132 ("ADA"), *The Fair Housing Act,* 42 U.S.C. §§ 3601-3631 and 3604(f)(1) ("FHA"), the *District of Columbia Human Rights Act*, D.C. Official Code §§ 2-1401.01 *et seq.* and 2-1402.21(a)(4) (place of residence discrimination) ("DCHRA") (see attached Exhibit of Complaint for preliminary and permanent



injunction in the United States District Court for the District of Columbia).[1] These federal claims arise as a result of the emerging trends, and ongoing patterns and practice of discrimination against plaintiffs by the District in violation of the aforementioned statutes.

Plaintiffs in the alternative respectfully request submit a Motion for an Amended Complaint for Preliminary and Permanent Injunctions.

## PRELIMINARY STATEMENT

Plaintiffs, an organization representing the residents of the former Franklin Shelter and individually named plaintiffs, all were residents at the former Franklin Shelter located in the 900 block of 13th Street in Northwest Washington, D.C (925 13th Street, NW). On the morning of September 26, 2008, at approximately 6:00am, the inhabitants of Franklin Shelter were awakened and informed that the shelter was closing.  Once leaving the shelter, the men were separated from their belongings that remained in the shelter and the men told they could not gain reentry to the shelter. The inhabitants of Franklin Shelter were then scattered throughout the downtown area, and police shouted through a loudspeaker from a police car throughout the day to people attempting to enter the shelter, informing them that the shelter was closed. Many persons attempted to enter the shelter throughout the day of September 26.  It rained throughout the day and the weekend that followed.  Numerous inhabitants of Franklin Shelter spent the weekend outside, in the rain, carrying their belongings or losing them on the streets.

On September 16, 2008, prior to the closing of the shelter, the Council had hearings on, and passed The Franklin Shelter Closing Requirements Emergency Act of 2008, B17-923 ("Emergency Act"). The Emergency Act requires that the Mayor, prior to closing the Franklin

---

[1] While the splitting of claims is disfavored, the federal claims raised here are ones of a special nature and are claims of first impression, and warrant federal jurisdiction.

A 125

Shelter, provide a report that describes any expected increase or decrease in the need for low barrier shelter space generally and, specifically, during the winter months, and an accurate assessment of the city's ability to seasonally increase capacity to reduce incidences of hypothermia among the homeless population. Also included in the provisions of this act is that the city provided coterminous services meeting the various needs addressed. The Mayor signed the act into law on September 30, 2008, following the closing of the facility.

This act contains various services and reporting requirements that have not been met by the District. Sec 3(a) requirements of the Emergency Act have not been satisfied, requiring the Mayor's report to be filed PRIOR to the closing of Franklin Shelter. The shelter was closed in hurried manner the morning of Sept. 26, 2008, the report was released the evening of September 30, after close of business.

Sec. 3(a)(1)(A)(i) requirements of the Emergency Act have not been satisfied, requiring the documentation of each client's supportive housing address. This has not been provided. Sec 3(a)(1)(A)(iv) requirements of the Emergency Act have not been satisfied, requiring documentation of supportive services provided to complement housing. The report merely mentions the organizations contracted, not an explanation of which services are provided by need to which person. The report merely mentions the promise of future transportation, no details of how the housed will reach their particular services, especially when they are dispersed to the poorest and most violent areas of the city, with the least amount of services available. Sec 3(a)(1)(B)(4) requirements of the Emergency Act have not been satisfied, requiring a proper analysis of the impact of closing of the shelter on the homeless population. No statistics of homeless needs are provided, especially in the Franklin Park area after the closing of the shelter.

A 126

District of Columbia has one of the highest rates of homelessness in the country. On a single night in January 2008, approximately 2,200 single adults were chronically homeless. *Major Recommendations: Summary Report of the Urban Institute's Assessment of the District of Columbia's Public Homeless Assistance System,* June 2, 2008 at 2. Approximately 13,000 single adults and 530 families (2,800 adults and children) use emergency District-sponsored shelter facilities (known as "Continuum of Care" facilities) every year. And this was before the economic collapse that we are now witnessing. As a result of these financial, physical and psychological conditions, a great number of the District's homeless subpopulations are unable to utilize shelter space in locations that require transportation or are overcrowded or are otherwise perceived to be threatening, even when such space is available. Sec. 3(a)(1)(A)(i) requirements of the Emergency Act have not been satisfied, requiring the documentation of each client's supportive housing address. This has not been provided. Sec 3(a)(1)(A)(iv) requirements of the Emergency Act have not been satisfied, requiring documentation of supportive services provided to complement housing. The report merely mentions the organizations contracted, not an explanation of which services are provided by need to which person. The report merely mentions the promise of future transportation, no details of how the housed will reach their particular services, especially when they are dispersed to the poorest and most violent areas of the city, with the least amount of services available. Sec 3(a)(1)(B)(4) requirements of the Emergency Act have not been satisfied, requiring a proper analysis of the impact of closing of the shelter on the homeless population. No statistics of homeless needs are provided, especially in the Franklin Park area after the closing of the shelter.

The Urban Institute reported that at least 13,000 single adults and 2,800 adults and children use emergency shelter in the District every year. The Urban Institute reported that that the

A 127

shelters are in excess of capacity on a regular basis: 164% over capacity at New York Ave.,
125% over capacity at Franklin Shelter, 111% over capacity at 801 East, report illustrated the
regular overcapacity of shelters prior to closing Franklin Shelter.

Needs are not accurately reflected in the Mayor's Report. The numbers provided only reflect
amount of beds made available by the city, independent of any accurate assessment of current
needs. Furthermore, these numbers of available beds are based on a single data point (September
26, 2008, with time of day unspecified), and pertain to beds distributed throughout distant parts
of the city, away from the downtown area, and are in distant parts of the city where the most
vulnerable of the former Franklin Shelter inhabitants are unable or unlikely to be able to locate
and obtain these services.

Plaintiffs' evidence submitted with their amended complaint on December 19, 2008
provides lists of services that were routinely provided in the Franklin Shelter facility, including
but not limited to mental health counseling, job counseling and links to employment
opportunities, guidance about how to access public transit, especially for disabled, psychiatric
contacts for diagnoses, benefit referrals, substance abuse treatment and counseling referrals,
detoxification access, psycho-social assessments, assistance with housing applications, and
medical service referrals. *See* Pl.'s Exhibits in their entirety filed with amended complaint on
December 19, 2008.

The District of Columbia has the third highest poverty rate in the nation. Nearly one out
of five of DC residents live at or below the poverty line. The rate of homelessness continues to
rise in the District, attributed to an ever increasing lack of affordable housing in the District,
including high rents and mortgages, a rise in physical and psychological abuses suffered by the
homeless, stagnant wages and slashed public assistance, the lack of adequate health care



services, lack of health insurance, lack of adequate mental health facilities and the lack of

adequate day care facilities. In DC, an estimated 71% of the homeless individuals suffer from

either substance abuse or mental illnesses.

Former inhabitants of Franklin Shelter now report lack of available beds in remaining

shelters including New York Ave. This makes it very difficult for inhabitants, especially those

with mental or physical disabilities, to be able to get two out of three basic meals a day. (*See*

correspondence from Fred Swan to Eric Sheptock about meal availability at 801 East Shelter at

Pl.'s Exhibit Fedex File 1, pages 5-6, filed Feb. 27, 2009.

The Table on pages 8-13 of the Mayor's Report shows that there are no placements in the

areas of town with the most resources available (Ward 2 and Ward 3). The Table on pages 8-13

of the Mayor's Report shows that there are no placements in the areas of town with the most

resources available (Ward 2 and Ward 3). Most placements are occurring in the poorest and

most violent parts of town, and with the least services available for the vulnerable and the

homeless. Overcrowding conditions in 801 East Shelter, fire sprinkler systems blocked by extra

beds, increased incidences of violence due to overcrowding, unreliable transportation and the

difficulty of maintaining or seeking employment in the downtown area or other areas of

opportunities, which are far removed from Wards 7 and 8, long lines to enter the shelters, meals

with little or no nutritional value, unsanitary conditions. The 801 East Shelter often has feces

and urine in the bathroom on the floors, walls, and fixtures overnight. A meal is offered once

daily, at 7 pm, and soup kitchens and food for the homeless during the day are located at 5-6

miles from the shelter.

Franklin Shelter has provided a stable resource to those seeking shelter in the downtown

area. It has served the homeless community as a continuum of care, as set forth in DC Code § 4-


A 129

754.11, *et seq.* The shelter is located near service providers for mental health and physical health care. It has provided shelter within walking distance, and/or reasonable distance from places of employment for Shelter inhabitants (e.g. within walking distance to day labor centers, Street Sense), enabling them to seek and maintain employment. Many inhabitants have come to rely on the mental and medical services required for their wellbeing, and within reasonable distance to Franklin Shelter. *See* Pl.'s Declarations including Phil Damus' Declaration, filed Feb. 2, 2009; other former Franklin Shelter inhabitants' Declarations filed as File 2, Feb. 17, 2007, pages 1-24; Declarations of Louis Cannao and Darrin Smith, Fedex File 3, Feb. 27, 2009, pages 12-14.

Many Franklin Shelter residents have been moved involuntarily out of Franklin Shelter, and placed in parts of the city that lack adequate facilities to provide for their physical and mental health needs, which place them and others in physical danger, and impose large impediments in their ability to seek and maintain employment. Former residents of Franklin Shelter include those with compromised physical and mental capacities, and are now living on the streets of the Franklin Shelter area, without access to life saving medicines, without access to case worker contact and supervision. Former residents of Franklin Shelter include those now living on the streets of the Franklin Shelter area in order to gain adequate access to their jobs so that they may continue being employed, or who now sleep at or near their workplace in order to get to work on time and maintain their employment.

## ARGUMENT

Plaintiffs filed suit against the District defendants alleging numerous violation of both federal constitutional and statutory violations. Plaintiffs allege that because the District defendants closed the Franklin Shelter, they deprived plaintiffs of their rights protected under the



8

the Fair Housing Act ("FHA"), the Americans With Disabilities Act ("ADA"), the District of Columbia Human Rights Act ("DCHRA"), and various common law and constitutional claims.

Plaintiffs seek a preliminary injunction , enjoining the District defendants from 1) taking any further action that eliminate the facility known as Franklin Shelter removed or precluded for the use as a facility to provide services to the homeless; 2) to order the District defendants to reopen Franklin Shelter and allow for the resumption of activities directed to care for the homeless; 3) to order the District defendants to provide those services consistent with the needs set forth in D.C. Code § 4-751 *et seq.*) to enjoin the District defendants from pursuing a policy that forces all facilities for the homeless to underserved areas of the city and otherwise discriminates against those with disabilities and because of place of residence.

To obtain a preliminary injunction against the District defendants, plaintiffs must make a clear showing that: 1) substantial likelihood of success on the merits; 2) that plaintiffs will suffer an irreparable harm should plaintiffs not be afforded relief; 3) that the defendants will suffer any undue hardship from the Court granting relief; 4) whether the public interest will be served by the granting of relief. *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290. 293 (D.C. Cir. 2006) *citing Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1066 (D.C. Cir. 1998); *World Duty Free Americas, Inc. v. Summers*, 94 F. Sup. 2d 61, 64 (D.D.C. 2000). While the court is to balance all four factors in considering these claims, plaintiffs must prove an irreparable injury before a court can then fashion some equitable relief. *Chaplaincy of Full Gospel Churches, id citing CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

**Plaintiffs will suffer irreparable harm if relief is not granted:**

A 131

Title II of the ADA applies to the "services, programs, or activities" of any "public entity," 42 U.S.C. § 12132, without regard to whether such services, programs, or activities are federally funded; a "public entity" includes "any State or local government [and] any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. §12131(1). Thus, as a matter of syntax, the two statutes cover all aspects of state and local governance.

Secondly, the ADA defines an "individual with a disability" as "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(8)(B). The evidence indicates that large segments of the population of Franklin Shelter were persons with cognizable disabilities. As described in plaintiffs' exhibits, many of residents suffer from disabling mental health illnesses that require services that were readily obtained from providers in the area of Franklin Shelter. Others suffered from substance abuse and related illnesses and were receiving treatment as well.

As the evidence of record makes clear, by closing Franklin Shelter the District defendants denied needed services to the disabled residents. By forcing the residents to travel far greater distances to remote areas of the city, many of the Franklin Shelter were unable to obtain the services and have been left to wander the streets in the area of Franklin Shelter.

The denial of these services violates the ADA and provides the basis for immediate relief. *See Inmates of Allegheny County v. Wecht,* 93 F.3d 1124 (3rd Cir. 1996)(vacated). An ADA Title II claimant must show (1) that the plaintiff is "qualified" or that the plaintiff would be qualified if the defendant made reasonable modifications, (2) that the plaintiff has a "disability," and (3) that "by reason of such disability," the plaintiff was excluded from a service, program, or activity



provided by a public entity. Disparate impact analysis applies to the ADA and does not require a showing of discriminatory animus of intent. *Helen L. v. DiDario,* 46 F.3d 325, 335 (3rd Cir. 1995); *Crowder v. Kitagawa,* 81 F.3d 1480, 1489 (9th Cir. 1996). The ADA has been held to apply Title VII disparate impact and, thus, a claimant must show that a "facially neutral policy has a disproportionate impact on a protected group. *Inmates of Allegheny County supra, also see Albemarle Paper Co. v. Moody,* 422 U.S. 405 (1975)(citations omitted) and *Griggs v. Duke Power,* 401 U.S. 424 (1977)(citations omitted). Further, given the remedial purpose of the ADA, those residents of Franklin Shelter who are defined as disabled should be afforded standing. *See Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205 (1972) (citations omitted) (conferring standing under the *Fair Housing Act* to any person injured by a discriminatory practice).

As the evidence of record supports, plaintiffs will present evidence showing that they are member of protected class under the ADA, and that the closing of Franklin Shelter had a disproportionate impact on this class by denying them vital services. While the District defendants did not provide the services available at Franklin Shelter, they owned the property and closed it for any use related to providing shelter and services to the homeless. The actions directly and proximately denied public services in violation of the ADA. On this theory, plaintiffs have met their burden of showing a likelihood of success on the merits.

b) Plaintiffs will likely prevail on their claims raised under the *Fair Housing Act.* In disparate treatment claims under the Fair Housing Act ("FHA"), the analysis traditionally associated with Title VII employment Claims is applied. *Tenants of 2922 Sherman Avenue, et al. v. District of Columbia, et al., Harris v. Itzhaki,* 183 F.3d 1043 (9th Cir. 1999). This first requires plaintiffs to establish that they are protected under the act, and, second, that as a result of the

12



A 133

defendant's discriminatory conduct, they suffered a distinct and palpable harm. *Id.* Under this theory, as a *prima facie* case, Plaintiffs must prove differential treatment between similarly situated persons or groups. The defendant may then present its case of justification that then must be proven to be a pretext before a plaintiff may then recover. *Town of Huntington v. Huntington Branch NAACP,* 844 F.2d 926 (2Nd Cir.) *aff'd.* 488 U.S. 15 (1988); *United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974); *Resident Advisory Board v. Rizzo,* 564 F.2d 126 (3rd Cir. 1977).

Alternatively, plaintiffs may prove an intent to discriminate by a sequence of events, variance with established protocols and procedures, or evidence of a subjective decision-making process. *Village of Arlington Heights v. Metro. Housing Development Corp.,* 429 U.S. 252, 266 (1977)(citations omitted) *also see Tsombanidis v. West Haven Fire Dep't.,* 352 F.3d 565, 579-80 (2nd Cir 2003).

Plaintiffs raise two theories upon which they intend to proceed: 1) evidence will show that District defendants discriminated against a protected class of African American men in denying the housing and thus violating the FHA; 2) the District defendants discriminated against persons with disabilities in violation of the FHA. Under both theories, plaintiff will proceed and likely in proving disparate treatment and disparate impact.

The record evidence indicates that the District defendants, Mayor Adrian Fenty specifically, violated statutes and engaged in other conduct from which an inference of discrimination can be drawn. As articulated above, on September 26, 2008, the city, upon information and belief acting on the orders of Adrian Fenty, closed the Franklin Shelter. Prior to the closing on September 16,2008, and out of mounting concerns for the shelter, the D.C. City Council passed and Emergency Act requiring the District to comply numerous, detailed

13



provisions prior to the closing of the shelter. Mayor Fenty did not sign the legislation into until September 30, 2008, after the closing of the shelter.

Neither Mayor Fenty nor the District have met the minimum requirements for closure of the shelter. The Emergency Act requires that the Mayor, prior to closing the Franklin Shelter, provide a report that describes any expected increase or decrease in the need for low barrier shelter space generally and, specifically, during the winter months, and an accurate assessment of the city's ability to seasonally increase capacity to reduce incidences of hypothermia among the homeless population. This act contains various services and reporting requirements that have not been met by the District. Sec 3(a) requirements of the Emergency Act have not been satisfied, requiring the Mayor's report to be filed PRIOR to the closing of Franklin Shelter. Sec. 3(a)(1)(A)(i) requirements of the Emergency Act have not been satisfied, requiring the documentation of each client's supportive housing address. This has not been provided. Sec 3(a)(1)(A)(iv) requirements of the Emergency Act have not been satisfied, requiring documentation of supportive services provided to complement housing. The report merely mentions the organizations contracted, not an explanation of which services are provided by need to which person. The report merely mentions the promise of future transportation, no details of how the housed will reach their particular services, especially when they are dispersed to the poorest and most violent areas of the city, with the least amount of services available. Sec 3(a)(1)(B)(4) requirements of the Emergency Act have not been satisfied, requiring a proper analysis of the impact of closing of the shelter on the homeless population. No statistics of homeless needs are provided, especially in the Franklin Park area after the closing of the shelter.

Plaintiffs will present further evidence indicating that the District defendants are pursuing a systematic policy of closing shelters for the homeless in the Northwest quadrant and

A135

developing areas of the city, forcing the homeless to remote areas of Wards 7 and 8. Services are

being curtailed and access has been made more difficult for residents at La Casa shelter in

Columbia Heights while other shelters are left in deteriorating conditions that ultimately will

compel their closure. Finally, and in its most insidious form, the District defendants have been

providing the mentally disabled with one way tickets out of town as final effort to remove the

homeless population from the District.

On just this basis, the record evidence supports a clear and irrefutable inference of

discrimination against both African American men and the mentally disabled. Statistics will

show that an overwhelming proportion of the homeless in the District are African American

men. More pointedly, the evidence in this case will show that the overwhelming proportion of

residents at Franklin Shelter were African American men. All told, the city will be unable to

justify its actions not only in closing Franklin Shelter, but also with its failure to provide access

to the needed services that were provided at the shelter and nearby providers. Plaintiffs are likely

to prevail on this theory.

Secondly, the closing of Franklin Shelter had a disparate impact on African American

men, the mentally disabled and those suffering from substance abuse, all protected classes under

the FHA. *See* 42 U.S.C. § 3601-3631. In proving this case, plaintiffs' evidence will show that

Franklin Shelter was populated with a majority of classes described above. This is so for many of

the shelters throughout the city. The evidence will further show that these shelters are located in

predominantly white sections of the city. In disparate impact theory, once the initial showing of a

racially neutral policies disparate effect is shown, then the District must prove"... that its actions

furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no

alternative would serve that interest with a less discriminatory effect." *Huntington Branch,*

15

A136

*NAACP v. City of Huntington,* 844 F.2d 926, 935-36 (2nd Cir. 1988) *also see The Tenants' Assoc. of 2922 Sherman Avenue, et al., v. District of Columbia , et al.,* 444 F.3d 673 (D.C. Cir. 2006). The District defendants will be unable to prove that no less discriminatory alternative existed.

Plaintiffs will meet their burden in showing a likelihood of success on the merits on this theory as well.

c) The analysis of place residence discrimination under the D.C. Human Rights Act ("DCHRA") is analogous to the analysis provided above with the exception that the protected class is persons residing in the Northwest quadrant of the city. *See* D.C. Official Code Sect. 2-1402.21 (a)(4). *George Washington Univ. v. D.C. Board of Zoning Adj.,* 831 A.2d 921, 939-40 (D.C. 2003) *also see Gay Rights Coalition v. Georgetown Univ.* 536 A.2d 1, 29 (D.C. 1987)(applying effects test of *Griggs v. Duke Power, supra* to DCHRA).

In this case, the theory of place of residence discrimination is that Franklin Shelter is located in Northwest, Washington D.C., and following its closure, the residents were forced to shelters and service providers in Wards 7 and 8. Further, with the other threatened closures of shelters in Northwest the only remaining shelters are in the remote sections in eastern part of the city.

**The public interest will be served by the court ordering the reopening of Franklin Shelter and the resumption of services:**

The District of Columbia has the third highest poverty rate in the nation. Nearly one out of five of DC residents live at or below the poverty line. The rate of homelessness continues to rise in the District, attributed to an ever increasing lack of affordable housing in the District, including high rents and mortgages, a rise in physical and psychological abuses suffered by the homeless, stagnant wages and slashed public assistance, the lack of adequate health care services, lack of health insurance, lack of adequate mental health facilities and the lack of


A137

adequate day care facilities. In DC, an estimated 71% of the homeless individuals suffer from either substance abuse or mental illnesses.

With other shelters already operating beyond their capacity and a worsening economic outlook in the short term, maintaining available resources are critical to abating a continuing rise in homelessness and community instability. The Urban Institute reported that at least 13,000 single adults and 2,800 adults and children use emergency shelter in the District every year. The Urban Institute reported that that the shelters are in excess of capacity on a regular basis: 164% over capacity at New York Ave., 125% over capacity at Franklin Shelter, 111% over capacity at 801 East, report illustrated the regular overcapacity of shelters prior to closing Franklin Shelter.

Needs are not accurately reflected in the Mayor's Report. The numbers provided only reflect amount of beds made available by the city, independent of any accurate assessment of current needs. Furthermore, these numbers of available beds are based on a single data point (September 26, 2008, with time of day unspecified), and pertain to beds distributed throughout distant parts of the city, away from the downtown area, and are in distant parts of the city where the most vulnerable of the former Franklin Shelter inhabitants are unable or unlikely to be able to locate and obtain these services.

Further, whatever employment opportunities are available, something critical to personal stability, need to be accessible to this ever-growing population. It is obviously in the public interest to facilitate a system that provides meaningful services and shelter to the most vulnerable population in our community.

## CONCLUSION

In considering a motion for a preliminary injunction, the court must first determine if the moving party has shown an irreparable harm that cannot be addressed by later relief. Plaintiffs

17



have made this showing. The remaining three factors are to be balanced in the sense that a strong

showing of one or two factors without a showing in another may be sufficient.

Plaintiffs decline to address any supposed burden to the District defendants, but at this

stage do not concede the point. Moreover, plaintiffs believe that both the public interest at stake

and the strong likelihood of success on the merits justifies the granting of this extraordinary

relief.

March 9, 2009                                    Respectfully submitted,

                                                 /Jane Zara/_____

                                                 Jane Zara
                                                 DC Bar # 982392
                                                 1611 Monroe Street, NW
                                                 Washington, DC  20010
                                                 (202) 483-9303
                                                 202-723-3955
                                                 jjzara@aol.com



**Certificate of Service**

I hereby certify that on March 9, 2009, I caused a true and exact copy of the forgoing to be delivered by E-Service to:

Denise Baker

Office of the Attorney General

441 4th Street, NW, 6th Floor South

Washington, DC 20001

Denise.Baker@DC.gov

/Jane Zara/_____

Jane Zara

1611 Monroe St., NW

Washington, DC  20010

jjzara@aol.com

DC Bar # 982392

(202) 483-9303

A 140

MAY 2 0 2009

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**(CIVIL DIVISION)**

|  |  |  |
|---|---|---|
| **ERIC SHEPTOCK**, *et al.*, | ) | |
|  | ) | |
|  | ) | |
| **Plaintiffs,** | ) | |
|  | ) | **2008 CA 007470 B** |
| **v.** | ) | **Judge Brook Hedge** |
|  | ) | **Calendar 7** |
| **MAYOR ADRIAN FENTY**, *et al.* | ) | |
|  | ) | |
| **Defendants.** | ) | |
|  | ) | |

**JUDGMENT**

In accordance with the Memorandum Opinion and Order of this date, it is this 11th day of May, 2009, hereby

ORDERED that judgment is granted in favor of defendants and against the plaintiffs.

*Brook Hedge*

BROOK HEDGE
JUDGE
(Signed in Chambers)

Copies served electronically through eFiling for Courts on:

Denise J. Baker, Esquire
Assistant Attorney General

Jane Zara, Esquire

A141

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**(CIVIL DIVISION)**

|  |  |
|---|---|
| **ERIC SHEPTOCK**, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>**MAYOR ADRIAN FENTY**, *et al.*<br><br>    Defendants. | )<br>)<br>)<br>)<br>)    **2008 CA 007470 B**<br>)    **Judge Brook Hedge**<br>)    **Calendar 7**<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

This Order addresses the following motions currently pending before the Court:

1. Defendants' Motion to Dismiss Plaintiffs' Supplemental Amended Complaint for Declaratory and Injunctive Relief or, In the Alternative, for Summary Judgment

2. Defendant Mayor Adrian Fenty's Motion to Dismiss Or In the Alternative For Summary Judgment

3. Plaintiffs' Amended and Supplemental Motion for Preliminary and Permanent Injunction

4. Plaintiffs' Motion for Preliminary Injunction

5. Plaintiffs' Motion to File Under Seal Documents Found Abandoned Outside of Franklin Shelter

6. Plaintiffs' Motion to Compel Discovery

7. Plaintiffs' Motion to Enlarge Time

8. Plaintiffs' second Motion to File Documents Under Seal

9. Plaintiffs' Motion to Proceed Informa Pauperis

10. Plaintiffs' third Motion to File Documents Under Seal

11. Plaintiffs' Motion to Stay Proceeding Pending Discovery and Pending Submission of Federal Claims in the United States District Court for the District



of Columbia or in the Alternative Motion to Amend Complaint for Preliminary
and Permanent Injunctions

12. Plaintiffs' second Motion to Compel Discovery

These motions are all resolved in the context of the core motions: plaintiffs'
Motion for a Preliminary Injunction and defendants' Motion to Dismiss, or in the
alternative, for Summary Judgment. The Court gave the parties until February 16, 2009,
to file any supplements. As of the hearing on defendants' motion on February 3, 2009,
plaintiffs had filed an opposition to the Motion to Dismiss and defendants filed a reply
noting there had been no opposition to the motion for summary judgment. The day before
the hearing, plaintiffs filed an opposition to the summary judgment. After that, plaintiffs
filed the additional motions. For the reasons that follow, the Court will grant
defendants' Motion for Summary Judgment.

### Background

This case arises out of the closing of the Franklin Shelter for the homeless,
located at 925 13th Street, N.W., in Washington D.C. The Franklin Shelter had space for
three-hundred beds. At the time of its closure, it had less than seventy-five persons
spending the night. It was defined as a "low-barrier" facility which meant it provided
overnight accommodation for homeless males.[1] The facility allowed individuals who
used the Shelter to leave personal belongings in a foot locker. Individuals, however, did
not remain in the Shelter during the day. They were allowed to go through intake for that
night's bed space starting at 4 p.m. and were required to leave at 7 a.m. the following
morning.[2]

---

[1] Franklin Shelter Closing Requirements Emergency Act of 2008, A-17-0518, §2.
[2] Testimony of Fred Swan, Motion Hearing, February 3, 2009. The background facts are undisputed.

A143

The District of Columbia does not operate homeless shelters directly. Instead they contract out to "providers." The provider of Franklin Shelter was Catholic Charities. By statute, the Mayor may provide supportive services directly or through the providers, but he is only required to make provision, in public or private facilities, for low-barrier homeless shelter housing when the weather is such that the temperature, with wind chill, falls below 32 degrees or rises above 95 degrees. D.C. Code §4-753.01(c).

The Franklin Shelter closing was an issue closely watched by plaintiffs and by the City Council. The Council addressed the subject in July 2008, and then on August 13, 2008, City Council Chairman Vincent Gray sent a letter to Mayor Fenty,[3] expressing his "grave" concern over the plans "to reduce capacity, bar new admissions and prepare to close the Franklin School shelter." Chairman Gray "urged" the Mayor to submit a report to the Council that stated the current need for a downtown shelter for men and how the need would be met with the projected closing. The core concerns were the loss of an accessible downtown shelter during the cold winter months and one near needed services.

On September 10, 2008, exit interviews were conducted of those who were at Franklin Shelter that inquired as to whether the individual had heard about the impending closure and what services would be required. On September 26, 2008, at 6:30 a.m., while it was raining, the Mayor's representatives announced to those who were spending the night that they had to leave and would not be able to return. They were told that they could take their belongings and that footlockers would be provided if they needed something in which to place their belongings. They were also notified and a notice was posted that, if they did not take their belongings, the belongings would be placed in

---

[3] August 13, 2008 Letter from Vincent Gray to Mayor Fenty attached to plaintiff's Motion for Preliminary Injunction.

A144

footlockers and taken to the 801 East Shelter at St. Elizabeth's where they could stay.

The posting indicated that the property would be held until October 10, 2008. Some

plaintiffs retrieved their belongings from St. Elizabeth's while others did not.

Later on September 26, 2008, the City Council passed the Franklin Shelter

Closing Requirements Emergency Act of 2008, A-17-0518 (hereinafter "Emergency

Act"). Section 3 provided, in part, that:

> (a) [p]rior to the closing of the Franklin Shelter, …the Mayor shall certify to the
> Council that no fewer than 300 men have been placed in supportive-housing units
> and submit the certification to the Council along with a report on the proposed
> Franklin Shelter closing that includes [various information regarding the
> placement of the men and the services to be rendered, as well as information
> regarding low-barrier shelters, the impact of the closure, and the expected
> increase or decrease in the need for such shelter during the months when
> hypothermia could be an issue].

Section (b) provided that "[e]xcept as provided for in subsection (a) the Mayor shall

continue to operate the Franklin Shelter as a 300-person low barrier shelter." Further

complicating the situation, Section 5 provided that "[t]his act shall take effect following

the approval of the Mayor . . . and shall remain in effect no longer than 90 days . . . ."

The Mayor signed the legislation into law September 30, 2008. Accordingly, the

requirements of the Act began after the Shelter was closed and ceased to apply after

December 30, 2008. The Mayor submitted a report to the Council September 30, 2008,

allegedly addressing the requirements of Section 3.

Plaintiffs filed their first suit, 2008 CA 006954 B, on September 26, 2008, to bar

closure of the facility. A two-day hearing on the motion for a temporary restraining order

was held on September 30 and October 1, 2008, after which the motion was denied in

part because of a lack of substantial likelihood of success on the merits. A status was set

before the judge who was assigned the case which was held October 8, 2008. At that

A145

time, the judge set a preliminary injunction motion hearing for December 2, 2008. At no time did the plaintiffs move for an order to preserve their property or to order the return of their property.

On October 22, 2008, instead of moving to amend the complaint in the pending case to add claims or to seek further relief, plaintiffs filed the instant action. The complaint included the same allegations as those then pending in 2008 CA 006954 B, but also expanded on the factual claims arising out of the closure and on the claims for relief. As is customary when a complaint is filed, the Initial Scheduling Conference was set. In this case, it was set for January 30, 2009. In the meantime, plaintiff failed to notify the judge in 2008 CA 006954 B that a related case had been filed so that the newer case could be consolidated with the first case under court rules. Instead, on November 3, 2008, plaintiffs moved to dismiss the earlier case one month before the preliminary injunction hearing. When defendants opposed, noting the filing of the related case, plaintiffs filed a dismissal under Rule 41(a)(1). As a result, the preliminary injunction hearing set prior to the sunset of the Franklin Shelter Emergency Act legislation was vacated.

A motions hearing was held before this Court on February 3, 2009, at which time the Court heard from plaintiffs and defendants regarding the motions pending before the Court.

### Discussion

Plaintiffs seek relief alleging due process violations, actions in violation of the Takings Clause, intentional infliction of emotional distress, conversion, negligence per

se, improper passage of the Emergency Act, and violations of D.C. Code §4-753.01 and §4-754.22. [4]

**Claims Relating to Reopening Franklin Street Shelter**

Plaintiffs argue that before the Mayor could close the Shelter, they were entitled to notice and an opportunity to be heard, and that closing the Shelter amounted to a taking in violation of the Fifth Amendment. To succeed, plaintiffs must demonstrate they possess a legally protected which is being taken. The District's shelter, however, is not a property right. *See Johnson v. Dixon*, 786 F. Supp. 1, 3 (D.D.C. 1991). The D.C. Code expressly states that there is no entitlement to services except for shelter in severe weather pursuant to §4-754.11(5). *See* D.C. Code §4-755.01 ("[n]o provision of this chapter shall be construed to create an entitlement (either direct or implied) on the part of any individual or family to any services within the Continuum of Care, other than shelter in severe weather conditions as authorized by §4-754.11(5)").

In cases of severe weather, the Amended Frigid Temperature Protection Act requires the following:

> [w]henever the actual or forecasted temperature, including the wind chill factor, falls below 32 degrees Fahrenheit, or whenever the actual or forecasted temperature or heat index rises above 95 degrees Fahrenheit, the District shall make available appropriate space in District of Columbia public or private buildings and facilities for any person in the District who is homeless and cannot access other shelter. In doing so, the District shall not use District of Columbia Public School buildings currently being used for educational purposes without the prior approval of the Board of Education.

D.C. Code §4-753.01(c).

---

[4] Defendants' standing argument was denied at the hearing on February 3, 2009. At the same time, the District withdrew its argument under D.C. Code §12-309.

6

All that is statutorily required is that the District provide shelter in severe weather. The Act does not state that the Mayor must provide specific shelter at a specific place nor does the statute require the use of the Franklin Shelter to meet this requirement. The Act only requires that the Mayor make available appropriate space in District public or private buildings. Since plaintiffs do not have a constitutional right to shelter at the Franklin Shelter, there was no legal duty on the part of the defendants to provide notice and an opportunity to be heard (to each who used the shelter) before the actual closing. Even though there was no legal duty, although the exact date was not known, the imminent closure was well-known as plaintiffs demonstrate with regard to the City Council actions.

Plaintiffs concede that there are other shelters available for them albeit they are not as centrally located as the Franklin Shelter. However, this alone does not give plaintiffs a claim for relief or an enforceable constitutional right. Further, plaintiffs' argument that closing Franklin Shelter amounts to a taking of private property for public use is incorrect as it is not private property—it is public property that, while utilized as a shelter, was for public use.

Plaintiffs also argue that the Mayor violated the Emergency Act because in closing the Franklin Shelter, the Mayor failed to act in accordance with the prerequisites to the closure. As laid out above, the Emergency Act requires that, prior to closing Franklin Shelter, the Mayor submit certification to the Council that no fewer than three-hundred men have been placed in supportive-housing units. The certification was to be accompanied by a detailed report. Otherwise, it was to continue to be operated as a three-hundred-person low barrier shelter.



The Emergency Act was signed into law September 30, 2008, and thus, expired December 30, 2008. Accordingly, it did not govern acts prior to September 30. Plaintiffs' argument is rooted in the assertion that the Mayor failed to abide by the Emergency Act giving them a cause of action. The Emergency Act, however, was not law when the Mayor authorized the closure of the Franklin Shelter.

The Mayor, and by extension the District, were not required to abide by what was only a bill at the time. Thus, whether the report submitted by the Mayor was insufficient as plaintiffs argue is irrelevant because there was no requirement that the Mayor submit one in the first place. The Mayor had the authority to close the Franklin Shelter on September 26 in the manner that he did and the Court cannot second guess his decision.

Further, the Act only remained in effect ninety days, its provisions expiring December 30, 2008, long before a hearing was held in the instant action. Even assuming the Court could order the Shelter reopened, the reopening would be for the Mayor to comply with the Act's reporting requirement. The report, however, was to be submitted to the City Council as specified in the Act on September 30, 2008. The Mayor satisfied the Act's closing prerequisite by submitting a report on September 30, 2008, the day he signed the legislation into law. It was for the City Council to determine if the report was sufficient and that the Emergency Act should be amended to reopen the Shelter. The Council, however, took no further action. In any event, by law, the Shelter would have closed December 30, 2008. Thus, the action for injunctive relief is moot.

Furthermore, the Court notes that injunctive relief is equitable. Plaintiffs could have pursued the first suit and had the hearing prior to the sunset provision deadline. They abandoned that case and the hearing and waited until after the Mayor's and City

8

A 1 49

Council's deadlines for closing Franklin Shelter had passed. The plaintiffs cannot now seek to alter the lawful status quo.

**Tort Claims**

Finally, plaintiffs' conversion and intentional infliction of emotional distress claims also fail.

Conversion is the "unlawful exercise of ownership, dominion and control over the personalty of another in denial or repudiation of his right to such property." *Blanken v. Harris, Upham & Co.*, 359 A.2d 281, 283 (D.C. 1976). Plaintiffs argue that the District converted their personal property when it was moved to the 801 East Shelter. Plaintiffs also seek to recover for the personal property that some Plaintiffs inadvertently left behind the morning the Shelter was closed.

It is undisputed that Shelter occupants were permitted to take their belongings with them when they left that morning, and if they could not, they were provided footlockers to store their things until they picked them up at the 801 East Shelter. The District posted a sign on the Shelter which provided Shelter occupants the information necessary to collect these personal belongings and that they could collect them until October 10, 2008.[5] The flyer provided a phone number to contact if transportation to 801 East Shelter was needed. Shelter staff were outside September 27, 2008, through October 4, 2008 from 4-6 p.m. (considered regular intake hours) to inform residents of the closure, the location of the their belongings, and provide transport to retrieve their belongings.[6]

---

[5] *See* Defendants' Supplemental Brief in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment, Declaration of Fred Swan ¶ 4(a).
[6] *Id.*



Of great importance here is the fact that certain plaintiffs and counsel were in court for the initial TRO hearing on September 30 and October 1, 2008. At this time, certain plaintiffs testified about how their belongings were taken to the 801 East Shelter the morning of the closure.[7] The defendants also provided information about the location of property and that shuttle busses were available to take plaintiffs there. Plaintiffs could have raised this issue with the Court then, or at least moved to preserve the property well before the October 10, 2008 pickup deadline.

The District removed plaintiffs' belongings that remained from the shuttered Shelter, however, they were made available for the owners to pick up and at no time were they converted to the public's use or benefit. Plaintiffs were not prevented from going to 801 East Shelter to claim their property and defendants did not prevent them from claiming their belongings. In fact, it is undisputed that at least five of the named plaintiffs in this suit traveled to the 801 East Shelter to reclaim their belongings before the October 10, 2008 deadline and of the one-hundred-sixty-two footlockers that were taken to the 801 East Shelter, eighty-eight contained personal belongings and seventy of them have been retrieved.[8] Most importantly, the District has not disposed of the property and presumably the plaintiffs who have not already done so may still claim their property.[9]

The claims for intentional infliction of emotional distress ("IIED") also fail because plaintiffs cannot establish, as a matter of law, outrageous conduct necessary to

---

[7] Testimony of Terry Huff and Eric Sheptock, Hearing on Temporary Restraining Order, September 30, 2008.
[8] *See* Defendants' Supplemental Brief in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment, Declaration of Fred Swan ¶ 4(c).
[9] *Id.*



establish this claim.[10]  To succeed, plaintiffs must show "(1) 'extreme and outrageous'

conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the

plaintiff 'severe emotional distress.'" *Howard Univ. v. Best*, 484 A.2d 958 (citing *Sere v.*

*Group Hospitalization, Inc.*, 443 A.2d 33, 37, n. 26 (D.C. 1982).  Intent or recklessness

can be inferred from the outrageousness of the acts.  *Best*, 484 A.2d 985 (citing *Sere*,

443 A.2d at 37).  Conduct that is extreme and outrageous "must be 'so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency.'"

*Jackson v. District of Columbia*, 412 A.2d 948, 957 (D.C. 1980).

　　　　To the extent they predicate their IIED claim on the closing of the Shelter, as

discussed above, defendant acted lawfully.  Therefore, an IIED claim cannot prevail.

Second, to the extent plaintiffs predicate their claim on the allegedly abandoned

documents outside the Shelter, they likewise cannot establish a claim under IIED.  There

is no evidence that it was defendants who caused personal documents to be scattered

outside.  Further, there is record evidence, submitted in accordance with Rule 56, which

is uncontested and reflects the care taken by defendants to put plaintiffs' personal

belongings into footlockers and to store them to the current time, some seven moths after

defendants said they would hold them.  In short, plaintiffs can point to no case law

support for an IIED claim against the government for the abandoned documents on the

street, and accordingly, their claims must fail.

　　　　For the above reasons, judgment must be granted in favor of the defendants.

Accordingly, it is this 11th day of May, 2009, hereby

---

[10] The Court has no doubt that plaintiffs believe the Shelter's closing is "outrageous."  There was obvious concern by many about the Shelter closing as reflected in the City Council's action in passing the Emergency Act.  That, however, is not the standard set by our cases for determining this tort.


A152

**ORDERED** that the District Defendants' Motion to Dismiss Plaintiffs' Supplemental Amended Complaint for Declaratory and Injunctive Relief or, In the Alternative, for Summary Judgment is **GRANTED**; and it is further

**ORDERED** that the Defendant Mayor Adrian Fenty's Motion to Dismiss, Or In the Alternative, For Summary Judgment is **DENIED** as moot; and it is further

**ORDERED** that the Amended and Supplemental Motion for Preliminary and Permanent Injunction is **DENIED**; and it is further

**ORDERED** that the Motion for Preliminary Injunction is **DENIED** as moot; and it is further

**ORDERED** that the Motion to File Under Seal Documents Found Abandoned Outside of Franklin Shelter is **DENIED**; and it is further

**ORDERED** that the Plaintiffs' Motion to Compel Discovery is **DENIED**; and it is further

**ORDERED** that the Motion to Enlarge Time is **DENIED**; and it is further

**ORDERED** that the Plaintiffs' second Motion to File Documents Under Seal is **DENIED**; and it is further

**ORDERED** that the Motion to Proceed Informa Pauperis is **DENIED**; and it is further

**ORDERED** that the Plaintiffs' third Motion to File Documents Under Seal is **DENIED**; and it is further

**ORDERED** that the Motion to Stay Proceeding Pending Discovery and Pending Submission of Federal Claims in the United States District Court for the District of

A153

Columbia or in the Alternative Motion to Amend Complaint for Preliminary and

Permanent Injunctions is **DENIED**; and it is further

      **ORDERED** that the Plaintiffs' second Motion to Compel Discovery is **DENIED**.



             BROOK HEDGE
               JUDGE
          (Signed in Chambers)

Copies served electronically through eFiling for Courts on:

Denise J. Baker, Esquire
Assistant Attorney General

Jane Zara, Esquire

A154

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### (CIVIL DIVISION)

|                                    |     |                          |
| ---------------------------------- | --- | ------------------------ |
| **ERIC SHEPTOCK,** *et al.,*       | )   |                          |
|                                    | )   |                          |
|                                    | )   |                          |
| **Plaintiffs,**                    | )   |                          |
|                                    | )   | **2008 CA 007470 B**     |
| **v.**                             | )   | **Judge Brook Hedge**    |
|                                    | )   | **Calendar 7**           |
| **MAYOR ADRIAN FENTY,** *et al.*   | )   |                          |
|                                    | )   |                          |
| **Defendants.**                    | )   |                          |
|                                    | )   |                          |

### JUDGMENT

In accordance with the Memorandum Opinion and Order of this date, it is this 11th

day of May, 2009, hereby

ORDERED that judgment is granted in favor of defendants and against the

plaintiffs.

*Brook Hedge*

—————————————
BROOK HEDGE
JUDGE
(Signed in Chambers)

Copies served electronically through eFiling for Courts on:

Denise J. Baker, Esquire
Assistant Attorney General

Jane Zara, Esquire



A 155

## BALTIMORE v. DISTRICT OF COLUMBIA

### *10 A.3d 1141 (2011)*

Edward BALTIMORE, et al., Appellants,

v.

DISTRICT OF COLUMBIA, Appellee.

### Nos. 09-CV-759, 09-CV-760, 09-CV-761.

District of Columbia Court of Appeals.

Argued April 1, 2010.

Decided January 6, 2011.

Jane Zara, for appellant.

Stacy L. Anderson, Assistant Attorney General, D.C., with whom Peter J. Nickles, Attorney General, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee.

Before REID, GLICKMAN, and BLACKBURNE-RIGSBY, Associate Judges.

REID, Associate Judge:

Appellants, several former residents of the Franklin School Men's Shelter ("Franklin Shelter")[1] and the Committee to Save Franklin Shelter ("the Committee") (collectively "appellants" or "plaintiffs"), filed a complaint against the District of Columbia for declaratory and injunctive relief which alleged constitutional and statutory violations, negligence per se, and several tort claims. Consistent with the trial court's ruling, we hold that the District of Columbia Homeless Services Reform Act ("the HSRA") grants a homeless person or client a statutory entitlement to shelter in severe or frigid weather (as defined) but does not create a direct or implied

[ 10 A.3d
1144 ]

entitlement to any other particular service. In addition, on this record, we do not discern denial by the District of any procedural rights to which appellants were entitled under the HSRA. We further conclude that a homeless person or client who receives medical or other services in the District from a provider does not have a protected property right or interest in those services grounded either in the Constitution or any District of Columbia statute; the exception is the statutory entitlement to shelter in severe or frigid weather. Finally, we agree with the trial court that appellants have not established legally viable claims for negligence per se, intentional infliction of emotional distress or conversion. Consequently, we conclude that the trial court did not err in granting summary judgment in favor of the District, nor did it err in denying other motions filed by appellants in the trial court. Hence, we affirm the judgment of the trial court.

## FACTUAL SUMMARY

The record reveals that the Franklin Shelter, which was located in the 900 block of 13th Street, in the Northwest quadrant of the District of Columbia, provided overnight accommodation for homeless males; the shelter was operated by Catholic Charities under a contract with the

District government. Men were allowed to go through intake for the night's bed space starting at 4 p.m. They were required to leave at 7 a.m. the following morning. Although they could not stay at the Franklin Shelter during the day, they could leave personal belongings there in the footlockers.

In July 2008, the Council of the District of Columbia considered the closing of the Franklin Shelter. The shelter's staff conducted exit interviews with the residents on September 10, 2008. The Council approved the Franklin Shelter Closing Requirements Emergency Act of 2008 on September 16, 2008 ("the Shelter Closing Emergency Act"), and the act was sent to the Mayor for signature.

The District closed the Franklin Shelter very early on the morning of September 26, 2008. Sometime in the afternoon on that same day, plaintiffs filed a complaint for declaratory and injunctive relief (*Eric Sheptock v. Fenty,* CAB6954-08). The Mayor signed the Shelter Closing Emergency Act into law on September 30, 2008. On September 30, and October 1, 2008, the trial court (the Honorable Stephanie Duncan-Peters) heard testimony on plaintiffs' motion for a temporary restraining order to preclude the closing of Franklin Shelter. Judge Duncan-Peters denied the motion, essentially because of her conclusion that the plaintiffs could not prevail on the merits of the lawsuit. The judge also determined that the Committee, an unincorporated association, did not have standing to sue.[2]

Plaintiffs voluntarily dismissed their complaint on October 21, 2008; however,

[ 10 A.3d
1145 ]

they filed a second Complaint for Declaratory Judgment on October 22, 2008, and a Supplemental and Amended Complaint for Declaratory and Injunctive Relief on December 19, 2008 (*Edward Baltimore v. District of Columbia,* CAB7470-08).[3] As the litigation unfolded and discovery proceeded, the parties filed numerous motions; these included the District's December 18, 2008 "motion to dismiss or in the alternative for summary judgment" and its January 9, 2009 "motion to dismiss plaintiff's supplemental amended complaint for declaratory and injunctive relief or, in the alternative, for summary judgment."[4] On February 3, 2009, the trial court held a hearing on the District's "motion to dismiss or in the alternative for summary judgment." Approximately one month after the hearing, plaintiffs filed their March 9, 2009 "motion to stay proceeding pending discovery and pending submission of federal claims in the United States District Court for the District of Columbia[,] or in the alternative[,] motion to amend complaint for preliminary and permanent injunction."[5]

On May 11, 2009, the trial court resolved all of the outstanding motions.[6] The trial court determined that (1) the plaintiffs' due process and takings claims failed because they were unable to establish a constitutionally protected right or interest in the continued operation of Franklin Shelter; (2) the Homeless Services Reform Act ("HSRA") "expressly states that there is no entitlement to services except for shelter in severe weather pursuant to D.C.Code § 4-754.11 (5)"; (3) neither the HSRA nor the Frigid Temperature Protection Amendment Act ("Frigid Temperature Act") mandate that the "Mayor ... provide specific shelter at a specific place"; and (4) "the imminent closure was well known" and since plaintiffs d[id] not have a constitutional right to shelter at the Franklin Shelter, there was no legal duty on the part of [the District] to provide notice and an opportunity to be heard before the actual closing." (Order at 6-7.)

The trial court further declared that the District did not violate the Shelter Closing Emergency Act which took effect on September 30, 2008, and expired on December 30, 2008, because (1) the Shelter Closing Emergency Act had not yet become law when Franklin Shelter closed on September 26, 2008; (2) it was no longer law when the February 3, 2009 hearing was held on the summary judgment motion; and that nevertheless, (3) the Mayor complied with the Shelter Closing Act's reporting requirement when it became law on September 30, 2008. (Order at 8.)



With respect to plaintiffs' tort claims, the trial court ruled that the claims for conversion and intentional infliction of emotional distress ("IIED") failed. The conversion claim failed because the belongings

[ 10 A.3d
1146 ]

of the men who slept at Franklin Shelter "were made available for [them] to pick up and at no time were converted to the public's use or benefit." The judge noted that the vast majority of footlockers transported from Franklin Shelter to the 801 East Shelter had been claimed, that "the District ha[d] not disposed of the property, and that presumably [the men] who ha[d] not already done so may still claim their property." Furthermore, the notice posted to Franklin Shelter on September 26, 2008, the day the shelter was closed, provided a telephone contact number if a person needed transportation to the 801 East Shelter. Franklin Shelter staff also stood outside the shelter on September 27, 2008 through October 4, 2008 (during regular intake hours) "to inform residents of the closure, the location of their belongings, and [to] provide transport to retrieve their belongings." (Order at 9.) Regarding the IIED claim, the judge declared that plaintiffs "[could not] establish, as a matter of law, [the element of] outrageous conduct" because the District lawfully closed Franklin Shelter. The court found no evidence demonstrating that the District caused personal documents of men housed at the shelter to be "abandoned" outside Franklin Shelter. (Order at 10-13.)

## ANALYSIS

Appellants essentially raise statutory and constitutional issues, negligence per se, and common law claims relating to the closing of the Franklin Shelter. Legal questions, including those relating to the grant of summary judgment, are subject to *de novo* review. *See Sears v. Catholic Archdiocese of Washington,* 5 A.3d 653, 657 (D.C.2010); *Andrade-Sorto v. Allstate Ins. Co.,* 982 A.2d 669, 670 (D.C.2009). "`Summary judgment is properly granted only if there are no genuine issues of material fact in dispute and if the moving party is entitled to judgment as a matter of law.'" *New Econ. Capital, L.L.C. v. New Mkts. Capital Grp.,* 881 A.2d 1087, 1094 (D.C.2005) (quoting *Jack Baker, Inc. v. Office Space Dev. Corp.,* 664 A.2d 1236, 1240 (D.C.1995)). "We review the trial court's grant of summary judgment *de novo.*" *Allen v. Schultheiss,* 981 A.2d 610, 614 (D.C.2009) (citation omitted).

"In construing a statute the primary rule is to ascertain and give effect to legislative intent and to give legislative words their natural meaning." *Banks v. United States,* 359 A.2d 8, 10 (D.C.1976) (internal quotation marks and citation omitted). "Statutory interpretation is a holistic endeavor, and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." *Cook v. Edgewood Mgmt. Corp.,* 825 A.2d 939, 946 (D.C.2003) (internal quotation marks and citation omitted). Words "are inexact tools at best and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how clear the words may appear on superficial examination." *Citizens Ass'n of Georgetown v. Zoning Comm'n of the District of Columbia,* 392 A.2d 1027, 1033 (D.C.1978) (citation omitted). "If related statutes conflict, we must reconcile them." *Abadie v. District of Columbia Contract Appeals Bd.,* 843 A.2d 738, 742 (D.C.2004) (citing *Gonzalez v. United States,* 498 A.2d 1172, 1174 (D.C. 1985)).

### *The Statutory Claims*

### *Homeless Services Reform Act of 2005*

In essence, appellants contend that the District violated the HSRA by not providing certain services to homeless men who slept in the Franklin Shelter, a low barrier facility, and by denying them certain procedural rights to which they were entitled under the HSRA before the closing of the shelter. They claim that "[t]he [s]helter's closure occurred without properly assessing



A158

[ 10 A.3d
1147 ]

the needs for shelter, without adequately informing the public or the Council, without adequate public hearings, and without properly determining how these heretofore unassessed needs are to be adequately provided." Moreover, they assert that "[a]s a result of the District's actions many in need of mental health, health care and other related services have suddenly been deprived of mental and medical health care services, ... and now sleep in the wet and cold in the downtown area."

We have not previously considered or interpreted the HSRA. Therefore, we begin by summarizing the statutory provisions. By enacting the HSRA, the Council of the District of Columbia sought to implement the concept of "continuum of care" to address the problem of homelessness in the District of Columbia.[7] The statute defines "continuum of care" as "the comprehensive system of services for individuals and families who are homeless or at imminent risk of becoming homeless and designed to serve clients based on their individual level of need." D.C.Code § 4-751.01(8) (2008 Repl.). The continuum of care "may include crisis intervention, outreach and assessment services, shelter, transitional housing, permanent supportive housing, and supportive services." *Id.* However, § 4-755.01(a) specifies that there is no statutory entitlement to these services, except for severe weather shelter.[8]

Subchapter III of the HSRA details services within the continuum of care and eligibility for those services. D.C.Code §§ 4-753.01 and 4-753.02. The basic service concept is found in § 4-753.01(a):

> The District's provision of homeless services shall be based on a Continuum of Care that offers a comprehensive range of services through various member agencies and is designed to meet the specific, assessed needs of individuals and families who are homeless or at imminent risk of becoming homeless. The District shall respond to the changing needs of individuals and families by ensuring that transfer between and among services within the Continuum of Care is fluid and allows clients to modify the intensity of services they receive to meet their needs, preferences, and changing circumstances.

The severe or frigid weather requirement was incorporated into the HSRA.[9] Section 4-753.01 (c) provides:

> (c) Whenever the actual or forecasted temperature, including the wind chill factor, falls below 32 degrees Fahrenheit, or whenever the actual or forecasted temperature or heat index rises above 95 degrees Fahrenheit, the District shall make available appropriate space in District of Columbia public or private buildings and facilities for any person in the District who is homeless and cannot access other shelter. In doing so, the District shall not use District of Columbia Public School buildings currently being used for educational purposes without the prior approval of the Board of Education.

[ 10 A.3d
1148 ]

Subchapter IV of the HSRA contains provisions pertaining to rights and responsibilities of those receiving provider services, standards and requirements for those providing services, and administrative hearings and reviews. Client rights, which appear in Part B of Subchapter IV of the HSRA, include "[t]imely notice, where required by § 4-754.33, of any decision of the Department [of Human Services] or a provider that adversely affects the client's receipt of services within the Continuum of Care."[10] D.C.Code § 4-754.33(b) specifies, in part: "All providers shall give to any client to whom they have denied services oral and written notice of the right to appeal the denial...." And, § 4-754.33(c) states, in part: "All providers shall give written and oral notice to clients of their transfer to another provider... at least 15 days prior to the effective date of the transfer...." Section 4-754.34 governs the transfer of clients, and § 4-754.34(a) specifies:

> (a) A provider may transfer a client to another provider to ensure the client receives the most appropriate services available within the Continuum of Care whenever:
>
> (1) The client consents to the transfer; or



(2) The provider identifies and secures for the client a placement with another provider that more appropriately meets the client's medical, mental health, behavioral, or rehabilitative service needs in accordance with the client's service plan.

Section 4-754.34(b) states, in part:

(b) In addition to the circumstances under which a client may be transferred as described in subsection (a) of this section, a provider may transfer a client when a client fails or refuses to comply with the provider's Program Rules and the client responsibilities listed in § 4-754.13, or engages in any of the behaviors listed in § 4-756.36(2)....

Part C of Subchapter IV contains standards applicable to providers who operate programs for the homeless within the Continuum of Care. Standards common to all providers are found in § 4-754.21 and include the requirement that providers "[c]ollaborate and coordinate with other service providers to meet the client's needs, as deemed appropriate by the provider and the client" (§ 4-754.21(4)). The HSRA includes additional standards for those providing "severe weather shelter," "low barrier shelter," and "temporary shelter and supportive housing."[11]

[ 10 A.3d
1149 ]

Part E of Subchapter IV contains provisions relating to hearings and administrative reviews. Under certain enumerated circumstances, a client may request a fair hearing under D.C.Code § 4-754.41 to appeal administrative review or provider decisions.[12] Under D.C.Code § 4-754.42, the Department of Human Services has the right to review the decision that will be the subject of a fair hearing.[13]

In examining the record before us, which contains a plethora of documents, including numerous articles and newspaper clippings, it is difficult to discern appellants' precise contentions on appeal regarding the District's alleged violations of specific provisions of the HSRA. In their supplemental and amended complaint, plaintiffs alleged violations of D.C.Code §§ 4-754.11, .12, .21, .22, .24, .33, .41, and.42. During the February 3, 2009 hearing

[ 10 A.3d
1150 ]

on the District's motion to dismiss or for summary judgment, the trial judge endeavored to pinpoint the provisions of the HSRA on which plaintiffs relied in seeking relief under the HSRA, that is, as plaintiffs' counsel puts it, "to restore services"—"the abundance of services that were provided to inhabitants of Franklin Shelter, including mental health counseling, psychiatric matching, psychiatric services, employment services, information about how handicap can access mass transit, information about day labor situations downtown." Plaintiffs emphasized services in the downtown area, and the individual's right to a hearing. In response to the judge's inquiry, counsel for plaintiffs referenced §§ 4-754.11 through 4-754.39, and said that she would "pin cite 4-743.33(c) [sic], ... 754.11 ...[,] [and] 754.41(d)." Later, she also focused on the District's alleged violation of § 4-754.23 regarding case management services for low barrier shelters. On appeal, appellant's HSRA arguments range widely and generally over several HSRA provisions, but appear to center on § 4-753.01, § 4-754.11(15) which cross references § 4-754.33 which cross references §§ 4-754.41 and .42; § 4-754.21, .22, and .23; and §§ 4-754.34 and .35.

We concentrate first on appellants' argument that the District deprived the men who stayed at Franklin Shelter of "mental and medical health care services," and that "once services are being provided under the HSRA, the District is obliged to comply with the act, especially concerning the abrupt removal of services for a vulnerable population." Because there are potential ambiguities in the sections of the HSRA which pertain to services to the homeless, we must construe several provisions together (§§ 4-753.01, 4-754.21, .22,.23, and 4-755.01) and reconcile them in order to determine what, if any, services mentioned in the HSRA constitute statutory entitlements. *Abadie, supra,* 843 A.2d at 742.



We do not read §§ 4-753.01(a) and (b) as a statutory entitlement to services. Rather, § 4-753.01(a) describes the "comprehensive range of services" that a provider may offer to the homeless as part of the District's commitment to a continuum of care. Indeed, § 4-753.01(b) specifies that "[t]he Continuum of Care *may include*" (emphasis added) five different types of services, including "outreach and assessment." However, there is one clear statutory entitlement embodied in § 4-753.01(c), and that is the right to "appropriate space in District of Columbia public or private buildings and facilities" for a homeless person "who cannot access other shelter" "[w]henever the actual or forecasted temperature, including the wind chill factor, falls below 32 degrees Fahrenheit, or whenever the actual or forecasted temperature or heat index rises above 95 degrees Fahrenheit."

In addition to § 4-753.01, we must examine other sections of the HSRA, particularly those pertaining to providers, to determine whether there is any other statutory entitlement. There is some ambiguity in §§ 4-754.21, .22,[14] and .23[15] because

[ 10 A.3d
1151 ]

of the use of words that may convey different meanings: "standards" compared with "requirements" and "shall" or "shall provide." The section by section discussion in the Council's Committee Report on the HSRA legislation uses the word "standards" in describing § 4-754.21 ("section 12 outlines common standards for all providers including ....");[16] § 4-754.22 ("section 13 outlines additional standards for providers of severe weather shelter including ...."); and § 4-754.23 ("section 14 outlines additional standards for low barrier shelters, which include the offer of case management services...."). In context, the word "standards" suggests norms or what is acceptable or desirable, not a statutory entitlement. Nevertheless, each of these sections also uses the word "shall" or the words "shall provide." However, when these sections, as well as § 4-753.01, are read together with § 4-755.01, it is clear that there is only one statutory entitlement conveyed by the act, and that is shelter in severe or frigid weather. Section 4-755.01(a) unambiguously states: "No provision of this chapter shall be construed to create an entitlement (either direct or implied) on the part of any individual or family to any services within the Continuum of Care, other than shelter in severe weather conditions as authorized by § 4-754.11 (5)" ("Clients served within the Continuum of Care shall have the right to shelter in severe weather conditions.").[17] Hence, while the Continuum of Care with its range of comprehensive services is designed to guide providers as they address the needs of homeless individuals and families and those at imminent risk of homelessness, the continuum of care is not a statutory entitlement, except with respect to shelter in severe or frigid weather.[18]

With respect to the right to shelter in severe weather, our review of the record, particularly the written declarations of men who slept at the Franklin Shelter prior to its closing, has not revealed any specific complaint about the denial of other shelter during severe weather conditions.[19] In contrast, the declaration of Fred Swan, an administrator of the Department of Human Services' ("DHS") Homeless Services Program, stated that DHS provided funds

[ 10 A.3d
1152 ]

for the Center for Creative Non-Violence ("CCNV"), located in the downtown area, to operate 700 temporary beds and an additional 183 emergency/hypothermia beds for men during the winter season.[20] Furthermore, the District operates a Shelter Hotline 24 hours a day during hypothermia season and men may request transportation to a shelter.[21]

We now turn our attention to appellants' arguments concerning the alleged denial of procedural rights under the HSRA. These arguments require us to consider other sections of the HSRA pertaining to client rights, transfer of clients, suspension and termination of services, and administrative hearings and reviews. Appellants complain that under § 4-754.11(15) (located in



This Document is Provided by Leagle.com

the section on client rights), the District denied them timely notice of the Franklin Shelter's closing, and a fair hearing pursuant to § 4-754.41.

Section 4-754.11(15) mandates timely notice only "where required by § 4-754.33." Section 4-754.33 contains two pertinent subsections—(b) concerning the denial of services by a provider and (c) relating to the transfer, suspension or termination of services as a sanction. There is some ambiguity surrounding the word "transfer." The plain words of § 4-754.34(a) indicate that "[] a provider may transfer a client to another provider ..." even though the client manifests no behavioral problem. However, HSRA's legislative history as well as §§ 4-754.33(c)(1) and (2) associate a transfer with a sanction or a denial of services, as evidenced by the required content of the notice. The discussion of § 19, the notice provision—§ 4-754.11(15)—in the legislative history states that "Notice shall include [a] clear statement of sanction or denial; [a] detailed statement of the factual basis and the dates that this factual basis occurred; [and a] reference to the statute pursuant to the sanction or denial...." Committee Report at 8. At any rate, we do not interpret § 4-754.34(a) as granting to the client a pre-transfer right to a fair hearing since this particular subsection, which uses the words "may transfer," imposes no obligation on the provider to transfer a client to another program in the event its facility is scheduled for closing.

Furthermore, as the trial court recognized, § 4-754.36 regarding termination of services, and § 4-754.35 involving suspension of services (which cross references 4-754.36), highlight misconduct and prohibited behavior such as possessing a weapon, possessing or selling drugs, assaulting a person, endangering the client's safety or that of others, and repeatedly violating a provider's program rules. Section 4-754.36(2)(A) through (G). The Committee Report appears to confirm this interpretation of these sections by asserting that § 19 (D.C.Code § 4-754.36) "describes the grounds for termination of services to a client, only after attempts to transfer or suspend the client, and the client [p]ossesses a weapon on the premises...." Committee Report at 9. On this record we discern neither a termination of services to the men in the Franklin Shelter, nor any charge of misconduct or bad behavior on the part of any of the clients that would

[ 10 A.3d
1153 ]

require notice before a transfer to another program under § 4-754.34(b).

Moreover, even assuming termination of services or misconduct or bad behavior on the part of one or more of the clients, on the record before us, we would be satisfied that the District provided timely notice of the Franklin Center's closing. Attached to the District's motion to dismiss supplemental and amended complaint are exit interview forms for several of the plaintiffs. These forms are dated September 10, 2008 and Terry Huff, Eric Sheptock, Djuan Bean, and Tommy Bennett answered yes to the question, "Have you been informed that Franklin Shelter will close on October 1, 2008?" Although Edward Baltimore, Lewis Cannao, and Kevin Gallon answered the question in the negative, they all received notice at least as of September 10, 2008 which met the fifteen-day notice required by § 4-754.33(c). Moreover, Mr. Swan's supplemental declaration, filed on February 17, 2009, in response to specific questions by Judge Hedge, indicates that the residents of Franklin Shelter were informed orally at a meeting in July 2008 that the shelter would close by October 1, 2008. In addition, flyers were posted on the doors of the shelter on September 27, 2008 informing the residents where they could pick up their belongings if they left them in the shelter, and as Judge Hedge found, staff members were stationed outside the shelter from September 27, 2008 through October 4, 2008, from about 4-6 p.m. to assist former residents with the retrieval of their belongings. Among those who picked up their belongings from another shelter were Edward Baltimore, Terry Huff, and Eric Sheptock. Furthermore, we see no indication in the record that any of the appellants ever requested a fair hearing pursuant to § 4-754.41. Consequently, even assuming the applicability of the procedural provisions, we are convinced that appellants would not prevail on their HSRA contentions.

### *Franklin Center Closing Requirements Emergency Act of 2008*



This Document is Provided by Leagle.com

Appellants contend in Count VI of their complaint that the District "is liable for violating the Franklin Shelter Closing Requirements Emergency Act of 2008." Section 3(a) of that Act stated, in part: "Prior to closing of the Franklin Shelter, ... the Mayor shall certify to the Council that no fewer than 300 men have been placed in supportive-housing units and submit the certification to the Council along with a report on the proposed Franklin Shelter that includes" information identified in § 3(a)(1) through (6). The emergency act is silent as to any requirement if the Franklin Shelter closed before the act became law. On appeal appellants essentially argue that the Mayor has never complied with the emergency act and that the September 30, 2008 "Report on Supportive Housing Placements and Emergency Shelter Capacity in the District of Columbia," which the District sent to the Council, did not meet the requirements of the emergency act. But, as Judge Hedge properly found the emergency act "was not law when the Mayor authorized the closure of the Franklin Shelter," and hence, "[t]he Mayor, and by extension the District, were not required to abide by what was only a bill at the time." We conclude that appellants cannot prevail on Count VI of their complaint.

### The Constitutional Claims

### Due Process

Count I of appellants' complaint alleges a due process cause of action. They claim a "constitutional right to [d]ue [p]rocess" on the ground that the District "fail[ed] to provide a proper notice and a fair hearing before denial of their property and liberty interests in remaining in

[ 10 A.3d 1154 ]

shelter and having access to services." Their due process claim also is based on their assertion that the District "fail[ed] to provide notice and a fair hearing before depriving them of their belongings and personal property."

In order to prevail on their due process claim appellants must establish either a right to shelter traceable to the Constitution, or a right grounded in statute which is protected by the Fifth Amendment Due Process Clause. The first avenue was foreclosed in *Lindsey v. Normet* when the Supreme Court declared: "We do not denigrate the importance of decent, safe, and sanitary housing[,] [b]ut ... [w]e are unable to perceive in [the Constitution] any constitutional guarantee of access to dwellings of a particular quality ..." and "[a]bsent constitutional mandate, the assurance of adequate housing ... [is a] legislative, not judicial, function[]." 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). The second avenue requires a statutory entitlement. As the court explained in *Washington Legal Clinic for the Homeless v. Barry,* 323 U.S.App. D.C. 219, 223, 107 F.3d 32, 36 (1997):

> The Fifth Amendment's Due Process Clause prohibits the District of Columbia from depriving persons of property, without due process of law. Individuals are entitled to due process, however, only if they have a constitutionally protected property interest. To have a property interest in a government benefit, a person clearly must have more than an abstract need or desire for [the benefit]. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. Entitlements derive from an independent source such as state law, i.e., statutes or regulations that secure certain benefits and that support claims or entitlements to those benefits.

*Id.* at 36 (citing *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)) (other citations and internal quotation marks omitted). We have established above that except for the right to shelter in severe or frigid weather, which is not at issue in this case, the District's legislature has not created a statutory entitlement to nor a protected property right or interest in shelter or shelter services. *See* D.C.Code § 4-755.01(a). Nor has the District's legislature established a statutory right of the homeless in the HSRA to a hearing before a shelter is closed. Consequently we discern no error in Judge Hedge's rejection of appellants' due process claim.[22]



[ 10 A.3d
1155 ]

***The Tort Claims***

## *Intentional Infliction of Emotional Distress*

In Count III of their complaint, appellants allege intentional infliction of emotional distress ("IIED") due to the closing of the Franklin Shelter. "To prove a claim of IIED, 'a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.'" *Kitt v. Capital Concerts, Inc.,* 742 A.2d 856, 861 (D.C.1999) (quoting *Crowley v. North Am. Telecomms. Ass'n,* 691 A.2d 1169, 1171 (D.C.1997)) (citations omitted); *Kotsch v. District of Columbia,* 924 A.2d 1040, 1045 (D.C.2007) (citing *Waldon v. Covington,* 415 A.2d 1070, 1076 (D.C.1980)). Regarding the first element, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Kotsch v. District of Columbia,* 924 A.2d 1040, 1045-46 (D.C.2007) (quoting Restatement (Second) of Torts § 46, cmt. D (1965)) (alteration in original). The record does not show that appellants can satisfy the element of extreme and outrageous conduct. To the contrary, the record reveals that the District attempted to close the shelter in a methodical manner. On April 2, 2008, the Mayor publicly announced that the Franklin Shelter would be closed. From that date until September 26, the beds in the shelter were gradually reduced as clients were assisted in locating alternative shelters. Many clients, including several of the appellants, participated in exit interviews conducted to assure awareness of the upcoming closure and to provide transitional assistance. On the morning of the closure, clients gathered their things and then the District, at the clients' requests, transported footlockers filled with personal belongings to the 801 East Shelter. And, after the closure, the District provided transportation to and from downtown and other shelters, including 801 East Shelter. To the extent that appellants rely on the documents found outside Franklin Shelter for their claim of IIED, they speculate and make conclusory statements but do not provide any credible evidence that shows (1) the District discarded the documents, or (2) the manner of the discarding constituted extreme and outrageous conduct by the District, or (3) the discarded documents caused them severe emotional distress. For the foregoing reasons, appellants' claim for IIED fails as a matter of law.

## *Conversion*

In Count IV, appellants allege that the District "is liable to plaintiffs for conversion where their personal belongings were intentionally taken from [them], and not returned." "The tort of conversion involves 'an unlawful exercise of ownership, dominion, and control over the personalty of another in denial or repudiation of his right to such property.'" *Dennis v. Edwards,* 831 A.2d 1006, 1013 (D.C.2003) (citations omitted). The parties agree that appellants either willingly consented to the transport of their personal belongings in a footlocker or opted to assume responsibility for them. With respect to the footlockers, it is undisputed that the District did not "unlawful[l]y exercise ... ownership, dominion and control over the personalty of [appellants] in denial or repudiation of [their] right[s] to such property." *Dennis,*

[ 10 A.3d
1156 ]

831 A.2d at 1013. The items lost or left behind rather than being placed in footlockers constituted abandoned property and appellants correctly state that a conversion claim cannot be grounded on abandoned property. *See, e.g., Block v. Fisher,* 103 A.2d 575, 576 (D.C.1954) ("Abandonment of personal property is a complete defense to an action for conversion."). Furthermore, appellants fail to show that there was an "unlawful exercise of ownership, dominion and control" by the District and therefore their conversion claim fails.[23]



A164

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

# Footnotes

1. Counsel for appellants identifies the individual parties to this appeal as Edward Baltimore, Terry Huff, and Eric Sheptock.

Back to Reference

2. In their reply brief, appellants contend that "Superior Court erroneously denied associational standing for the Committee to Save Franklin Shelter ....., and they cite to the decision made by Judge Duncan-Peters during consideration of plaintiffs' first complaint pertaining to this matter on October 1, 2008. That complaint was voluntarily dismissed. The question of the Committee's standing in the case before us was not properly preserved in the trial court, and indeed that issue was not discussed in appellants' main brief in this case. After Judge Hedge declared during the February 3, 2009 hearing in this case that "whether or not the association" had standing, "it certainly seems that [the individual plaintiffs] would have standing," and rejected the District's standing argument, plaintiffs did not press their contention about the Committee's standing. Therefore the issue of the Committee's standing has been waived.

Back to Reference

3. The complaint contained six causes of action, and the supplemental and amended complaint added two other causes of action.

Back to Reference

4. The Committee opposed the motion on January 5, 2009.

Back to Reference

5. The District opposed this motion on March 25, 2009, and the Committee filed a reply on April 1, 2009.

Back to Reference

6. The trial court granted the District's "motion to dismiss plaintiffs' supplemental amended complaint for declaratory and injunctive relief or, in the alternative, for summary judgment" and denied as moot the District's "motion to dismiss, or in the alternative, for summary judgment." The court either denied or denied as moot all of plaintiffs' pending motions: those relating to discovery or filing documents under seal, those pertaining to preliminary and permanent injunctive relief and *in forma pauperis* status, and "the motion to stay proceeding pending discovery and pending submission of federal claims in the United States District Court for the District of Columbia."

Back to Reference

7. The HSRA was intended to "support the vision" of the District's 2005 "Homeless No More Strategic Plan for Ending Homelessness in Washington, D.C. by 2014." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON HUMAN SERVICES, Report on Bill 16-103, "Homeless Services Reform Act of 2005," April 21, 2005 ("Committee Report on HSRA"), at 1-2.

Back to Reference

8. D.C.Code § 4-755.01(a) (2008 Repl.) states:

> No provision of this chapter shall be construed to create an entitlement (either direct or implied) on the part of any individual or family to any services within the Continuum of Care, other than shelter in severe weather conditions as authorized by § 4-754.11(5).

Back to Reference

9. Section 32(c) of the HSRA repealed the Frigid Temperature Protection Amendment Act of 1988.

Back to Reference

10. D.C.Code § 4-754.11(15); § 4-754.11 pertains to rights of clients who are "served within the Continuum of Care." Section 4-754.12 covers the rights of "[c]lients residing in temporary shelter or supportive housing" such as the right to receive visitors during specified hours and in designated places (§ 4-754.12(1)) and the right to "[r]easonable privacy in caring for personal needs and in maintaining personal living quarters" (§ 4-754.12(5)). Section 4-754.13 outlines the responsibilities of clients such as looking for employment or educational opportunities (§ 4-754.13(2)).

Back to Reference

A 165

11. Providers of low barrier shelter, such as Franklin Shelter, must "provide: (1) [c]ase management services with an appropriately trained, qualified, and supervised case manager, which shall include the development of a service plan; (2) [h]ot shower facilities; and (3) [p]ersonal hygiene supplies." D.C.Code § 4-754.23. Severe weather shelter provider standards appear in § 4-754.22, and severe weather shelter is defined as "hyperthermia shelter or hypothermia shelter" (§ 4-751.01(36)). Those governing temporary shelter and supportive housing are located in § 4-754.24. Temporary shelter does not include a low barrier shelter (§ 4-751.01(40)); a low barrier shelter is defined as "an overnight housing accommodation for individuals who are homeless, provided directly by, or through contract with or grant from, the District, for the purpose of providing shelter to individuals without imposition of identification, time limits, or other program requirements" (§ 4-751.01(26)).

### Back to Reference

12. D.C.Code § 4-754.41 provides, in part:

> (a) The Office of Administrative Hearings shall grant a fair hearing to any client or client representative who wishes to appeal a decision listed in subsection (b) of this section and who requests such a hearing, orally or in writing, within 90 days of receiving written notice of the adverse action. A request for a fair hearing shall be made to the client's provider, the Department, the Mayor, or the Mayor's designee. If the request is made orally, the individual receiving the request shall promptly acknowledge the request, reduce it to writing, and file the request for a fair hearing with the Office of Administrative Hearings.

> (b) A client or client representative may request a fair hearing to:

> (1) Appeal an administrative review decision made pursuant to § 4-754.42;

> (2) Review any decision of a provider of services, other than shelter or supportive housing, to:

> (A) Transfer the client to another provider;

> (B) Suspend provision of services to the client for a period longer than 10 days; or

> (C) Terminate services to the client; or

> (3) Obtain any legally available and practicable remedy for any alleged violation of:

> (A) The provider standards listed in §§ 4-7512.2-4-754.25; or

> (B) The client rights listed in §§ 4-754.11 and 4-754.12, including the denial of a request by an individual with a disability for a reasonable accommodation or modification of policies or practices.

> ....

> (d) In accordance with § 4-754.11(18), any client who requests a fair hearing within 15 days of receipt of written notice of a suspension or termination of shelter or supportive housing shall continue to receive shelter or supportive housing pending a final decision from the fair hearing proceedings. This right to continuation of shelter or supportive housing pending appeal shall not apply in the case of an emergency suspension or termination pursuant to § 4-754.38.

> (e) Upon receipt of a fair hearing request, the Mayor or the Mayor's designee shall offer the client or client representative an opportunity for an administrative review by the Department of the decision that is the subject of the fair hearing request.

> ....

### Back to Reference

13. D.C.Code 4-754.42 states, in part:

> (a) The purpose of the administrative review shall be to enable the Department to ascertain the legal validity of the decision that is the subject of the fair hearing request, and, if possible, achieve an informal resolution of the appeal.

> (b) Any administrative review conducted pursuant to subsection (a) of this section shall be completed within 15 days of the receipt of the administrative review request, except upon showing of good cause as to why such deadline cannot be met. If good cause is shown, a decision shall be rendered as soon as possible thereafter. If an extension of time for review is required for good cause, written notice of the extension shall be provided to the client or client representative prior to the commencement of the extension.

> (c) An administrative review must be completed before the Office of Administrative Hearings shall grant a fair hearing to any client or client representative.

D.C.Code § 4-754.42

### Back to Reference

14. D.C.Code § 4-754.22 reads:

> In addition to the standards in § 4-754.21, providers of severe weather shelter shall provide:

> (1) When severe weather conditions continue overnight, a clean bed with clean linens, pad, and blanket for each bed;

> (2) Basic needs, such as food and clothing and other supportive services, or information about where to obtain such basic needs and supportive services;

> (3) 24-hour, properly functioning toilet facilities;

> (4) Cool water, available via water cooler, fountain, or other means; and



(5) Properly functioning heating and cooling systems during the appropriate seasons.

#### Back to Reference

15. D.C.Code 4-754.23 states:

In addition to the requirements in §§ 4-754.21 and 4-754.22, providers of low barrier shelter shall provide:

(1) Case management services with an appropriately trained, qualified, and supervised case manager, which shall include the development of a service plan;

(2) Hot shower facilities; and

(3) Personal hygiene supplies.

#### Back to Reference

16. D.C.Code § 4-754.21 provides, in part:

Providers shall: ...

(2) Maintain safe, clean, and sanitary facilities that meet all applicable District health, sanitation, fire, building, and zoning codes;

(3) Assist clients to prepare for living in permanent housing, as deemed appropriate by the provider and the client;....

#### Back to Reference

17. The right to space and a bed during severe or frigid conditions is also reflected in § 4-753.01(c), discussed above, and § 4-754.22(1) ("providers of severe weather shelter shall provide ... [w]hen severe weather conditions continue overnight, a clean bed with clean linens, pad, and blanket for each bed").

#### Back to Reference

18. We offer no opinion as to whether a contract between the providers of homeless services and the District would create contractual rights in the homeless as third party beneficiaries, or whether the contract would give the District the right to enforce HSRA statutory provisions relating to providers.

#### Back to Reference

19. Appellants' Appendix contains over forty declarations from men who received services from the Franklin Shelter; the names of the men were redacted after the trial court denied appellants' motion to file the declarations under seal. Many of the declarations show that men were able to obtain shelter at other shelters—Adams Place, La Casa, and New York Avenue. Men complained about transportation difficulties in accessing the 801 East Shelter in the Southeast quadrant of the District.

#### Back to Reference

20. The declaration of Mr. Swan was attached to the District's motion to dismiss supplemental and amended complaint for declaratory and injunctive relief or, in the alternative, for summary judgment.

#### Back to Reference

21. One of the documents attached to Mr. Swan's declaration was the 2008-2009 Winter Plan, developed by the Interagency Council on Homelessness, see D.C.Code §§ 4-752.01,.02, and .03; the Winter Plan not only detailed the need for hypothermia services, but also the types of shelters available and their locations, as well as transportation schedules.

#### Back to Reference

22. Count II of appellants' complaint contains another constitutional claim. They allege that the District "is liable for violation ... of [their] constitutional right to just compensation for the taking of their belongings and personal property." The pertinent part of the Fifth Amendment states: "[N]or shall private property be taken for public use without just compensation." Appellants' argue that under Kelo v. City of New London, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), their personal possessions were taken for public use "in order to clear the [Franklin Shelter] because of its alleged uninhabitability." Kelo was an eminent domain case concerning a challenge of nine landowners to the taking of their property by the City of New London as part of an economic development plan that included certain authorization by the local city council. In rejecting the landowners' challenge, the Court acknowledged that its prior cases had defined public purpose "broadly, reflecting [the Court's] longstanding policy of deference to legislative judgments in this field." 545 U.S. at 480, 125 S.Ct. 2655. The situation here is not comparable to Kelo; this is not an eminent domain case, and there has been no legislative approval or authorization of any plan requiring the taking of the possessions of any of the plaintiffs for the public purpose of renovating the Franklin School. Moreover, although some of the declarations of the men who resided at the Franklin Shelter assert that they lost belongings, we see no evidence in the record that their personal belongings were taken at all by the District, let alone taken for public use. Mr. Swan's declaration shows that the District took steps to safeguard possessions that were left in the shelter and to transport them to another shelter. Under these circumstances, appellants cannot prevail on their contention that their personal belongings were taken for public use.

A167

This Document is Provided by Leagle.com

Back to Reference

23. Appellants take issue with the trial court's denial of their motion to stay the proceedings in this action pending discovery and the submission of federal claims in the United States District Court for the District of Columbia. We are convinced that the trial court did not abuse its discretion in denying the motion. At the time they filed their motion, appellants already had lodged and subsequently voluntarily dismissed one complaint regarding the issues before us, and in the midst of the trial court's consideration of its second complaint, appellants decided the federal court would be a better forum for causes of action pertaining to two federal statutes, the Americans With Disabilities Act ("ADA") and the Fair Housing Act ("FHA"), along with an additional District statute, the District of Columbia Human Rights Act ("DCHRA"). These causes of action could have been filed in the instant action and appellants offer no persuasive reason why they were not. *See Yellow Freight System v. Donnelly,* 494 U.S. 820, 823, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990) ("State courts... are ... presumptively competent to adjudicate claims arising under the laws of the United States.") (citations omitted). Moreover, plaintiffs could have filed a motion in Superior Court under Super. Ct. Civ. R. 56 (f) to the extent they believed discovery was necessary to oppose the District's motion to dismiss or in the alternative for summary judgment.

Back to Reference



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Eric Sheptock, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Civil Action No. 09-00672 (RBW) |
| v. | : | |
| | : | |
| Adrian Fenty, et al., | : | |
| | : | |
| Defendants. | : | |

## ORDER

Consistent with oral rulings made by the Court during the status conference held on July 1, 2009, it is hereby

**ORDERED** that the defendants' motion to dismiss is denied without prejudice. It is further

**ORDERED** that the plaintiffs are permitted to file another amended complaint by July 10, 2009. It is further

**ORDERED** that the plaintiffs are not permitted to file any further amendments to their complaint after July 10, 2009. It is further

**ORDERED** that this case is stayed and administratively closed pending a decision by the District of Columbia Court of Appeals in a matter arising out of the same event that is the subject of this litigation. It is further

**ORDERED** that the parties shall appear before the Court for a status hearing on October 7, 2009 at 9:00 a.m.



**SO ORDERED**, this 1st day of July, 2009.

REGGIE B. WALTON
United States District Judge

A170

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Eric Sheptock, et al.,                    :
                                          :
            Plaintiffs,                    :
                                          :        Civil Action No. 09-00672 (RBW)
            v.                             :
                                          :
Adrian Fenty, et al.,                     :
                                          :
            Defendants.                    :
_____       :

### ORDER

Consistent with oral rulings made by the Court during the hearing on the plaintiffs'

Motion for a Preliminary Injunction held on May 21, 2009, it is hereby

   **ORDERED** that the plaintiffs' Motion for a Preliminary Injunction is **DENIED**.  It is

further

   **ORDERED** that the parties shall appear before the Court for a status on June 26, 2009 at

3:00 p.m.

   **SO ORDERED**, this 22th day of May, 2009.

                                   REGGIE B. WALTON
                                   United States District Judge



## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

ERIC SHEPTOCK, *et al.*,    )
                  )
      Plaintiff,    )
                  )
v.    )    Civil Action No. 09-672 (RBW)
                  )
                  )
ADRIAN FENTY, *et al.*,    )
                  )
      Defendant.    )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## PLAINTIFFS' MOTION TO LIFT THE STAY AND PROCEED
## WITH HEARING ON PRELIMINARY INJUNCTION

Plaintiffs, by and through undersigned counsel, hereby move this Court to lift the stay

entered pending resolution of all matters in the District of Columbia Court of Appeals

("DCCA"). Recent steps taken by the District defendants to dispose of the building identified as

Franklin Shelter will alter the status quo such that any resulting harm could not be remedied by

the Court. Plaintiffs maintain that there remains strong likelihood of success on the merits of the

claims stated in their amended complaint and motion for a preliminary injunction.

Despite the pending amended complaint and motion for a preliminary injunction, the

District defendants persist in their plans to dispose of the building to commercial developers. In

the period since the stay was entered, the District defendants have published Requests for

Proposals for the commercial development of the property, and, on December 3, 2009,

conducted a walk-thru of the property for developers interested in the property. Since the entry of

the stay in this case, plaintiffs have made every effort to expedite the appeal in the DCCA. The

District defendants, however, sought an extension of an additional thirty (30) days in which to

1



respond to plaintiffs' initial brief. Taken together, both the request for an extension of time in the

DCCA along with their ongoing efforts to dispose of the property, the District defendants

threaten to shift the relative positions of the parties thereby rendering any possible extraordinary

relief moot.

The needs of the homeless in the District remain unmet. The shelters remain at or over

capacity, placing this already vulnerable population at greater risk. Given the District defendants'

continuing failures to address the growing needs of this population, any further delay increases

the risk of an irreparable harm

This Court should therefore lift the stay in this case and proceed with a hearing on the

motion for a preliminary injunction.

## PRELIMINARY STATEMENT

On September 23, 2009, the District defendants published an announcement seeking

Requests for Proposals for the commercial development of the property identified as Franklin

Shelter.[1]  On December 3, 2009, the District defendants conducted a walk-thru of the building

for prospective commercial developers. Within this same time frame, plaintiffs filed their initial

brief in the DCCA as soon as practicable, while the District defendants sought an enlargement of

an additional thirty (30) days in which to respond. The DCCA granted the District defendants'

motion, giving them until December 23, 2009, to file their response brief. The affect of their

motion is to delay resolution of the DCCA claims further delaying any resolution of the issues

before this Court.

Early in this federal litigation, plaintiffs sent document preservation letters to numerous

non-parties to the litigation, including Catholic Charities, operator of the Franklin Shelter and

---

[1]*http://dcbiz.dc.gov/dmped/frames.asp?doc=/dmped/lib/dmped/historicfranklin_school_rf p_9_23_09.pdf* .

2


A173

numerous other facilities and services for the homeless in the District. Recent reports indicate

that Catholic Charities plans to end its contract with the District of Columbia for these services

thus presenting the risk that all documents needed to prosecute these claims would no longer be

available or cease to exist. Aside from any possible claim of spoliation, and despite repeated

efforts to obtain the requested information informally, plaintiffs are without these documents that

contain information as to the racial make-up of Franklin Shelter, those specific services provided

at the shelter, the availability of other services in the area provided to then residents of Franklin

Shelter, the frequency and length of time residents would stay at the shelter along with a list of

other information relevant to plaintiffs' claims. Any further delay runs the palpable risk of losing

information central to plaintiffs' claims.

PROCEDURAL HISTORY

Plaintiffs filed suit in the United States District Court for the District of Columbia

("USDC") on April 10, 2009. In the complaint, and later the amended complaint filed on July 10,

2009, plaintiffs alleged numerous violations of federal statutes including the *Fair Housing Act*,

42 U.S.C. §§ 3601-3631 and 3604(f)(1) ("FHA"), *Americans With Disabilities Act* , 42 U.S.C. §§

12101 *et seq.*, 12131, and 12132 ("ADA"), *D,C, Human Rights Act*, D.C. Official Code §§ 2-

1401.01 *et seq.* and 2-1402.21(a)(4) (place of residence discrimination) ("DCHRA"). The claims

arise from the abrupt closure of the property identified as the Franklin Shelter, and the ongoing

failures of the District defendants to meet the growing and ongoing needs of the homeless and

the requirements of law.

On May 21, 2009, this Court conducted a hearing on plaintiffs' motion for a Temporary

Restraining Order against the District. At this hearing the District defendants argued that these

claims were being litigated in the D.C. Superior Court and therefore controlled any resolution of

3



the newly brought claims in the USDC. The District defendants further stated that it was their

plan to convert the building identified as Franklin Shelter to a public charter school. Plaintiffs

argued that the claims were separate and distinct, and were filed prior to any resolution of the

Superior Court claims. As to any plans for converting the building to a public charter school,

plaintiffs argued that this was not the case and was only pretext because the estimated costs for

converting the building was in excess of twenty one million dollars ($21,000,000.00). After

asserting jurisdiction over the claims, this Court denied plaintiffs' motion for immediate relief,

setting the case down for further status. *See Exxon Mobil v. Saudi Basic Industries,* 544 U.S. 280

(2005).

The District defendants moved to dismiss the complaint. *See* Docket # 22, dated June 22,

2009. The District defendants argued that plaintiffs failed to state a claim under either the FHA

or ADA, and, regardless, all claims would be barred by *res judicata.* Plaintiffs countered by

seeking leave to amend their complaint, and argued that the amendment would not be futile

because plaintiffs alleged sufficient facts to support both theories under the FHA and ADA, that

the amendment would reflect newly discovered facts supporting ongoing failures of the District

defendants to adhere to their obligations under law, and numerous procedural issues estopping

the defense of *res judicata.* [2] This Court granted leave to amend the complaint, stayed the

---

[2] As argued in earlier pleadings, plaintiffs contend that there is a strong likelihood of success on
the merits. Plaintiffs first argued a number grounds that would estop the affirmative defense of
*res judicata.* Included in these arguments are 1) plaintiffs reserved their right to seek federal
adjudication of claims arising under federal law; 2) this Court would not have asserted
jurisdiction over the claims that were filed an litigated in the D.C. Superior Court; 3) the District
of Columbia recognizes a waiver of the defense of *res judicata,* and the District defendants failed
to make a timely, clear, and unequivocal assertion of this defense. Plaintiffs further amended the
complaint to allege ongoing failures of the District to meet its obligations under federal law, and
that the homeless system, both as a whole and with respects to former Franklin residents,
remains in a precarious and dangerous condition.

4



proceedings consistent with *Colorado River Water Conversation District v. United States*, 424 U.S. 800 (1976), and set the case for further status.

In entering the stay, this Court reasoned that it did not want to rule on anything that would be contrary to any decision made by the DCCA. The order was entered despite the repeated arguments that the claims in the DCCA were separate from the federal claims, and that they were germane to the operation of state law over which this Court would be unlikely to assert jurisdiction in the first instance. In its opposition to plaintiffs' motion to stay the appeal in the DCCA, the District defendants acknowledge that any federal claims would not be precluded by District law claims over which this Court would not have asserted jurisdiction.[3]

In their appeal in the DCCA, plaintiffs raise issues germane to the operation of District law and alleged violations of District law. Plaintiffs claimed that the Mayor's closing of Franklin Shelter violated the Franklin Shelter Closing Requirements Emergency Act and denied them their post deprivation rights resulting from the loss of their personal property. Plaintiffs further argued that the closing of the shelter denied them services as required by the Homeless Services Reform Act. Under this theory, plaintiffs reasoned that this act provides an implied private right of action, and violating this act deprived plaintiffs of substantive and procedural due process. Also included in this appeal is whether the trial court erred in denying plaintiffs' motion to stay the Superior Court action so that the federal claims could then be litigated in this Court. This followed the DCCA's denial of plaintiffs' motion to stay the appeal. None of the issues

---

Secondly, plaintiffs argued that under the circumstances of this case, plaintiffs raise viable claims of discrimination under the FHA and ADA along with the District's related failures under the community integration clause of the ADA.

[3] "...If however, the court in the first action would clearly not have had jurisdiction to entertain the omitted theory or ground (or, having jurisdiction, would clearly have declined to exercise it as a matter of discretion), then a second action in a competent court presenting the omitted theory or ground should be held not precluded..." *Restatement, Second, Judgments* § 25.



contained in the DCCA appeal would have resulted in this Court asserting original subject matter jurisdiction.

* * *

Meanwhile, the crisis with homeless men in the District continues unabated. Recent data collected from the four shelters operated by Catholic Charities on behalf of the District of Columbia, 801 East, La Casa (the only shelter in Northwest with a ninety (90) bed capacity), Adams House and New York Avenue, indicates that in October all of the shelters were at capacity for the entire month. This data does not include those persons forced to sleep on the streets, though other data provides some insights into the unsheltered homeless (persons living on the streets).

The most recent data from the Metropolitan Washington Council of Governments indicates that in a single day survey over twenty five percent (25%) of the regions over twelve hundred unsheltered homeless are in the District.[4] These persons are detached from any required services such as mental health services, substance abuse counseling and other medical needs. This is the highest percentage in the region. Another report by a coalition of homeless advocates and homeless persons in the District entitled "Unmet Shelter Needs Assessment, April to June

---

[4] The report notes the difficulty in obtaining data on the unsheltered homeless because it requires surveyors to go to locations known to be frequented by homeless, ie streets, alleys, parks, under bridges. *See* "The 2009 Count of Homeless Persons in Shelters and On the Streets In Metropolitan Washington" The Homeless Services Planning and Coordinating Committee, May 2009,http://www.mwcog.org/pubilcations/departmental.asp?classification_ID=6&SUBCLASSIF ICATION_ID=6.

The census data from the specific shelters run by Catholic Charities was obtained from The Community Partnership for the Prevention of Homelessness, http://www.community-partnership.org.



17, 2009" attempts to detail the numbers of persons turned away from shelters and describes why others elect not to seek shelter due to overcrowded conditions.[5]

While statistics are difficult to accumulate, anecdotal accounts complete a picture of increasing numbers of homeless people left to the streets in Northwest as well as other parts of the District. On October 30, 2009, it was reported that the Untied States Park Police dismantled the sleeping area of a group of homeless on the east side of Freedom Plaza in Northwest; a homeless woman once housed in Permanent Supportive Housing and suffering from substance abuse and mental health issues sleeps on a bench at 12th Street and New York Avenue in Northwest; as of October 8, 2009, there was a reported increase in homeless persons sleeping and seeking services around Robert F. Kennedy Stadium, Sherriff Road, Minnesota Avenue, and in the Greenlawn and River Terrace neighborhoods there was a reported increase in the number of mentally ill persons; there were reported increases in mentally ill homeless sleeping and/or seeking services along the Martin Luther King Avenue and Alabama Avenue corridors. These anecdotal reports include increases of homeless persons with substance abuse and mental health issues sleeping on the streets near McPherson Square and Farragut Park, and on any given day, numbers of homeless persons can be found in Franklin Park across the street from what was once Franklin Shelter.

The District's efforts to address the needs of this growing community are absent or sporadic at best. While a few of these persons report speaking with an outreach worker on one occasion, these workers have not been seen or heard from again. Others report being informed

---

[5]http://wiki.nlchp.org/download/attachments/8585526/Unmet+Shelter+Need+Assessment+-+6-26-09.pdf.

7



that any housing for these persons has been de-funded and no housing is available. The situation requires immediate redress.[6]

## ARGUMENT

Plaintiffs argue that continuing the stay in this case will change the status quo such that any extraordinary relief will be moot, and that further delay may result in the loss of evidence material to plaintiffs' claims. The District defendants continue to pursue the sale and/or disposal of the property known as Franklin Shelter to private commercial developers, and have not made any effort to identify an alternative site in the downtown area for providing shelter services to the District's homeless. All could transpire before this Court is able to adjudicate plaintiffs' claims that arise under federal law.

Further, plaintiffs have been unable to obtain documents from Catholic Charities, the present operator of many of the District's homeless services, but not a party in this litigation. In the absence of the limited discovery asked for in this litigation, and the ability to subpoena Catholic Charities to a document deposition, documents and information central to plaintiffs' claims may be lost.

The risk of harm to the homeless continues to grow as the numbers of homeless increase, and basic services become unavailable. The existing shelters remain at capacity if not over capacity. The placement of persons outside of the shelter system has stopped. The end result is an increase of persons living on the streets and alleys and under bridges without services to address their life-saving needs. This litigation must move forward.

A)   The District defendants continue with efforts to sell and/or dispose of the property known as Franklin Shelter. These efforts continue despite the pending motion for preliminary and permanent injunctions and threaten to alter the status quo.

---

[6] These reports were provided by and based on the personal knowledge of Brain Anders, a homeless advocate in the District of Columbia.



The purpose of a preliminary injunction is to preserve the status quo between two

respective parties, pending resolution of any viable legal claims. *Dist. 50, United Mine Workers*

*of America v. Int'l Union, United Mine Workers of America*, 412 F.2d 165, 168 (D.C. Cir. 1969)

("The usual role of a preliminary injunction is to preserve the status quo pending the outcome of

litigation."). Allowing the District defendants to continue with its plans to commercially develop

the property known as Franklin Shelter without any effort to offer an alternative site in the

downtown area for providing homeless services would deprive plaintiffs of any opportunity to

litigate their claims and seek relief as provided for by federal law. The ongoing efforts of the

District defendants indicate their resolve to moot any issues concerning the viability of the

homeless population of the District remaining in downtown. Indeed, continuing a stay and

delaying resolution in this case would foreclose any opportunity to abate the District's continued

efforts to force the homeless out of downtown and leave plaintiffs without any means of

recourse.

The District defendants have sought delay by not responding to plaintiffs' appeal in the

DCCA until December 23, 2009. While plaintiffs admit to seeking a brief extension in filing

their initial brief, any delay caused by this extension was minimal. Plaintiffs may seek expedited

consideration in the DCCA, but there is no guarantee the DCCA will oblige; there are no rules or

timeframes governing resolution of matters before that court. Simply put, any further delay

advances the District defendants' interest in disposing of Franklin Shelter, making any issue of

homeless services in downtown moot.

The District defendants' intent to end the providing of homeless services in downtown is

clear. On April 7, 2009, the District defendants issued a Request for Proposals for the

commercial development of Franklin Shelter. This was followed by a walk-thru of the building

9



for commercial entities expressing any interest in the project on December 3, 2009. All of this followed the District defendants assuring this Court that any planned use of the building was for a public charter school, while these recent events indicate that District defendants had other plans. A continued stay would allow this pattern of conduct to continue and alter the status quo between the parties and disadvantage plaintiffs.

The disadvantage to plaintiffs will also arise with the loss of evidence central to its claims. Courts uniformly recognize the potential loss of evidence as providing a basis of prejudice and requiring litigation to go forward. *See Clinton v. Jones* 520 U.S. 681, 708 (1997) *also see STX, Inc. v. Trik Stik, Inc.* 708 F.Supp. 1551 (N.D. Cal. 1988). The pace of litigation and continuing developments in this case pose such a risk.

Recent developments indicate that Catholic Charities, the primary provider of homeless services in the District, may cease to provide these services. As the primary provider and operator of Franklin Shelter, Catholic Charities possesses documents and information central to plaintiffs' case. These documents include information concerning the racial make-up of former Franklin residents, records of disabilities of former Franklin residents, services provided either at Franklin Shelter or those services provided at nearby locations, the length of time and frequency residents would stay at Franklin Shelter, along with other pertinent information contained in the documents or information known to those employed at Catholic Charities. Any loss of these documents and information occasioned by any continued stay may prove to be an insurmountable hurdle should the litigation go forward at a later time.

B)    Further delaying the litigation may result in irreparable harm to the District's homeless population.

If proven, the present conditions described above substantiate a risk of immediate and permanent harm to plaintiffs and other large numbers of homeless persons in the District.


A181

Further, the public interest will be served by taking steps to ensure that some relief is provided to a population facing increasing peril and need. *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290. 293 (D.C. Cir. 2006) *citing Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1066 (D.C. Cir. 1998); *World Duty Free Americas, Inc. v. Summers*, 94 F. Sup. 2d 61, 64 (D.D.C. 2000). This Court should lift the stay and allow plaintiffs to proceed with their amended complaint and motion for a preliminary injunction.

The ongoing crisis and continued failure of the District defendants to address it will result in irreparable harm to the District's homeless population, including many former Franklin residents. Many remain unable to access services. Many remain on waiting lists for supportive housing or other programs that have not begun to meet the promised goals. In fact, recent reports indicate that the "Housing First" program or "Permanent Supportive Housing" cease to function at all, leaving hundreds if not thousands of persons on waiting lists with little hope for relief. This leaves growing numbers of homeless persons forced to sleep on the streets while services and other facilities remain stretched beyond any reasonable limits.

In their amended complaint, plaintiffs alleged an ongoing harm to large number of homeless persons consistent with the pattern described above. Plaintiffs insist that both the ADA and FHA not only require the non-discriminatory providing of housing and services, but also require that the services provided be directed towards inclusion and re-integration in the community as a whole. The District defendants' inaction as to the growing needs in the midst of crisis and continued efforts to dispose of a location once used for providing services to the homeless underscores the claims raised by plaintiffs. By allowing the present course to continue, any possible hope of reaching these lawful, indeed required, ends dissipates, and, for some if not most, any relief becomes illusory.

11



Respectfully submitted

_____/s/_____

GEORGE E. RICKMAN, ESQ.
P.O. Box 21267
Kalorama Station
Washington, D.C.  20009-21267
202-723-3955
georgerick11@comcast.net
*Counsel for Plaintiffs*


_____/s/_____

JANE ZARA, ESQ.
DC Bar # 982392
1611 Monroe St., NW
Washington, DC  20010
202-483-9303
jjzara@aol.com

A183

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

ERIC SHEPTOCK, *et al.,*      )
                   )
     Plaintiff,     )
                   )
v.                  )    Civil Action No. 09-672 (RBW)
                   )
                   )
ADRIAN FENTY, *et al.,*     )
                   )
     Defendant.    )

**PLAINTIFF'S MOTION TO LIFT THE STAY, ORDER LIMITED DISCOVERY AND
PROCEED WITH A HEARING ON PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION**

Plaintiffs Eric Sheptock, The Committee to Save Franklin Shelter, Richard Embden,

Edward Baltimore, Reginald DuBose, Terry Huff, Samuel Davis and Tommy Bennett

(collectively "Plaintiffs"), by and through undersigned counsel, hereby move this court to lift the

stay entered on July 1, 2009, and proceed with limited discovery and a hearing on the motion for

a preliminary injunction. As reasons why this motion should be granted, plaintiffs state the

following:

1.     Recent events indicate that Catholic Charities, the principle provider of services

for the District of Columbia's homeless population, and operator of the Franklin Shelter, intends

to cease operation in the District of Columbia. Plaintiffs' informal efforts to obtain documents

and information have been unavailing. In the likely event that Catholic Charities ends its

operations, plaintiffs will be unable to obtain documents and witnesses central to their claims

against defendants the District of Columbia, Adrian Fenty, Neil Albert, Clarence Carter and Fred

Swan (collectively "District defendants"). Loss of the documents, information and witnesses will

prejudice plaintiffs in their ability to present their claims.


A184

2.      During the course of the stay, the plight of the homeless worsens. The ongoing

harm resulting from a lack of shelter space and services continues unabated, while the District

defendants continue their efforts to dispose of the building identified as Franklin Shelter to

commercial developers.

A memorandum of point and authorities in support of this motion is attached hereto.

Respectfully submitted

/s/
GEORGE E. RICKMAN, ESQ.
P.O. Box 21267
Kalorama Station
Washington, D.C.  20009-21267
202-723-3955
georgerick11@comcast.net
*Counsel for Plaintiffs*

/s/
JANE ZARA, ESQ.
DC Bar # 982392
1611 Monroe St., NW
Washington, DC  20010
202-483-9303
jjzara@aol.com

Local Rule 7 (m) Certification

I do hereby certify that on December 9, 2009, Denise Baker, counsel for District

defendants, was contacted to obtain her position on the relief sought herein. Ms. Baker informed

the undersigned that the District defendants oppose the requested relief.

/s/
GEORGE E. RICKMAN, ESQ.


A185

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

ERIC SHEPTOCK, *et al.,*                )
                                        )
    Plaintiff,                       )
                                        )
v.                                      )      Civil Action No. 09-672 (RBW)
                                        )
                                        )
ADRIAN FENTY, *et al.,*                 )
                                        )
    Defendant.                       )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## PLAINTIFFS' MOTION TO LIFT THE STAY AND PROCEED
## WITH HEARING ON PRELIMINARY INJUNCTION

Because of the worsening conditions faced by former residents of Franklin Shelter and

the homeless population of the District of Columbia, plaintiffs are compelled to seek immediate

relief and have the stay lifted in this case. While the legal issues have not changed, an increase in

the number of unsheltered homeless, and the continued and repeated failures of the District

defendants to make needed services available to former Franklin residents in general require this

Court to proceed with discovery and resolve the still pending motions for preliminary and

permanent injunctions against the District.

The worsening conditions have resulted in the death of some Franklin residents, and

many remain living on the streets estranged from vital services. Even though plaintiffs track

these conditions through the summer months, a period that has its own risks, winter fast

approaches and many issues raised in this complaint remain unresolved. Indeed, the District

defendants have had months to address these issues, but plaintiffs still receive reports of their

1



failure to provide services, increased numbers of unsheltered homeless, and conditions that have
resulted in death and the increased risk of loss of life.

## PRELIMINARY STATEMENT

On October 7, 2009, this Court entered a stay of proceedings. , The Court reasoned that
it did not want to rule on anything that would be contrary to any decision made by the DCCA.
The order was entered despite the repeated arguments that the claims in the DCCA were separate
from the federal claims, and that the claims in Superior Court were germane to the operation of
state law over which this Court would be unlikely to assert jurisdiction in the first instance. In its
opposition to plaintiffs' motion to stay the appeal in the DCCA, the District defendants
acknowledge that any federal claims would not be precluded by claims over District law which
this Court would not have asserted jurisdiction.

The appeal in the DCCA was argued and submitted to a panel of that Court on April 1,
2010. No opinion has been rendered by that Court, and there is no basis to believe that the
DCCA will render any opinion in the near future. There are no rules governing the promptness
with which the DCCA addresses matters before it, and there is nothing to suggest that they view
this case with same urgency that plaintiffs now face.

In their appeal in the DCCA, plaintiffs raised issues germane to the operation of District
law and alleged violations of District law. Plaintiffs claimed that the Mayor's closing of Franklin
Shelter violated the Franklin Closure Act and denied them their post deprivation rights resulting
from the loss of their personal property. Plaintiffs further argued that the closing of the shelter
denied them services as required by the Homeless Services Reform Act. Under this theory,
plaintiffs reasoned that this act provides an implied private right of action, and violating this act
deprived plaintiffs of substantive and procedural due process. Also included in this appeal is

2



whether the trial court erred in denying plaintiffs' motion to stay the Superior Court action so that the federal claims could then be litigated in this Court. This followed the DCCA's denial of plaintiffs' motion to stay the appeal. None of the issues contained in the DCCA appeal would have resulted in this Court asserting original subject matter jurisdiction, and would not effect the claims raised in this suit.

Plaintiffs filed suit in the United States District Court for the District of Columbia ("USDC") on April 10, 2009. In the complaint, and later the amended complaint filed on July 10, 2009, plaintiffs alleged numerous violations of federal statutes including the *Fair Housing Act,* 42 U.S.C. §§ 3601-3631 and 3604(f)(1) ("FHA"), *Americans With Disabilities Act ,* 42 U.S.C. §§ 12101 *et seq.*, 12131, and 12132 ("ADA"), *D,C, Human Rights Act,* D.C. Official Code §§ 2-1401.01 *et seq.* and 2-1402.21(a)(4) (place of residence discrimination) ("DCHRA"). The claims arise from the abrupt closure of the property identified as the Franklin Shelter, and the ongoing failures of the District defendants to meet the growing and ongoing needs of the homeless and the requirements of law.

On May 21, 2009, this Court conducted a hearing on plaintiffs' motion for a Temporary Restraining Order against the District. At this hearing the District defendants argued that these claims were being litigated in the D.C. Superior Court and therefore controlled any resolution of the newly brought claims in this Court. The District defendants further stated that it was their plan to convert the building identified as Franklin Shelter to a public charter school. Plaintiffs argued that the claims were separate and distinct, and were filed prior to any resolution of the Superior Court claims. As to any plans for converting the building to a public charter school, plaintiffs argued that this was not the case and was only pretext based on estimated costs for converting the building in excess of twenty one million dollars ($21,000,000.00). After asserting

3



jurisdiction over the claims, this Court denied plaintiffs' motion for immediate relief, setting the case down for further status. *See Exxon Mobil v. Saudi Basic Industries,* 544 U.S. 280 (2005).

The District defendants moved to dismiss the complaint. *See* Docket # 22, dated June 22, 2009. The District defendants argued that plaintiffs failed to state a claim under either the FHA or ADA, and, regardless, all claims would be barred by *res judicata.* Plaintiffs countered by seeking leave to amend their complaint, and argued that the amendment would not be futile because plaintiffs alleged sufficient facts to support both theories under the FHA and ADA, that the amendment would reflect newly discovered facts supporting continuing failures of the District defendants to adhere to their obligations under law, and numerous procedural issues estopping the defense of *res judicata.* This Court granted leave to amend the complaint, stayed the proceedings consistent with *Colorado River Water Conversation District v. United States*, 424 U.S. 800 (1976), and set the case for further status.

Since then, the Court granted limited relief to plaintiffs, allowing them to proceed with limited discovery from Catholic Charities, a non-party to the suit responsible for the day to day operations of then Franklin Shelter and the remaining shelters operated by the District of Columbia. Catholic Charities produced some documents and filed a motion to quash the subpoena on June 30, 2010. *See* Docket # 37. Plaintiffs opposed this motion on July 9, 2010,and Catholic Charities filed its reply on July 19, 2010. *See* Docket Entries # 38 and 39 respectively. This motion is now ripe for decision while the parties await ruling by the Court.

### ARGUMENT

Because of the ever worsening conditions suffered by the homeless in District of Columbia, this case should be allowed to move forward so that plaintiffs can obtain all appropriate relief. Plaintiffs can show a strong likelihood of success on the merits and a minimal

4



impact, if any, a ruling of the DCCA would have on plaintiffs' claims. It is impossible to say when the DCCA will render its opinion while the harm suffered by former Franklin residents only worsens. For these reasons, this Court should lift the stay entered in this case and allow the parties to proceed with this litigation.

A) The worsening circumstances of the homeless in the District of Columbia require this case move forward.

The need for this case to move forward increases daily. The most recent point in time study released by Metro Washington Area Council of Governments indicates continued increases in the numbers of homeless persons in the District of Columbia. *See* "A Regional Portrait on the Homeless" May, 2010, attached hereto as Exh. A.  And while these numbers have increased the availability of shelter space and permanent supportive housing has remained stagnant and does not to begin to address the rising need. *See* "Community Partnership for the Prevention of Homelessness" http://www.community-partnership.org. For instance, The Community Partnership for the Prevention of Homelessness reports that through the periods of May, June, and July, on many occasions the shelters were filled to their reported capacities of nine hundred and eighty (980) men. *Id.*

The capacity has not changed over the year, while the reported number of homeless men increased in the District of Columbia. Even though the District reports that it has increased the number of available spaces in its Permanent Supportive Housing over the past year by 683 beds to an aggregate number reaching 4602, the numbers of unsheltered homeless also increased from 2009 to 2010.

The result of the District's failures to create additional housing, either permanent supportive housing or emergency shelter space, can be seen in a commensurate increase in the number of unsheltered homeless-persons living on the street. According to the Metropolitan Area

5


A 190

Counsel of Government's May report, the number of unsheltered homeless has increased by 176 persons. Due the difficulty in obtaining continuous statistics beyond a point-time-study, we believe the number to be greater. Other reports and anecdotal accounts not only confirm this statistical picture, but also reveal circumstances more injurious to the health and safety of greater numbers of homeless persons than are indicated in the report.

These anecdotal reports contain information that details what is described in the increased numbers. Recent newspaper accounts report overcrowding at the District's one family shelter, leaving some families with children either on the street or living in uninhabitable conditions. The conditions and the numbers at the men's shelters, while not widely reported, paint a similar picture. Not only are the men forced to live in overcrowded conditions, for those who choose to stay at one of the city run shelters, but care-providers report many who are displaced and estranged from the needed services. It is widely known that persons who cannot provide a fixed address cannot obtain services from a service provider. For years prior to its closing, Franklin Shelter provided shelter and services to the homeless in downtown Washington, D.C.

Franklin Shelter was a low barrier shelter which served up to 300 homeless men, hosted a twelve hour program and Mental Health component under Anchor Mental Health, to specifically address problems that create and exacerbate homelessness. These problems include chemical dependency, mental illness, crisis intervention, and Anchor provided counseling and referrals to address the lack of employment and housing. Social services were also provided in the form of primary medical care, mental health services, and substance abuse services. At least three case workers were employed full time at Franklin Shelter, case management services were provided on site, and Catholic Charities, in running Franklin Shelter, also worked with other provider organizations to facilitate appropriate social services referral for Franklin Shelter clients. Anchor



Mental Health also provided support services for Franklin Shelter residents to secure food

stamps, Medicaid, identification while clients were in a pre-contemplative stage for receiving

mental health services. In addition, a mental health staff worked closely and overlapped hours

with shelter staff to develop relationships with staff and clients, identify potential program

participants and identify clients' needs. Psychiatric residents and outreach workers from the

Department of Human Services Homeless Outreach Program were also present at Franklin

Shelter when it was a shelter. They addressed urgent mental health issues.

All of these services provided in and through the programs at Franklin Shelter were

abruptly halted when the shelter closed. These services were never restored in the downtown

area. Former residents of Franklin Shelter are suffering from the loss of access to these vital

services since the shelter's closing.

One Plaintiff has been in and out of the criminal justice system since the closing of

Franklin Shelter, and with the accompanying lapse in the provision of mental health support

services and case worker management. A second Plaintiff has been in and out of homelessness,

has lived transiently in various neighborhoods of the District of Columbia and Virginia, is now

suffering from colon cancer, and still awaits any form of compensation for the loss of his

personal belongings and complete set of musical compositions due to the abrupt closing of

Franklin Shelter. Another former Franklin Shelter resident has been sleeping in his car in order

to maintain gainful employment in downtown DC since the closing of Franklin Shelter.

Several homeless suffering from mental and physical disabilities died this past year on

the streets of DC. We are also beginning to track homeless atrocities due to the heat. Sonny, a

homeless man who suffered from schizophrenia, lacked a case worker and received no mental

health services, died this past winter of hypothermia as he lived on the streets of DC (his body



was found in Ward 1).  A former Franklin resident and member of the choir at Church of the
Epiphany died of hypothermia this past winter.  He suffered from mental illness and was not
receiving case worker supervision or mental health supportive services in Ward 2 after the
closing of Franklin Shelter.  His inability to make rational choices to seek shelter in distant
places, combined with the lack of access to vital supportive services for his disabilities, led to his
demise.  Another former Franklin resident  lost his Permanent Supportive Housing (PSH).  He
was featured on the front cover of Street Sense in the fall of 2008, when he first received his
PSH.  He suffers from several physical disabilities and failed to receive adequate supportive
services that were necessary for him to retain his housing.  He is now homeless again.

     Shaw residents report a severe lack of case workers for homeless persons living in the
neighborhood, where persons with mental health disabilities suffer from lack of access to case
worker supervision and lack of access to appropriate medications.  In addition, we have had
several meetings with concerned residents of Ward 2 in the Dumbarton Oaks area of Georgetown
this past winter about the abundance of homeless persons living in and around the park area,
visibly suffering from mental disabilities and receiving no supportive services or help for their
disabilities.

     Homelessness itself is a degrading circumstance that often leaves emotional scars.
"Living on the streets," as some refer to the unsheltered homeless, exacerbates these
circumstances, and in and of itself causes or worsens already debilitating mental illness. By not
providing ready access to much needed mental health services, physical treatment, and psycho-
social counseling, the District not only violates federal law, but also denies persons the basic
human dignity owed to all members of our community, and runs the palpable risk of a loss of
life, while posing increasing risks to the public at large.

8



B) There is a likelihood of success on the merits.

Plaintiffs' case is strong. In their complaint plaintiffs detail the facts leading up to the closure of Franklin Shelter and the numerous promises made to both the City Council and the then residents of Franklin Shelter. Instead of fulfilling what was promised, the District fabricated a basis for closure prior to the enactment of then pending legislation before the City Council. Plaintiffs will present expert testimony indicating that the reasons for closing the shelter, imminent risk to public safety, were specious and not supported by the facts proffered by the District. The clear pretext on this one point and the continued and repeated failures to provide the permanent supportive housing promised Franklin residents only prove that the District never intended to fulfill its obligations under the law, and provides clear evidence of an intent to displace the homeless from the downtown area of the District.

Indeed, as plaintiffs spell out in their complaint by removing persons from areas where much needed services are available, the District defendants violate provisions of the *Fair Housing Act,* the *Americans With Disabilities Act,* the *D.C. Human Rights Act,* and the United States Constitution. This removal of access has come in the form of the systematic closure of shelters in the downtown area of the city, particularly Franklin Shelter. The results can be seen on a daily basis with numbers of homeless men left to wander areas of downtown, including Franklin Square and McPhereson Square, along with increased numbers of homeless in the far eastern quadrants of the city. The circumstances detailed in plaintiffs' previous motion to lift the stay have not changed or only worsened.



As the complaint details, nearly 70% of the District's homeless suffer from some cognizable disability. And it is the loss of services that remain one of the more pronounced claims now before this Court. In plaintiffs' amended complaint, they allege that because of the closure of Franklin Shelter and the failure of the District to meet what was promised, many former residents became estranged from much needed services. Even at that time, plaintiffs alleged that the harm went unabated, leaving many without recourse or relief. This is even more the case today. After months, if not years of promises, the District's homeless remain in a precarious state-either going to jail for minor offenses only to return to the same circumstances that led to their arrest, or to wander the streets

As argued in earlier pleadings, plaintiffs contend that there is a strong likelihood of success on the merits. Plaintiffs first argued a number grounds that would estop the affirmative defense of *res judicata*. Included in these arguments are 1) plaintiffs explicitly reserved their right to seek federal adjudication of claims arising under federal law; 2) this Court would not have asserted jurisdiction over the claims that were filed and litigated in the D.C. Superior Court; 3) the District of Columbia recognizes a waiver of the defense of *res judicata,* and the District defendants failed to make a timely, clear, and unequivocal assertion of this defense. Plaintiffs further amended the complaint to allege continuing failures of the District to meet its obligations under federal law, and that the homeless system, both as a whole and with respects to former Franklin residents, remains in a precarious and dangerous condition. Second, plaintiffs argued that under the circumstances of this case, plaintiffs raise viable claims of discrimination under the FHA and ADA along with the District's related failures under the community integration clause of the ADA. None of these claims would be affected by the judgment of the DCCA.



Even so, given the increased risk of irreparable harm, in their second amended complaint plaintiffs raised claims based on facts that followed the closure of Franklin Shelter. On this basis alone, plaintiffs should be allowed to pursue the stated claims in the case and resolve all other issues at its completion.

WHEREFORE, for the reasons stated herein, plaintiffs move this Court to lift its stay of the proceedings and allow the parties to proceed with this litigation.

Respectfully submitted,

_____/s/_____ _____

GEORGE E. RICKMAN, ESQ.
P.O. Box 21267
Kalorama Station
Washington, D.C.  20009-21267
202-723-3955
georgerick11@comcast.net
*Counsel for Plaintiffs*

_____/s/_____ _____

JANE ZARA, ESQ.
DC Bar # 982392
1611 Monroe St., NW
Washington, DC  20010
202-483-9303
jjzara@aol.com
*Counsel for Plaintiffs*



Case 1:09-cv-00672-RBW   Document 40   Filed 07/30/10   Page 1 of 2

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

ERIC SHEPTOCK, *et al.*,          )
                                  )
        Plaintiff,                )
                                  )
v.                                )        Civil Action No. 09-672 (RBW)
                                  )
                                  )
ADRIAN FENTY, *et al.*,           )
                                  )
        Defendant.                )

### PLAINTIFFS' SECOND MOTION TO LIFT THE STAY

Plaintiffs, by and through undersigned counsel, hereby move this Court lift the stay of the

proceedings. Because conditions for former Franklin residents and the homeless in the District of

Columbia has worsened, an immediate lift of the stay is required: As further reasons for this

motion, plaintiffs state the following:

1. The risk of irreparable harm has reached intolerable levels and requires immediate

   redress by this Court. The number of homeless men in the District of Columbia has

   increased over the past year outpacing the availability of services. This shown by the

   rise of unsheltered homeless and with dramatic increases in all sub-groups of the

   homeless population.

2. The appeal in District of Columbia Court of Appeals ("DCCA") was argued and

   submitted April 1, 2010. No decision has been rendered. It is impossible to say when

   the DCCA will rule, and the deteriorating conditions require this Court to lift the stay.

A memorandum of points and authorities is attached hereto.

                                        Respectfully submitted,



_____/s/_____
GEORGE E. RICKMAN, ESQ.
P.O. Box 21267
Kalorama Station
Washington, D.C.  20009-21267
202-723-3955
georgerick11@comcast.net
*Counsel for Plaintiffs*

_____/s/_____
JANE ZARA, ESQ.
DC Bar # 982392
1611 Monroe St., NW
Washington, DC  20010
202-483-9303
jjzara@aol.com
*Counsel for Plaintiffs*

Local Rule 7(m) Certification

I do hereby certify that on July 30, 2010, I made efforts to contact the Office of the

Attorney General for the District of Columbia ("District") in an effort to obtain their consent to

the relief sought herein. The undersigned was unable to learn the District's position, and this

motion should therefore be treated as opposed.

_____/s/_____
GEORGE E. RICKMAN, ESQ.



## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

)
ERIC SHEPTOCK, et al.,                )
                                      )
                Plaintiffs,           )
                                      )
        v.                            )       Civil Action No. 09-672 (RBW)
                                      )
ADRIAN FENTY, et al.,                 )
                                      )
                Defendants.           )
_____)

### DISTRICT DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants, Mayor Adrian Fenty,

Neil O. Albert, Clarence H. Carter, and Fred Swan, in their official and individual capacities

(hereinafter "the District Defendants"), by and through undersigned counsel, and for the reasons

set forth in the accompanying memorandum of points and authorities, move this Court for an

order dismissing Plaintiffs' Amended Complaint for failure to state a claim upon which relief

may be granted.

For the third time, a third complaint, within a nine (9) month period of time, Plaintiffs'

attempt to force the District Defendants to reopen the school building referred to as the Franklin

Shelter.[1]  For the third time, Plaintiffs' efforts should fail, notwithstanding their attempts to dress

up their garden-variety request for mandatory injunctive relief, *i.e.*, the reopening of a public

building for a specific use.  Plaintiffs should be precluded from re-litigating these same claims.

Assuming *arguendo* every legal argument raised by Plaintiffs, several homeless men and

an unincorporated association were factually true, and every statutory provision applicable,

Plaintiff could not and should not receive the relief that they request.  Plaintiffs "seek temporary

_____

[1] On June 10, 2009, while this federal case is pending, Plaintiffs docketed an appeal of the D.C. Superior Court
Order dismissing one of the prior complaints. They also filed a motion for reconsideration of that dismissal with the
Superior Court, *see*, Exhibit 2 attached hereto)



and permanent injunctive relief compelling the District Government to stop the closure of the

Franklin Shelter and return the *status quo.*" (Compl. ¶ 25).   A local statute permitted closure of

the Franklin School.  *See*, Franklin Shelter Closing Requirements Emergency Act of 2008, A-17-

0518.  Reopening the shelter would require this Court to invalidate the local law without

deference to the D.C. Council and the Mayor acting within the ambit of their legitimately derived

authority.  Plaintiffs seek a mandatory injunction, altering the status quo.  As such they cannot

meet the very high burden for such extraordinary relief.

A memorandum of points and authorities, and a proposed order are attached hereto.

Respectfully submitted,

PETER NICKLES
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

/s/ Ellen A. Efros
ELLEN A. EFROS
Chief, Equity I

/s/ Denise J. Baker
DENISE J. BAKER
Assistant Attorney General
441 Fourth Street, N.W., Suite 600 South
Washington, D.C. 20001
(202) 442-9887 (telephone)
(202) 727-3625 (facsimile)
Denise.Baker@dc.gov

/s/ Sarah Sulkowski
SARAH SULKOWSKI*
Assistant Attorney General
441 Fourth Street, N.W., Suite 600 South
Washington, D.C. 20001

---

\*       District of Columbia Bar application pending.  Member in good standing of the Virginia State
Bar.  Authorized by the Office of the Attorney General for the District of Columbia to provide legal
services pursuant to Rule 83.2(f) of the United States District Court for the District of Columbia.

2



(202) 724-6627 (telephone)
(202) 730-1454 (facsimile)
Sarah.Sulkowski@dc.gov

Case 1:09-cv-00672-RBW   Document 22   Filed 06/18/09   Page 4 of 47

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| ERIC SHEPTOCK, et al., ) |   |
| ) |   |
| Plaintiffs, ) |   |
| v. ) | Civil Action No. 09-672 (RBW) |
| ) |   |
| ADRIAN FENTY, et al., ) |   |
| ) |   |
| Defendants. ) |   |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DISTRICT DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

District Defendants move this Court for an order dismissing Plaintiffs' Amended Complaint for failure to state a claim upon which relief may be granted. Plaintiffs' Amended Complaint should be dismissed with prejudice for the following reasons more fully set forth below:

### I.    STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Federal Rule of Civil procedure 12(b)(6), a complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A court may not dismiss for failure to state a claim so long as the complaint contains sufficient factual allegations to establish a *prima facie* claim, "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted). "So long as the pleadings suggest a 'plausible' scenario to 'show that the pleader is entitled to relief,' a court may not dismiss." *Tooley v. Napolitano*, 556 F.3d 836, 839 (D.C. Cir. 2009) (brackets omitted) (quoting *Twombly,* 550 U.S. at 557).

4



However, the Supreme Court recently made it clear that "[w]here the claim is invidious discrimination * * * the plaintiff must plead * * * that the defendant acted with discriminatory purpose. Under extant precedent purposeful discrimination requires more than intent as volition or intent as awareness of consequences. It instead involves a decisionmaker's undertaking a course of action 'because of,' not merely 'in spite of,' the action's adverse effects upon an identifiable group." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, slip op. at 12 (U.S. May 18, 2009) (internal quotation marks, brackets, and citations omitted); *see also Atherton v. District of Columbia Office of the Mayor,* — F.3d —, 2009 WL 1515373, at *15-*16 (D.C. Cir. June 2, 2009) (same).

The Supreme Court's holding in *Iqbal* means that

> [t]o survive a motion to dismiss, a complaint must contain sufficient factual
> matter, accepted as true, to state a claim to relief that is plausible on its face.
> A claim has facial plausibility when the plaintiff pleads factual content that
> allows the court to draw the reasonable inference that the defendant is liable
> for the misconduct alleged. The plausibility standard is not akin to a
> "probability requirement," but it asks for more than a sheer possibility that a
> defendant has acted unlawfully. Where a complaint pleads facts that are
> merely consistent with a defendant's liability, it stops short of the line
> between possibility and plausibility of entitlement to relief.

*Ashcroft,* 129 S. Ct. 1937, slip op. at 14 (internal quotation marks and citations omitted); *see also Atherton,* 2009 WL 1515373, at *16 (same).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the closure of a temporary homeless shelter at the Franklin School (hereinafter "Franklin"), located at 925 14th Street, N.W., in Washington, D.C. Franklin had space for three hundred (300) beds and was defined as a "low-barrier" facility, meaning that it provided overnight accommodations for homeless males. Individuals did not remain in Franklin



during the day; they were permitted to begin the intake process for a night's bed space at 4 p.m. and were required to leave by 7 a.m. the following day.[2]

On September 10, 2008, exit interviews were conducted to determine whether the individuals who were at Franklin that day were aware of the impending closure of the facility. On September 26, 2008, at 6:30 a.m., the Mayor's representatives announced to those who were spending the night at Franklin that they would have to leave and would not be able to return. (Memorandum Order, attached as Exhibit 1 (hereinafter "Mem. Order"), at 3.)

Later on the day of September 26, 2008, the D.C. Council passed the Franklin Shelter Closing Requirements Emergency Act of 2008, A-17-0518 (hereinafter "Emergency Act"), specifying conditions that must be met before Franklin could be closed. The Mayor signed the Emergency Act into law on September 30, 2008 – after Franklin was already closed. (Mem. Order at 4.)

On September 26, 2008, Plaintiffs filed Civil Action No. 2008 CA 006954 B in the District of Columbia Superior Court, seeking to bar the Franklin closure. (*Id.*) After a two-day hearing on Plaintiffs' motion for a temporary restraining order, held on September 30 and October 1, 2008, that motion was denied in part because Plaintiffs lacked a substantial likelihood of success on the merits. (*Id.*) At the status hearing subsequently held on October 8, 2008, the court scheduled a hearing on Plaintiffs' motion for a preliminary injunction to be held on December 2, 2008. (*Id.* at 5.)

On October 22, 2008, while the first action still was pending, Plaintiffs filed a second civil action in D.C. Superior Court, captioned Civil Action No. 2008 CA 007470 B. (*Id.*) Although this case, like its predecessor, involved claims arising from the Franklin closure

---

[2]     Uncontroverted testimony of Fred Swan, Motions hearing, February 3, 2009, 2008 CA 007470 B (Mem. Order at 2).



(specifically, it alleged that Mayor Fenty violated Plaintiffs' due-process rights by failing to

provide them with proper notice and a fair hearing before closing the shelter, Compl. ¶¶ 69-71

(Case No. 2008 CA 007470 B)), Plaintiffs failed to notify the Court that the two cases were

related. (Mem. Order at 5.) Instead, on November 3, 2008 – one month before the preliminary

injunction hearing was to be held in the first case – Plaintiffs moved to dismiss the earlier-filed

case. (*Id.*) Although Defendants opposed the motion, Plaintiffs obtained a dismissal pursuant to

Rule 41(a)(1). As a result, the preliminary-injunction hearing was vacated. (*Id.*)

Defendants then filed dispositive motions in the second case, and an oral hearing was

held on February 3, 2009. (*Id.*) At that hearing, Plaintiffs failed to bring to the court's attention

their convoluted history of multiple actions and pleadings arising from the same nucleus of

operative facts – the same facts that give rise to the instant federal action.

On March 9, 2009, Plaintiffs moved to stay the Superior Court proceedings "Pending

Discovery and Pending Submission of Federal Claims in the United States District Court."

(Docket, Case No. 2008 CA 007470B, attached as Exhibit 2.) On May 3, 2009, while the motion

to stay was still pending, Plaintiffs moved to compel discovery in the Superior Court. (May 3,

2009 Docket Entry, Exhibit 2.)

On May 7, 2009, Plaintiffs filed their Amended Complaint ("Compl.") in this Court,

asserting the same due-process violations that they alleged in D.C. Superior Court. (Docket No.

7 ¶¶ 92-95.) Plaintiffs did not notify this Court that these claims were already pending in another

forum.

On May 11, 2009, the Superior Court granted summary judgment in favor of Defendants

and denied Plaintiffs' motion for a stay.



On May 21, 2009, this Court heard oral arguments on Plaintiffs' motion for injunctive

relief. The Court denied the motion orally at the conclusion of the hearing citing the concurrent

jurisdiction of the Superior Court to hear the claims raised in the federal complaint, and issued a

written order confirming that denial the following day (Docket No. 21).

## III.    LEGAL ARGUMENT

### A. *Plaintiffs' Claims are Barred and Precluded from this Court's Consideration*

The Superior Court of the District of Columbia has reviewed Plaintiffs' claims. Plaintiffs

had several options to bring the newly-minted discrimination claims before that tribunal, but

made tactical and strategic decisions not to do so in several failed attempts to gains several bites

at the judicial apple. Recognized legal doctrine supports dismissal of Plaintiffs' claims and

preclusion of this Court's continued jurisdiction.

The doctrine of *res judicata* prevents "repetitious litigation" involving the same causes

of action or the same issues. *NextWave Personal Communications, Inc. v. FCC*, 254 F.3d 130,

142 (D.C. Cir. 2001), *affirmed in relevant part*, 537 U.S. 293 (2003). *See also Stanton v. D.C.*

*Court of Appeals*, 127 F.3d 72, 77 (D.C. Cir. 1997) (*res judicata* exists in part to shield litigants

from duplicative and vexatious litigation).[3] *Res judicata* consists of claim preclusion and issue

preclusion. *NextWave*, 254 F.3d at 143. Under claim preclusion, a final judgment on the merits in

a prior suit involving the same parties (or their privies) bars subsequent suits based on the same

cause of action. *NextWave*, 254 F.3d at 143 (*citing Allen v. McCurry*, 449 U.S. 90, 94 (1980)).

---

[3]      *See also Montana v. United States*, 440 U.S. 147, 153–54 (1979) ("To preclude parties from
contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the
expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial
action by minimizing the possibility of inconsistent decisions.") (footnote omitted); *Southern Pacific R.R. Co. v.
United States*, 168 U.S. 1, 48 (1897) (enforcement of preclusion "is essential to the social order . . . .").



Claim preclusion applies even if an appeal is pending in the prior action. *See Yamaha Corp. of America v. United States*, 961 F.2d 245, 255 (D.C. Cir. 1992) ("collateral estoppel may be applied to a trial court finding even while the judgment is pending on appeal") (*quoting Southern Pac. Communications Co. v. AT&T*, 740 F.2d 1011, 1018 (D.C. Cir. 1984), *cert. denied*, 470 U.S. 1005 (1985)).

Claims may be barred by issue preclusion (also known as collateral estoppel), preventing subsequent relitigation of issues resolved in a prior suit, *regardless* of whether the later suit is based on the same cause of action or the same opposing party. *NextWave*, 254 F.3d at 147. For issue preclusion to apply, the issue must have been "actually and necessarily determined" by a court of competent jurisdiction in the first action. *Id.* (*quoting Connors v. Tanoma Mining Co.*, 953 F.2d 682, 684 (D.C. Cir. 1992)). *See Allen*, 449 U.S. at 94; *Dynaquest Corp. v. United States Postal Svc.*, 242 F.3d 1070, 1076 n.5 (D.C. Cir. 2001) (final judgment in another court *precludes* parties (or their privies) from relitigating issues that were or could have been raised in that action, regardless of whether that action was administrative or judicial, and *res judicata* applies to questions of law as well as fact); *North v. Walsh*, 881 F.2d 1088, 1093 (D.C. Cir. 1989).

To establish issue preclusion, a party must show: (1) that the same issue now being raised was previously contested by the parties and submitted for judicial review, (2) that the issue was actually and necessarily determined by a court of competent jurisdiction in the prior case, and (3) preclusion would not work a basic unfairness to the party bound by the first decision. *Beverly Health & Rehabilitation Svcs, Inc. v. NLRB*, 317 F.3d 316, 322 (D.C. Cir. 2003) (*citing Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 467 n.6 (1982)). *See also Allen*, 449 U.S. at 94 ("once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude



relitigation of the issue in a suit on a different cause of action involving a party to the first

case.").

 In the instant litigation, the issues raised are identical to those previously contested by the

District Defendants and these same Plaintiffs.   Those issues were decided by a court of

competent jurisdiction, and preclusion would not be unfair to the Plaintiffs, as Plaintiffs brought

both suits, with the same counsel, and had a full and fair opportunity to litigate the same issues in

the D.C. Superior Court.  Plaintiffs are precluded from relitigating them here. *See Montana*, 440

U.S. at 156 (issue preclusion applies where coordinate court decided "the precise constitutional

claim" that one party advanced previously).

 Even if arguably Plaintiffs attempt to raise an issue for the first time *here*, such as these

newly-minted discrimination claims, they would still be precluded from doing so:

> if a new legal theory or factual assertion put forward in the second action is
> related to the subject-matter and relevant to the issues that were litigated
> and adjudicated previously, so that it *could* have been raised, the judgment
> is conclusive on it despite the fact that it was not in fact expressly pleaded
> or otherwise urged.

*Hall v. Clinton*, 285 F.3d 74, 81 (D.C. Cir. 2002) (*quoting Yamaha Corp. of Am. v. United States*,

961 F.2d 245, 257–58 (D.C. Cir. 1992) (emphasis in original)).

 Plaintiffs are likewise barred by asking this Court for a new determination on the same

operative facts based on the doctrine of parallel litigation.   As a matter of law, when cases

proceed in parallel, the first to reach judgment controls the other, through claim and issue

preclusion. *Central States, Southeast & Southwest Areas Pension Fund v. Paramount Liquor

Co.*, 203 F.3d 442, 445 (7th Cir. 2000) ("outright dismissal is most likely to be appropriate when

the same party has filed all of the suits.") (citation omitted).



Moreover, the parties in the two suits need not be identical. *See Montana*, 440 U.S. at 153

(once issue is actually and necessarily determined by court of competent jurisdiction, issue

preclusion applies "in subsequent suits based on a different cause of action involving *a party* to

the prior litigation.") (emphasis added). *See also NOW v. Operation Rescue*, 747 F.Supp.760,

766 (D.D.C. 1990) (parties must only be "substantially the same"), *affirmed in relevant part,*

*vacated in part and remanded*, 373 F.3d 646 (D.C. Cir. 1994); *Burlington Northern R.R. Co. v.*

*Hyundai Merchant Marine Co., Ltd.*, 63 F.3d 1227, 1232 (3rd Cir. 1995) ("Complete identity of

parties in the two suits is not required for the application of issue preclusion."); *Coeur D'Alene*

*Tribe of Idaho v. Hammond*, 384 F.3d 674, 688 (9th Cir. 2004) (parties may be "in privity"), *cert.*

*denied*, 537 U.S. 1187 (2005). *Cf. United States v. Dominguez*, 359 F.3d 839, 843 (6th Cir. 2004)

("Many jurisdictions have dispensed with the privity requirement altogether as to the party

asserting preclusion, but never as to the party to be precluded.") (*citing, inter alia, Blonder-*

*Tongue*, 402 U.S. at 326).

   The District Defendants are therefore entitled to judgment on all counts.

## B. *Plaintiffs' Claims Against Defendants Fenty, Albert, Carter, and Swan In Their Individual Capacities Should Be Dismissed On Qualified-Immunity Grounds*

   Plaintiffs' claims against the individual Defendants in their individual capacities must be

dismissed because these Defendants are immune from such claims.

   It is well-settled that government officials enjoy qualified immunity from claims against

them, "insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808,

815 (2009) (internal quotation marks omitted); *see also Lederman v. United States*, 291 F.3d 36,

46 (D.C. Cir. 2002) ("Qualified immunity shields officials from liability for damages so long as



their actions were objectively reasonable, as measured in light of the legal rules that were clearly

established at the time of their actions." (internal quotation marks omitted)).

"Plaintiffs bear the burden of defeating this immunity, which is a legal issue to be

decided by the court." *Thomas v. Cohen*, 304 F.3d 563, 569 (6th Cir. 2002); *see also Armstrong*

*v. City of Melvindale*, 432 F.3d 695, 699 (6th Cir. 2006) ("Qualified immunity is an affirmative

defense; once asserted, the burden of proof is on the plaintiff to show that the defendants are not

entitled to qualified immunity." (internal quotation marks and brackets omitted)); *Woodward v.*

*City of Worland*, 977 F.2d 1392, 1396 (10th Cir. 1992) (once a defendant raises a claim of

qualified immunity, the burden is on the plaintiff to "show that the law was clearly established

when the alleged violation occurred and come forward with facts or allegations sufficient to

show that the official violated the clearly established law").

Qualified-immunity arguments are especially appropriate early in the proceedings of a

case. As noted by the Supreme Court:

> Because qualified immunity is an immunity from suit rather than a mere
> defense to liability[,] it is effectively lost if a case is erroneously permitted to go
> to trial. Indeed, we have made clear that the driving force behind creation of the
> qualified immunity doctrine was a desire to ensure that insubstantial claims
> against government officials will be resolved prior to discovery. Accordingly, we
> repeatedly have stressed the importance of resolving immunity questions *at the*
> *earliest possible stage in litigation.*

*Pearson*, 129 S. Ct. at 815 (emphasis added) (internal quotation marks, citations, brackets, and

ellipsis omitted).

Prior to *Pearson*, courts faced with qualified-immunity claims were required to engage in

the sequential two-step analysis prescribed by the Supreme Court in *Saucier v. Katz*, 533 U.S.

194 (2001). Under *Saucier*, a court was required to consider *first* whether the plaintiff's

allegations, if true, established a violation of a constitutional or statutory right. 533 U.S. at 201.



Only after answering this question in the affirmative could the court proceed to the *second* step, determining whether that right was "clearly established" at the time of the defendant's alleged violation. *Id.*

*Pearson* did away with *Saucier*'s "rigid order of battle," 129 S. Ct. at 817 (internal quotation marks omitted), recognizing that that "procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case" because "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," *id.* at 818. Accordingly, a court may now dismiss a claim on qualified-immunity grounds upon a finding *either* that the plaintiff's allegations do not suffice to claim a violation of a constitutional right *or* that the right asserted was not clearly established at the time of the alleged violation. *Id.* at 821.

As Defendants explained in their briefing on Plaintiffs' motion for injunctive relief and at the May 21, 2009 hearing on that motion, the doctrine of *res judicata* bars each and every one of Plaintiffs' claims in this Court. Defendants incorporate those arguments by reference herein, rather than tax the Court's patience by recapitulating them here.

In addition, each of Plaintiffs' claims fails on its own terms, as explained herein.

### C. Plaintiffs' Claims Against Defendants Fenty, Albert, Carter, and Swan In Their Official Capacities Should Be Deemed To Be Claims Against The District

"When sued in their official capacities, government officials are not personally liable for damages. A * * * suit for damages against municipal officials in their official capacities is thus equivalent to a suit against the municipality itself." *Atchison v. District of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996) (internal citation omitted). For this reason, the Supreme Court has held that "[t]here is no longer a need to bring official-capacity actions against local government officials." *Kentucky v. Graham*, 473 U.S. 159, 167 (1985).



Accordingly, because Plaintiffs' claims against the individual Defendants in their official capacities are properly construed as claims against the District, individual Defendants Fenty, Albert, Carter, and Swan should be dismissed as Defendants in this action and the District substituted for them.

### D. Plaintiffs have not stated a claim under the FHA or the ADA.

Both the Fair Housing Act ("FHA") and the Americans With Disabilities Act ("ADA") create causes of action for disparate-impact and disparate-treatment discrimination. *See Gamble v. City of Escondido,* 104 F.3d 300, 304-05 (9th Cir. 1997) (FHA); *Raytheon Co. v. Hernandez,* 540 U.S. 44, 46 (2003) (ADA). Disparate treatment requires some showing of discriminatory intent on the part of a defendant, whereas a plaintiff asserting a disparate-impact claim must establish "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Gamble,* 104 F.3d at 306 (internal quotation marks omitted) (FHA); *see also Hernandez,* 540 U.S. at 52-53 (same for ADA).

In *Johnson v. Dixon,* 786 F. Supp. 1 (D.D.C. 1991), the U.S. District Court for the District of Columbia dismissed the plaintiffs' disparate-treatment and disparate-impact claims on facts nearly identical to those at issue here. The *Johnson* plaintiffs, four homeless men, sued for a permanent injunction ordering the District to reopen two downtown shelters. *Id.* at 1. They contended that a substantial proportion of the inhabitants of the two shelters were disabled within the meaning of the FHA and that the District acted with discriminatory purpose in closing the shelters. They could not, however, offer any evidence of overtly discriminatory collusion; instead, they merely postulated that the closure of the two shelters had a discriminatory *effect* by disproportionately impacting the disabled. *Id.* at 5.



14

The court rejected this argument, emphasizing that plaintiffs "present[ed] * * * no evidence of discriminatory intent upon the part of the District of Columbia in closing the [two] shelters, and none to show that the handicapped homeless persons are disproportionally affected in the selection of the shelters to be closed or inadequately accommodated in the manner of doing so." *Id.* at 7. Indeed, in *Johnson* as here, it was undisputed that the disabled homeless population in the District was approximately evenly distributed among the various shelters located throughout the city. *Id.* at 5 n.9.

The court went on to note that "[t]he District of Columbia is, moreover, a governmental body acting within the ambit of legitimately derived authority, both fiscal and legislative, and the relief sought is not merely a waiver of a regulatory requirement, but, rather, a massive judicial intrusion upon that governmental autonomy." *Id.* (internal quotation marks omitted). The court declined to usurp political power in such a fashion. *Id.*

Here, as in *Johnson*, there is no evidence whatsoever of any discriminatory intent and, therefore, plaintiffs have not stated a disparate-treatment claim under either the FHA or the ADA. Moreover, the Complaint itself states that the proportion of users of the temporary shelter formerly located at the Franklin School who are African American is "similar" to that of African American members of the District's homeless population as a whole. (Compl. at ¶ 10.) Similarly, while Plaintiffs assert that an estimated 71% of the homeless population in the District suffers from some form of mental illness or substance abuse (Compl. at ¶17), they do not even allege that a higher proportion frequented the Franklin facility than use other shelters in the District. Thus, as was the case in *Johnson*, it cannot be said that the impact of the closure at issue here was discriminatory as between shelters. Without any such evidence of a significantly adverse or disproportionate impact on the relevant groups, and in light of the judicial deference



to governmental bodies acting within the ambit of their legitimately derived political authority,

Plaintiffs have no disparate-impact claim under either the FHA or the ADA.

### E. Plaintiffs' asserted right under the FHA to shelter at a particular site is not clearly established.

Plaintiffs' claims of race and disability discrimination under the FHA fail for an

additional reason: they rest on the allegations that "Defendants were/are housing providers as

defined under the FHA" (Compl. at 10 ¶ 28; *id.* at 11 ¶¶ 34, 40; *id.* at 12 ¶ 46) and "intentionally

denied plaintiffs housing because of" Plaintiffs' race and disability (Compl. at 10 ¶ 29; *id.* at 11 ¶

35). But the FHA does not entitle individuals to "housing" in a government, rent-free facility

that is used only temporarily as a homeless shelter and is not even open to those individuals 24

hours per day during such temporary use. Rather, the FHA applies to the sale or rental of

*dwellings*, which are defined as "building[s], structure[s], or portion[s] thereof which [are]

occupied as, or designed or intended for occupancy as, a residence by one or more families * * *

." 42 U.S.C. § 3602(b). A "residence," in turn, is "a temporary or permanent dwelling place,

abode or habitation to which one intends to return[,] as distinguished from the place of temporary

sojourn or transient visit." *Lakeside Resort Enters., LP v. Bd. of Supervisors*, 455 F.3d 154, 156

(3d Cir. 2006) (internal quotation marks omitted). For example, a summer home is a residence,

but a motel is not. *Id.* at 157.

If a motel is not a residence, then the shelter formerly provided to Plaintiffs on a

temporary basis at the Franklin School patently cannot be characterized as such. Even a motel

gives its guests the assurance that they will be permitted unlimited access to their rooms for a

particular span of days or weeks; the shelter at the Franklin School, in contrast, required all

individuals to vacate the premises by 7 a.m. each day, did not allow anyone to return until 4 p.m.,

and even then required every individual to complete an intake process each day before being



allowed to enter. *See supra* at 4 & n.1. In other words, no Plaintiff could ever be sure, upon

being evicted from the shelter in the morning, whether a bed would be waiting for him that night.

Calling the Franklin School Plaintiffs' "dwelling" under these circumstances would be to deprive

the word of all meaning.

Thus, because the temporary shelter formerly located at the Franklin School does not

qualify as a "dwelling," the FHA simply does not apply to it, and Plaintiffs accordingly cannot

have a clearly established right thereunder.

### F. Plaintiffs have not stated a claim under the D.C. Human Rights Act.

The D.C. Human Rights Act, D.C. OFFICIAL CODE §§ 2-1401.01 *et seq.*, creates causes of

action for place-of-residence and disability discrimination.[4] *See id.* § 2-1402.21(a) ("It shall be

unlawful to do any of the following acts, wholly or partially for a discriminatory reason based on

the actual or perceived * * * disability * * * or place of residence * * * of any individual.").

Plaintiffs do not, however, allege that Defendants did any of the prohibited acts, to wit:

- Various actions in the context of financial transactions in real property.

- Various actions regarding loans for purposes of acquiring, altering, or insuring real property.

- Various actions regarding the rights of tenants and lessees.

- Various actions regarding real-estate brokers.

*Id.* §§ 2-1402.21(a)(1)-(7). Succinctly, Plaintiffs fail to allege any "transaction in real property"

prohibited by the Act. See § 2-1402.21 ("[I]t shall be an unlawful discriminatory practice to . . .

interrupt or terminate, or refuse or fail to initiate or conduct **any transaction in real property** . .

..."). *Id.* at (a)(1) (emphasis added). Even though Franklin School closed, there was no

---

[4] The District of Columbia Human Rights Act employs virtually the same language as that found in the federal Fair
Housing Act, substituting the word "disability" for "handicap" while incorporating verbatim the federal wording for
discrimination based on "a refusal to make reasonable accommodations" for the disabled. D.C.Code §§ 2-
1402.21(a), -1402.21(d)(3)(B) (2001).



transaction. In fact, the District offered and provided placement at other shelters and in

programs providing permanent placement, which shows a lack of intent to discriminate

Plaintiffs simply have not alleged facts sufficient to state a claim under the D.C. Human Rights

Act.

### G. *Plaintiffs have not stated a claim for denial of procedural due process*

Plaintiffs premise their procedural-due-process claim on two alleged actions: (1) Mayor

Fenty's alleged action in "depriving [Plaintiffs] of their belongings and personal property"

(Compl. at 17 ¶ 94), and (2) Mayor Fenty's closure of the shelter at the Franklin School despite

the fact that he lacked authority to do so "where the Franklin Shelter Closing Requirements

Emergency Act of 2008 had not been enacted into law at the time the Mayor closed the shelter,

nor does its closing comply with existing laws" (Compl. at 17 ¶ 95).

With regard to the first of these claims, nowhere in their Amended Complaint do

Plaintiffs allege that the Mayor deprived them of any belongings or personal property

whatsoever. Notably, Plaintiffs did assert such a claim in the Superior Court, which rejected it:

> Finally, plaintiffs' conversion and intentional infliction of emotional
> distress claims also fail.
> Conversion is the "unlawful exercise of ownership, dominion and control
> over the personalty of another in denial or repudiation of his right to such
> property." *Blanken v. Harris, Upham & Co.*, 359 A.2d 281, 283 (D.C. 1976).
> Plaintiffs argue that the District converted their personal property when it was
> moved to the 801 East Shelter. Plaintiffs also seek to recover for the personal
> property that some Plaintiffs inadvertently left behind the morning the Shelter was
> closed.
> It is undisputed that Shelter occupants were permitted to take their
> belongings with them when they left that morning, and if they could not, they
> were provided footlockers to store their things until they picked them up at the
> 801 East Shelter. The District posted a sign on the Shelter which provided Shelter
> occupants the information necessary to collect these personal belongings and that
> they could collect them until October 10, 2008. The flyer provided a phone
> number to contact if transportation to 801 East Shelter was needed. Shelter staff
> were outside September 27, 2008 through October 4, 2008 from 4-6 p.m.

18



(considered regular intake hours) to inform residents of the closure, the location of their belongings, and provide transport to retrieve their belongings.

Of great importance here is the fact that certain plaintiffs and counsel were in court for the initial TRO hearing on September 30 and October 1, 2008. At this time, certain plaintiffs testified about how their belongings were taken to the 801 East Shelter the morning of the closure. The defendants also provided information about the location of property and that shuttle busses were available to take plaintiffs there. Plaintiffs could have raised this issue with the Court then, or at least moved to preserve the property well before the October 10, 2008 pickup deadline.

The District removed plaintiffs' belongings that remained from the shuttered Shelter, however, they were made available for the owners to pick up and at no time were they converted to the public's use or benefit. Plaintiffs were not prevented from going to 801 East Shelter to claim their property and defendants did not prevent them from claiming their belongings. In fact, it is undisputed that at least five of the named plaintiffs in this suit traveled to the 801 East Shelter to reclaim their belongings before the October 10, 2008 deadline and of the one-hundred-sixty-two footlockers that were taken to the 801 East Shelter, eighty-eight contained personal belongings and seventy of them have been retrieved. Most importantly, the District has not disposed of the property and presumably the plaintiffs who have not already done so may still claim their property.

(Mem. Order at 9-10 (footnotes omitted).)

The Superior Court likewise considered and rejected Plaintiffs' second contention, expressly finding that "[t]he Mayor had the authority to close the Franklin Shelter on September 26 in the manner that he did and the Court cannot second guess his decision." (*Id.* at 8.) Accordingly, Plaintiffs' claims are, in addition to being meritless, barred by *res judicata* not only because Plaintiffs *could* have raised them below but because Plaintiffs actually *did so* – and lost.

### *H. Plaintiffs have not stated a claim for denial of substantive due process.*

Plaintiffs' substantive-due-process claim, like their claim for a violation of procedural due process, is premised on the allegation that Mayor Fenty lacked the authority to close the shelter at the Franklin School. As explained above, the Superior Court has already concluded that the Mayor *did* have the authority to do so. Accordingly, Plaintiffs have no claim for a substantive due process violation in this Court.

19



### I. All Of Plaintiffs' Claims Against The District Should Be Dismissed For Failure To State A Claim Upon Which Relief May Be Granted.

Because, as explained above, Plaintiffs have failed to state a claim upon which relief can be granted on any of their asserted causes of action, their claims against the District should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

## IV.   CONCLUSION

For all the reasons set forth above, Plaintiffs' amended complaint should be dismissed with prejudice.

Respectfully submitted,

PETER NICKLES
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

/s/ Ellen A. Efros
ELLEN A. EFROS
Chief, Equity I

/s/ Denise J. Baker
DENISE J. BAKER
Assistant Attorney General
441 Fourth Street, N.W., Suite 600 South
Washington, D.C. 20001
(202) 442-9887 (telephone)
(202) 727-3625 (facsimile)
Denise.Baker@dc.gov

/s/ Sarah Sulkowski
SARAH SULKOWSKI[*]
Assistant Attorney General
441 Fourth Street, N.W., Suite 600 South
Washington, D.C. 20001
(202) 724-6627 (telephone)

---

[*]    District of Columbia Bar application pending. Member in good standing of the Virginia State Bar. Authorized by the Office of the Attorney General for the District of Columbia to provide legal services pursuant to Rule 83.2(f) of the United States District Court for the District of Columbia.

A 218

(202) 730-1454 (facsimile)
Sarah.Sulkowski@dc.gov

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

ERIC SHEPTOCK, *et al.*,                )
                                        )
    Plaintiff,                          )
                                        )
v.                                      )          Civil Action No. 09-672 (RBW)
                                        )
                                        )
ADRIAN FENTY, *et al.*,                 )
                                        )
    Defendant.                          )

### PLAINTIFFS' ERIC SHEPTOCK AND THE COMMTTEE TO SAVE FRANKLIN
### SHELTER'S MOTION TO AMEND THE COMPLAINT

Plaintiffs, Eric Sheptock and the Committee to Save Franklin Shelter, by and through undersigned counsel and pursuant to Fed. R. Civ. P. 15(a), hereby move this Court to grant its leave to amend the complaint in the matter referenced above. As reasons why this motion should be granted, plaintiffs state the following. A memorandum of points and authorities in support of this motion is attached hereto:

1.      Plaintiffs filed their complaint in the United States District Court for the District of Columbia on April 10, 2009. In their complaint, plaintiffs alleged numerous violations of the both the Fair Housing Act, Americans With Disabilities Act, the D.C. Human Rights Act, the Fifth Amendment of the United States Constitution as a result of the precipitous closing Franklin Shelter, a low barrier shelter located at 925 Thirteenth Street in Northwest Washington, D.C. In this complaint, plaintiffs further alleged ongoing failures on the part of the District of Columbia in providing housing and services to the homeless population in the District.

2.      On June 18, 2009, the District defendants filed a motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12 (b)(6). In this motion, defendants claim that plaintiff's claims are barred by *res judicata,* and that plaintiffs failed to allege facts that would warrant relief.



3.     Plaintiffs now seek leave to amend the complaint to include more specific allegations of the racial composition area in which Franklin Shelter was located as compared with the racial composition of the areas in which the remaining shelters are located. Plaintiffs further amend the complaint to reflect additional counts under the respective statutes regarding the District defendants' continued and ongoing failures to provide housing and services as described in the Permanent Supportive Housing Program. These allegations are supported by additional evidence of overcrowding at area shelters that has resulted in an increase of persons being refused housing in any area shelter.

WHEREFORE, for the reasons stated herein and the attached memorandum of points and authorities attached hereto, plaintiffs move this court to grant its leave and file the attached amended complaint.

Respectfully submitted

_____/s/_____
GEORGE E. RICKMAN, ESQ.
P.O. Box 21267
Kalorama Station
Washington, D.C.  20009-21267
202-723-3955
georgerick11@comcast.net
*Counsel for Plaintiffs*

_____/s/_____
JANE ZARA, ESQ.
DC Bar # 982392
1611 Monroe St., NW
Washington, DC  20010
202-483-9303
jjzara@aol.co
*Counsel for Plaintiffs*



Local Rule 7(m) Certificate

I do hereby certify that on June 25, 2009, the undersigned contacted Assistant Attorney General Denise Baker, counsel for the District defendants, in an effort to obtain her consent to the relief sought herein. The undersigned was informed that the District defendants will oppose the relief sought herein.

/s/
GEORGE E. RICKMAN, ESQ.

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

ERIC SHEPTOCK, *et al.*,            )
                                    )
    Plaintiff,              )
                                    )
v.                                  )    Civil Action No. 09-672 (RBW)
                                    )
                                    )
ADRIAN FENTY, *et al.*,             )
                                    )
    Defendant.              )

### SECOND AMENDED COMPLAINT

### JURISDICTION

1.      Plaintiffs bring this action pursuant to *The Americans With Disabilities Act*, 42

U.S.C. §§ 12101 *et seq.*, 12131, and 12132 ("ADA"), *The Fair Housing Act,* 42 U.S.C. §§ 3601-

3631 and 3604(f)(1)("FHA")  and the *District of Columbia Human Rights Act*, D.C. Official

Code §§ 2-1401.01 *et seq.* and 2-1402.21(a)(4) (place of residence discrimination) ("DCHRA").

This Court has original jurisdiction over all federal statutory claims pursuant to 28 U.S.C. § 1331

and supplemental jurisdiction over the claims arising under the laws of the District of Columbia.

### THE PARTIES

2.      Plaintiff, Eric Sheptock, is a natural person and former inhabitant of Franklin

Shelter, 925 13th Street, NW, Washington, DC, 20002.

3.      Plaintiff, Terry E. Huff, is a natural person and former inhabitant of Franklin

Shelter,  925 13th Street, NW, Washington, DC,  20002

4.      Plaintiff, Richard Embden, is a natural person and former inhabitant of Franklin

Shelter,  925 13th Street, NW, Washington, DC,  20002

1



5.     Plaintiff, Edward Baltimore, is a natural person and former inhabitant of Franklin Shelter,  925 13th Street, NW, Washington, DC,  20002

6.     Plaintiff Reginald Dubose, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

7.     Plaintiff Tommy Bennett, is a natural person and former inhabitant of Franklin Shelter, 925 13th Street, NW, Washington, DC, 20002

8.     Plaintiff Committee to Save Franklin Shelter is an unincorporated nonprofit association under D.C. Code 29-971, the Uniform Unincorporated Nonprofit Associations Act.

9.     Plaintiff Committee to Save Franklin Shelter was formerly located at 925 13th Street, NW, Washington, DC, 20002.

10.    The interest Plaintiff Committee to Save Franklin Shelter seeks to protect is to ensure that those who have inhabited the shelter are able to remain there and have adequate services provided for them.

## VENUE

11.    All parties either reside or work in the District of Columbia, and all complained of events took place in the District of Columbia. Franklin Shelter is located in the District of Columbia. Venue is therefore proper. 28 U.S.C. § 1391 *et seq.*

## ALLEGATIONS

12.    Plaintiffs allege that the District defendants have engaged in an emerging pattern of the systematic dislocation of the homeless population from the Downtown area of Washington, D.C. of which the closure of Franklin Shelter is a part.  In so doing, the District defendants have denied this homeless population services, including housing, as required under the *District of Columbia Homeless Services Reform Act* D.C. Official Code Sect. 4-752.01 (2005

2



ed.) along with other federal and District laws. These practices are ongoing and threaten the continued closure of "low barrier" shelters in the Northwest quadrant of the city.[1]

13.      The District of Columbia owned the property located at 900 13th Street, N.W. Washington D.C. known as the Franklin Shelter. Catholic Charities operated Franklin Shelter during the relevant time period and provided services to the homeless described below.

14.      Plaintiffs, an organization representing the residents of the former Franklin Shelter and individually named plaintiffs, all were residents at the former Franklin Shelter located in the 900 block of 13th Street in Northwest Washington, D.C. On the morning of September 26, 2008, at approximately 6:00am, the inhabitants of Franklin Shelter were awakened and informed that the shelter was closing.  Once leaving the shelter, the men were separated from their belongings that remained in the shelter and were told they could not gain reentry to the shelter. The inhabitants of Franklin Shelter were then scattered throughout the downtown area, and police shouted through a loudspeaker from a police car throughout the day to people attempting to enter the shelter, informing them that the shelter was closed. Many persons attempted to enter the shelter throughout the day of September 26.  It rained throughout the day and the weekend that followed.  Numerous inhabitants of Franklin Shelter spent the weekend outside, in the rain, carrying their belongings or losing them on the streets.

15.      On September 16, 2008, prior to the closing of the shelter, the Council had hearings on, and passed The Franklin Shelter Closing Requirements Emergency Act of 2008, B17-923 ("Emergency Act") (See also Franklin Shelter Closing Requirements Temporary Act of 2008, B17-0924). The Emergency Act requires that the Mayor, prior to closing the Franklin

---

[1] Plaintiffs continue to investigate disturbing facts concerning efforts to close the Federal City Shelter operated by CCNV located on First Street in Northwest Washington, D.C.



Shelter, provide a report that describes any expected increase or decrease in the need for low

barrier shelter space generally and, specifically, during the winter months,  and an accurate

assessment of the city's ability to seasonally increase capacity to reduce incidences of

hypothermia among the homeless population. Also included in the provisions of this act is that

the city provided coterminous services meeting the various needs addressed. The Mayor signed

the act into law on September 30, 2008, following the closing of the facility.

 16. This act contains various services and reporting requirements that have not been

met by the District. Sec 3(a) requirements of the Emergency Act have not been satisfied,

requiring the Mayor's report to be filed PRIOR to the closing of Franklin Shelter.  The shelter

was closed in hurried manner the morning of Sept. 26, 2008. The report was released the evening

of September 30, after close of business.  Sec. 3(a)(1)(A)(i) requirements of the Emergency Act

have not been satisfied, requiring the documentation of each client's supportive housing address.

This has not been provided. Sec 3(a)(1)(A)(iv) requirements of the Emergency Act have not been

satisfied, requiring documentation of supportive services provided to complement housing.  On

September 30, four days after closing the Shelter, and after close of business, a Report on

Supportive Housing Placements and Emergency Shelter Capacity in the District of Columbia

[*hereinafter* the "Mayor's Report"] was released. The mayor then signed the law on October 1,

2008, following the closure of the building.

http://dc.indymedia.org/usermedia/application/13/mayors_report_and_certification-
 franklin_closure.pdf

 17. The report merely mentions the organizations contracted, not an explanation of

which services are provided by need to which person.  The report merely mentions the promise

of future transportation, no details of how the housed will reach their particular services,

4



especially when they are dispersed to the poorest and most violent areas of the city, with the least amount of services available. Sec 3(a)(1)(B)(4) requirements of the Emergency Act have not been satisfied, requiring a proper analysis of the impact of closing of the shelter on the homeless population.  No statistics of homeless needs are provided, especially in the Franklin Park area after the closing of the shelter.

18.    The District justified the closure of Franklin Shelter prior to the release of the Report and the signing of the legislation into law by claiming that the building had become "uninhabitable." Plaintiffs recently learned that the only issue as to habitability concerned a fire alarm system that was no longer operable. This was the only building code violation cited, and provided the only legal basis for immediate closure. Plaintiffs further learned that short of immediate closure, the District would have been able to correct these violations for an insubstantial amount of money, thereby allowing the shelter to remain open while the District came into compliance with the requirements detailed in the Franklin Closure Act. Plaintiffs understand that the measures could have been met by utilizing a fire watch, purchasing battery operated smoke detectors and/or replacing the system for a cost of approximately $50,000.00.

19.    Under the District of Columbia *Homeless Services Reform Act* ("HSRA"), the District provides a "Continuum of Care" for persons deemed homeless. The range of services within this Continuum of Care includes  providing low barrier shelter space, permanent housing and a list of services to address housing needs, physical health, mental health, alcohol and other substance abuse issues, transportation, child care, case management and "other health and social services that may be barriers to obtaining or maintaining permanent housing."

20.    District of Columbia has one of the highest rates of homelessness in the country. On a single night in January 2008, approximately 2,200 single adults were chronically homeless.



*Major Recommendations: Summary Report of the Urban Institute's Assessment of the District of Columbia's Public Homeless Assistance System,* June 2, 2008 at 2 . A 2006 report identified that nearly 80% of the homeless population in the District of Columbia consists of African Americans. Recent information provided by the District defendants indicates that at the present time, the homeless population in the District is comprised of 84% African-Americans, with 74% of the homeless population suffering from some recognized disability. Upon information and belief this pattern persists to the present day, and that the population of Franklin Shelter was of similar proportions. The most recent census data for the District of Columbia indicates that African Americans comprise 60% of the total population of the District, while the disabled 22% of the population.

http://www.urban.org/UploadedPDF/411696_assessment_dc_homeless.pdf

21.     Approximately 13,000 single adults and 530 families (2,800 adults and children) use emergency District-sponsored shelter facilities (known as "Continuum of Care" facilities) every year.  This was before the economic collapse that we are now witnessing.

22.     As a result of these financial, physical and psychological conditions, a greater number of the District's homeless subpopulations are unable to utilize shelter space in locations that require transportation or are overcrowded or are otherwise perceived to be threatening, even when such space is available. Most recently, a report sponsored by the Washington Legal Clinic for the Homeless describes all shelters as being overcrowded to the point where persons seeking shelters are turned away and forced to sleep on the streets at night.

23.     Needs are not accurately reflected in the Mayor's Report.  The numbers provided only reflect amount of beds made available by the city, independent of any accurate assessment of current needs.  Furthermore, these numbers of available beds are based on a single data point



(September 26, 2008, with time of day unspecified), and pertain to beds distributed throughout distant parts of the city, away from the downtown area, and are in distant parts of the city where the most vulnerable of the former Franklin Shelter inhabitants are unable or unlikely to be able to locate and obtain these services.

The Inter-Agency Council on Homelessness (ICH) held its bi-monthly meeting on February 25, 2009, where Fred Swan reported that over 3,100 homeless singles and over 360 homeless families had completed assessment forms in efforts to obtain Permanent Supportive Housing, but only 414 singles and 1 family have been housed. (ICH Feb. 25, 2009 minutes in preparation). Of these, only a small subset (less than one fourth) of the 414 singles housed thus far, were housed from Franklin Shelter.

24. The District of Columbia has the third highest poverty rate in the nation. Nearly one out of five of DC residents live at or below the poverty line. The rate of homelessness continues to rise in the District, attributed to an ever increasing lack of affordable housing in the District, including high rents and mortgages, a rise in physical and psychological abuses suffered by the homeless, stagnant wages and slashed public assistance, the lack of adequate health care services, lack of health insurance, lack of adequate mental health facilities and the lack of adequate day care facilities. In DC, an estimated 74% of the homeless individuals suffer from either substance abuse or mental illnesses.

FRANKLIN SHELTER

25. Franklin Shelter has provided a stable resource to those seeking shelter in the downtown area. It has served the homeless community as a continuum of care, as set forth in DC Code § 4-754.11, *et seq*. The shelter is located near service providers for mental health and physical health care. It has provided shelter within walking distance, and/or reasonable distance

7



from places of employment for Shelter inhabitants (e.g. within walking distance to day labor centers, Street Sense), enabling them to seek and maintain employment. Many inhabitants have come to rely on the mental and medical services required for their wellbeing, and within reasonable distance to Franklin Shelter.

26.     Plaintiffs' evidence will show lists of services that were routinely provided to those in need in the Franklin Shelter facility, including but not limited to mental health counseling through a contract with Anchor Mental Health Services, job counseling and links to employment opportunities, guidance about how to access public transit, especially for disabled, psychiatric contacts for diagnoses, benefit referrals, substance abuse treatment and counseling referrals, detoxification access, psycho-social assessments, assistance with housing applications, and medical service referrals.

27.     Many Franklin Shelter residents stayed at the shelter for long and consistent periods of time, some for well over a year and others nearly three years. Former residents report that because of the closing they are now forced to live a "nomadic" existence, experiencing difficulty in obtaining services that were once central to Franklin Shelter. Former residents report having access to foot lockers for their personal belongings, receiving mail at the address for Franklin Shelter, sharing a common eating area, and receiving case management and mental health counseling within the facility.

28.     The most recent census data offers stark comparisons of the areas around Franklin Shelter and the remaining facilities contracted by the District of Columbia. In the census tracts in which Franklin Shelter was located and those neighboring tracts, African Americans made up an average of 26% of the total population. In the tract in which Franklin Shelter was located, African American comprised 25% of the population. This is to be compared with the areas where

8



the remaining shelters are located: 98% African-American population in area of 801 East shelter located on the grounds of Saint Elizabeth's Hospital, 98% African American population in the area of Adams Place Shelter, and 91% African American population in the area of New York Avenue Shelter. Upon information and belief based on anecdotal evidence, the population of Franklin Shelter from the time of closing and an appreciable period prior to closing, was consistent with recent estimates indicating that the homeless population in the District is comprised of 84% African-Americans, with 74% of the homeless population suffering from some recognized disability.

29.    Many Franklin Shelter residents have been moved involuntarily out of Franklin Shelter and placed in parts of the city that lack adequate facilities to provide for their physical and mental health needs. This places them and others in physical danger, and imposes large impediments to their ability to seek and maintain employment.  Former residents of Franklin Shelter include those with compromised physical and mental capacities and are now living on the streets of the Franklin Shelter area without access to life saving medicines, without access to case worker contact and supervision. Some former residents of Franklin Shelter now live on the streets of the Franklin Shelter area in order to gain adequate access to their jobs so that they may continue being employed, or who now sleep at or near their workplace in order to get to work on time and maintain their employment.

30.    After the closing, one resident reported frequent trips to a number of emergency rooms because of a heart condition that worsened due to the instability. This same resident has also required crisis intervention for mental health services since the closing and this has been directly attributed to the closing. Another resident was arrested for a minor charge after the closing of the shelter, only to later be found incompetent to stand trial in the D.C. Superior Court



for the misdemeanor offense after being deprived of this medication and services once accessed through Franklin Shelter. Many other former residents, those suffering from bi-polar disorder and schizophrenia, complain that the services, especially mental health services, are not available at the remaining facilities and complain of difficulties in obtaining their medications. All former residents complain that after applying for permanent supportive housing, they remain on the street with no information concerning the status of their request. The personal stories of hardship of former Franklin residents go on and on with the consistent theme that the District continues to fail to provide the services as required by the HSRA.

### EXISTING SHELTERS

31.     In a June 2, 2008 study commissioned by the District Government, the reviewers found that almost every District-owned emergency shelter has serious deficiencies, including but not limited to gaping holes, cracked ceilings, leaky pipes, unusable toilets and soiled beds. *The Community Partnership and the District of Columbia's Public Homeless Assistance System*, June 2, 2008 at 9.

32.     The Urban Institute reported that at least 13,000 single adults and 2,800 adults and children use emergency shelter in the District every year. The Urban Institute reported that that the shelters are in excess of capacity on a regular basis: 164% over capacity at New York Ave., 125% over capacity at Franklin Shelter, 111% over capacity at 801 East, report illustrated the regular overcapacity of shelters prior to closing Franklin Shelter.

33.     After the closing of Franklin Shelter, former inhabitants of Franklin Shelter reported a lack of available beds in remaining shelters including New York Ave. Shelter, 801 East, located on the grounds of Saint Elizabeth's Hospital, and Adams Place Shelter, located in Northeast. This makes it very difficult for inhabitants, especially those with mental or physical



disabilities, to be able to get two out of three basic meals a day or to access other services vital to their existence. Anecdotal evidence collected from former Franklin residents contains repeated complaints that they do not receive the needed services from these remaining facilities. These services include mental health services, job counseling, and assistance for placement in Permanent Supportive Housing.

34.     Overcrowded conditions in 801 East Shelter, fire sprinkler systems blocked by extra beds, increased incidences of violence due to overcrowding, unreliable transportation and the difficulty of maintaining or seeking employment in the downtown area or other areas of opportunities, which are far removed from Wards 7 and 8 (areas of the city in which the population is well over 90% African-American) long lines to enter the shelters, meals with little or no nutritional value, unsanitary conditions (801 East often has feces and urine in the bathroom on the floors). A meal is offered once daily, at 7 pm, and soup kitchens and food for the homeless during the day are located at 5-6 miles from the shelter.

35.     Up to date information, including that information obtained since the closing of Franklin Shelter, indicates that the system of low barrier shelters in the District has fallen into a state of crisis. A report sponsored in part by the Washington Legal Clinic for the Homeless indicates that in the month of April 2009 a growing percentage of persons were either turned away from the remaining shelters being forced to sleep on the streets, or did not seek shelter because of overcrowding and increasingly dangerous conditions.

36.     Currently most of the existing low barrier shelter space is as many as five miles away from the downtown area, and lack reasonable access to job opportunities, balanced meals, and much needed physical and mental health services. Upon information and belief, except for

an undescribed employment service at 801 East shelter, none of the remaining shelters provide

any services as required by the HSRA and limited counseling.

    37.    Even when vans are provided to shuttle homeless persons to far flung warming

centers, this is not a realistic option for many members of the downtown homeless population,

who are afflicted by physical, mental, and emotional disabilities whose transport is potentially

highly problematic. (*See Tommy Wells Checks Out Homeless Shelter, Gets in Car Accident*,

published Nov. 26, 2008, filed as Exhibit No. 8, December 19, 2008). One former Franklin

resident with a diagnosed pulmonary condition was forced to miss a job counseling session

because the bus ran out of gas and he was unable to walk the lengthy distance to the session. He

remains unemployed.

PERMANENT SUPPORTIVE HOUSING

    38.    The Permanent Supportive Housing Program, previously identified by the District

as the means to mitigate any loss of shelter space because for the closing of Franklin Shelter,

fails to keep pace with the demand. In a monthly inter-agency conference, Fred Swann, the

Director for Homeless Services, flatly stated that as of February 2009, the District would no

longer seek to place single men in Permanent Supportive Housing.

    39.    Even when placements were made under the Permanent Supportive Housing

Program, these placements were made in remote and poorest parts of the city. The Table on

pages 8-13 of the Mayor's Report (concerning Permanent Supportive Housing) clearly shows

that even on the rare occasions when single men are placed in housing, there are no placements

in the areas of town with the most resources available (Ward 2 and Ward 3). Most placements

are occurring in the poorest and most violent parts of town, and with the least services available

for the vulnerable and the homeless. Along with failing to provide the service of housing, the

12



District continues to fail to provide those other services identified in the HSRA to the population that consists of over 84% African American, and over 75% disabled.

40.    Nearly 2300 persons have been identified as "chronically homeless" in the District. As a part of the District's plan, Permanent Supportive Housing is supposed to address this population. At the time Franklin Shelter was closed, the District announced its Housing First Program. This program was to place approximately 250 single men in permanent housing thereby mitigating the loss of space resulting from the closure of Franklin Shelter. These numbers were to be further advanced through 2009. Instead, plaintiffs learned that since these initial placements only 40 additional single men have been placed. Upon information and belief, the vast majority of all placements remain in Wards 7 and 8.

41.    With only 40 additional single men have been placed in housing, the numbers of homeless at the remaining shelters swell over capacity leaving some without shelter. These are the only placements despite claims that the District has identified 630 individuals through the "vulnerability index," and further claims that they have not been able to locate 150 of these persons ready for placement. This index is defined by persons who have been homeless for more than six months and either suffer from end stage renal disease, a history of cold weather injuries, liver disease or cirrhosis, HIV+/AIDS, are over 60 years of age, three or more prior emergency room visits in the prior three months, three or more hospitalizations or ER visits in prior year, or are Tri-morbid (mentally ill + abusing substances + medical problem). Upon information and belief, none of the 150 persons identified by District have been placed, and many of the former residents of Franklin Shelter fitting the criteria described above have not been placed despite their constant efforts.  The District reports to have housed 40 families in this same time period.

13



42.    Many former residents of Franklin Shelter meet the criteria set forth above, but, as alleged above, have not been provided a caseworker or any hopes of ever entering the program. Plaintiffs obtained numerous declarations from former Franklin residents explaining their efforts and/or desire to obtain permanent supportive housing along with any other available services and their frustration in not receiving a response from the District.

40.  Plaintiffs seek temporary and permanent injunctive relief compelling the District Government to re-open Franklin Shelter and return the *status quo*, providing adequate facilities in good condition to serve persons who are homeless with reasonable access to much needed mental health, health care services, adequate staffing of case workers and counselors for addictions and other disabilities, as well as employment counseling, and to appoint a receiver for the Permanent Supportive Housing Program to ensure that all persons obtain housing without regard to disability, race and/or location in the city. Plaintiffs also seek money damages for all claims alleged herein.

## COUNT I

(Violation of Fair Housing Act Disparate Treatment--Race)

41.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

42.    Plaintiffs are a protected class under the FHA, African American men. Others also have suffered harm as a result of the discriminatory actions of defendants.

43.    Defendants were/are housing providers as defined under the FHA.

44.    Defendants intentionally denied plaintiffs housing because of plaintiffs' race.

45.    Defendants are without justification for the complained of acts.

14



46.    Plaintiffs therefore seek compensatory and punitive damages in the amount of $10,000,000.00, declaratory judgment, and such other relief deemed appropriate.

## COUNT II
(Violation of Fair Housing Act Disparate Treatment--Disability)

47.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

48.    Plaintiffs are a protected class under the FHA, mentally disabled, physically disabled and suffering from substance abuse. Others also have suffered harm as a result of the discriminatory actions of defendants.

49.    Defendants were/are housing providers as defined under the FHA.

50.    Defendants intentionally denied plaintiffs housing because of plaintiffs' disability.

51.    Defendants are without justification for the complained of acts.

Plaintiffs therefore seek compensatory and punitive damages in the amount of $10,000,000.00, declaratory judgment, and such other relief deemed appropriate.

## COUNT III
(Violation of Fair Housing Act Disparate Impact--Race)

52.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

53.    Plaintiffs are a protected class under the FHA, African American men. Others have also suffered harm as a result of the actions of defendants.

54.    Defendants were/are housing providers as defined under the FHA.

55.    Defendants actions had a disproportionate impact on African Americans.

15



56.    Defendants are without justification and less discriminatory means were available to achieve any purported interest.

57.    Plaintiffs therefore seek compensatory and punitive damages in the amount of $10,000,000.00, declaratory judgment, and such other relief deemed appropriate and consistent with Count I of this complaint.

### COUNT IV
(Violation of Fair Housing Act Disparate Impact--Disability)

58.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

59.    Plaintiffs are a protected class under the FHA, mentally disabled, physically disabled and suffering from substance abuse. Others also have suffered harm as a result of the actions of defendants.

60.    Defendants were/are housing providers as defined under the FHA.

61.    Defendants actions had a disproportionate impact on African Americans

62.    Defendants are without justification for these actions, and less discriminatory means were available to achieve any purported interest.

63.    Plaintiffs therefore seek compensatory and punitive damages in the amount of $10,000,000.00, declaratory judgment, and such other relief deemed appropriate and consistent with Count II of this complaint.

### COUNT V
(Violation of Americans With Disabilities Act - Disparate Treatment)

64.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

16



65.    Plaintiffs are a protected class under the ADA, mentally disabled, physically disabled and suffering from substance abuse. Others also have suffered harm as a result of the discriminatory actions of defendants.

66.    Defendants are a governmental entity as defined under the ADA, and subject to its requirements.

67.    Defendants owned the property located at 900 13th Street, N.W. Washington, D.C. known as Franklin Shelter. Services for disabled homeless were provided at Franklin Shelter.

68.    By closing Franklin Shelter, defendants intentionally and directly and proximately denied plaintiffs needed services because of their disability, and further denied a reasonable accommodation as required by law.

69.    Defendants are without justification for the complained of acts.

70.    Plaintiffs therefore seek compensatory and punitive damages in the amount of $10,000,000.00, declaratory judgment, and such other relief deemed appropriate.

### COUNT VI
(Violation of Americans With Disabilities Act - Disparate Impact)

71.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

72.    Plaintiffs are a protected class under the ADA, mentally disabled, physically disabled and suffering from substance abuse. Others also have suffered harm as a result of the discriminatory actions of defendants.

73.    Defendants are a governmental entity as defined under the ADA, and subject to it s requirements.

17



74.    Defendants owned the property located at 925 13th Street, N.W. Washington, D.C. known as Franklin Shelter. Services for disabled homeless were provided at Franklin Shelter.

75.    By closing Franklin Shelter, defendants directly and proximately denied plaintiffs needed services and plaintiffs are disabled, and further denied a reasonable accommodation as required by law.

76.    Defendants' actions had a disproportionate impact on the disabled.

77.    Defendants are without justification these actions, and less discriminatory means were available to achieve any purported interest.

78.    Plaintiffs therefore seek compensatory and punitive damages in the amount of $10,000,000.00, declaratory judgment, and such other relief deemed appropriate consistent with Count V of the complaint.

### COUNT VII
(Violation of D.C. Human Rights Act Place of Residence Discrimination - Disparate Treatment)

79.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

80.    Plaintiffs are/were residents of Northwest Washington, D.C. for the relevant time period.

81.    Defendants did intentionally discriminate against plaintiffs by closing Franklin Shelter.

82.    Other similarly situated shelters in remote areas of Wards 7 and 8 were treated differently by defendants.

83.    Defendants did so without justification.

18



84.     Plaintiffs therefore seek compensatory and punitive damages in the amount of

$10,000,000.00, declaratory judgment, and such other relief deemed appropriate.

## COUNT VIII
(Violation of D.C. Human Rights Act, Place of Residence Discrimination - Disparate
Impact)

85.     Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if

fully set forth herein.

86.     Plaintiffs are/were residents of Northwest Washington D.C. for the relevant time

period.

87.     Defendants' actions had a disproportionate impact on the residents of Northwest

Washington, D.C.

88.     Defendants are without justification these actions, and less discriminatory means

were available to achieve any purported interest.

89.     Plaintiffs therefore seek compensatory and punitive damages in the amount of

$10,000,000.00, declaratory judgment, and such other relief deemed appropriate consistent with

Count V of the complaint.

## COUNT IX
(Violation of D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq*. - Disparate

Treatment)

90.     Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if

fully set forth herein.

91.     Defendants did intentionally discriminate against plaintiffs by closing Franklin

Shelter and abruptly removing vital and other services.

19



92.    Plaintiffs are individuals with disabilities as defined in D.C. Code § 2-

1401.02(5A) and are entitled to all of the protections, rights and remedies of Title § 2-1401.01 *et*

*seq.* of the Code of the District of Columbia (the *Human Rights Act*).

93.    At all times relevant thereto, defendants violated the Plaintiffs' rights under the

Human Rights Act by refusing to accommodate their needs and requests for adequate shelter

from the rain, snow, ice and cold, as well as for accessible mental health and health care services,

adequate nutrition, and employment opportunity availability.

94. Defendants' actions constitute violations of D.C. Code § 2-1401.01 *et seq.*

95.    As a direct result of the discriminatory acts of Defendants, Plaintiffs have suffered

the damages described herein.

96.    Defendants did so without justification.

97.    Plaintiffs therefore seek compensatory and punitive damages in the amount of

$10,000,000.00, declaratory judgment, and such other relief deemed appropriate.

### COUNT X

(Violation of D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq.* - Disparate Impact)

98.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if

fully set forth herein.

99.    Defendants' actions had a disproportionate impact on the former inhabitants of

Franklin Shelter, by displacing them from much needed vital services, adequate nutrition, and

employment opportunities.

100.    Plaintiffs are individuals with disabilities as defined in D.C. Code § 2-

1401.02(5A) and are entitled to all of the protections, rights and remedies of Title § 2-1401.01 *et*

*seq.* of the Code of the District of Columbia (the *Human Rights Act*).



A242

101.    At all times relevant thereto, defendants violated the Plaintiffs' rights under the

Human Rights Act by refusing to accommodate their needs and requests for adequate shelter

from the rain, snow, ice and cold, as well as for accessible mental health and health care services,

adequate nutrition, and employment opportunity availability.

102.    Defendants' actions constitute violations of D.C. Code § 2-1401.01 *et seq*.

103.    As a direct result of the discriminatory acts of Defendants, Plaintiffs have suffered

the damages described herein.

104.    Defendants did so without justification.

105.    Plaintiffs therefore seek compensatory and punitive damages in the amount of

$10,000,000.00, declaratory judgment, and such other relief deemed appropriate.

**COUNT XI**:
(PROCEDURAL DUE PROCESS)

106.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if

fully set forth herein.

107.    On the facts alleged above, defendant Mayor Fenty is liable for violation under

color of law of plaintiffs' constitutional right to Due Process for the abrupt removal and ongoing

discontinuation of vital services for the most vulnerable residents of the District, and for failing

to provide proper notice and a fair hearing before denial of their property and liberty interests in

remaining in the shelter and having access to services.

108.    On the facts alleged above, defendant Mayor Fenty is liable for violation under

color of law of plaintiffs' constitutional right to Due Process for failing to provide proper notice

and a fair hearing before depriving them of their belongings and personal property

109.    On the facts alleged above, defendant Mayor Fenty is liable for violation under

color of law of plaintiffs' constitutional right to Due Process because the Mayor lacked authority



to close Franklin Shelter where the Franklin Shelter Closing Requirements Emergency Act of

2008 had not been enacted into law at the time the Mayor closed the shelter, nor does its closing

comply with existing laws.

**COUNT XII**
(SUBSTANTIVE DUE PROCESS)

110.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if

fully set forth herein.

111.    The District of Columbia owned and operated the property known as Franklin

Shelter as part of its statutory obligations to provide housing and services for plaintiffs.

Accordingly and consistent with the statutory obligations, the District created an interest

cognizable under the Due Process clause.

112.    On the facts alleged above, defendant Mayor Fenty is liable for violation under

color of law of plaintiffs' constitutional right to Due Process for the abrupt removal and ongoing

discontinuation of vital services for the most vulnerable residents of the District, and for failing

to provide proper notice and a fair hearing before denial of their property and liberty interests in

remaining in the shelter and having access to services.

113.    On the facts alleged above, defendant Mayor Fenty is liable for violation under

color of law of plaintiffs' constitutional right to Due Process because the Mayor lacked authority

to close Franklin Shelter where the Franklin Shelter Closing Requirements Emergency Act of

2008 had not been enacted into law at the time the Mayor closed the shelter, nor does its closing

comply with existing laws. In so doing, the Mayor's conduct was so opprobrious such that it

"shocks the conscience" and violated plaintiff's right to substantive due process of law.

22



## COUNT XIII

(Violation of Fair Housing Act Disparate Treatment--Race)

114.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

115.    Plaintiffs are a protected class under the FHA, African American men, and have suffered harm as a result of the discriminatory actions of defendants.

116.    Defendants were/are housing providers as defined under the FHA.

117.    Defendants intentionally denied plaintiffs housing, continued failures to provide adequate shelter space and placement in permanent supportive housing, because of plaintiffs' race.

118.    Defendants are without justification for the complained of acts.

119.    Plaintiffs therefore seek compensatory and punitive damages in the amount of $10,000,000.00, declaratory judgment, and such other relief deemed appropriate.

## COUNT XIV

(Violation of Fair Housing Act Disparate Treatment--Disability)

120.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

121.    Plaintiffs are a protected class under the FHA, mentally disabled, physically disabled and suffering from substance abuse. Others also have suffered harm as a result of the discriminatory actions of defendants.

122.    Defendants were/are housing providers as defined under the FHA.

23



123.    Defendants intentionally denied plaintiffs housing, through failing to provide adequate shelters permanent supportive housing, because of plaintiffs' disability.

124.    Defendants are without justification for the complained of acts.

Plaintiffs therefore seek compensatory and punitive damages in the amount of $10,000,000.00, declaratory judgment, and such other relief deemed appropriate.

### COUNT XV

(Violation of Fair Housing Act Disparate Impact—Race)

125.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

126.    Plaintiffs are a protected class under the FHA, African American men, and others have also suffered harm as a result of the actions of defendants.

127.    Defendants were/are housing providers as defined under the FHA.

128.    Defendants actions had a disproportionate impact on African Americans

129.    Defendants are without justification and less discriminatory means were available to achieve any purported interest.

130.    Plaintiffs therefore seek compensatory and punitive damages in the amount of $10,000,000.00, declaratory judgment, and such other relief deemed appropriate and consistent with Count I of this complaint.

### COUNT XVI

(Violation of Fair Housing Act Disparate Impact--Disability)

131.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

24



132.    Plaintiffs are a protected class under the FHA, mentally disabled, physically

disabled and suffering from substance abuse. Others also have suffered harm as a result of the

actions of defendants.

133.    Defendants were/are housing providers as defined under the FHA.

134.    Defendants actions had a disproportionate impact on African Americans

135.    Defendants are without justification for these actions, and less discriminatory

means were available to achieve any purported interest.

136.    Plaintiffs therefore seek compensatory and punitive damages in the amount of

$10,000.000.00, declaratory judgment, and such other relief deemed appropriate and consistent

with Count II of this complaint.

**COUNT XVII**

(Violation of Americans With Disabilities Act Disparate Treatment)

137.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if

fully set forth herein.

138.    Plaintiffs are a protected class under the ADA, mentally disabled, physically

disabled and suffering from substance abuse. Others also have suffered harm as a result of the

discriminatory actions of defendants.

139.    Defendants are a governmental entity as defined under the ADA, and subject to it

s requirements.

140.    Defendants owned the property and operate, through contract, the housing and

services provided through a "Continuum of Care" of services for the homeless population in the

District. These services include housing, mental health, substance abuse, physical health and

employment services among others.



141.    Defendants intentionally and directly and proximately denied plaintiffs needed services because of their disability, and further denied a reasonable accommodation as required by law.

142.    Defendants are without justification for the complained of acts.

143.    Plaintiffs therefore seek compensatory and punitive damages in the amount of $10,000.000.00, declaratory judgment, and such other relief deemed appropriate.

## COUNT XVIII

(Violation of Americans With Disabilities Act Disparate Impact)

144.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

145.    Plaintiffs are a protected class under the ADA, mentally disabled, physically disabled and suffering from substance abuse. Others also have suffered harm as a result of the discriminatory actions of defendants.

146.    Defendants are a governmental entity as defined under the ADA, and subject to its requirements.

147.    Defendants owned the property and operate, through contract, the housing and services provided through a "Continuum of Care" of services for the homeless population in the District. These services include housing, mental health, substance abuse, physical health and employment services among others.

148.    Since the closing of Franklin Shelter, defendants' repeated failures directly and proximately denied plaintiffs needed services and plaintiffs are disabled, and further denied a reasonable accommodation as required by law.

149.    Defendants' actions had a disproportionate impact on the disabled.

26



150.    Defendants are without justification for these actions, and less discriminatory

means were available to achieve any purported interest.

151.    Plaintiffs therefore seek compensatory and punitive damages in the amount of

$10,000,000.00, declaratory judgment, and such other relief deemed appropriate consistent with

Count V of the complaint.

Plaintiff's hereby demand a trial by jury for all claims so triable. Plaintiffs further

demand all such relief available, but not specifically demanded.

/S/
GEORGE E. RICKMAN, ESQ.
Bar # 433298
P.O. Box 21267
Kalorama Station
Washington, D.C.  20009-21267
202-723-3955
georgerick11@comcast.net
*Counsel for Plaintiffs*

/S/
JANE ZARA, ESQ.
DC Bar # 982392
1611 Monroe St., NW
Washington, DC  20010
202-483-9303
jjzara@aol.com
*Counsel for Plaintiffs*



## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2012, I caused a true and exact copy of the

forgoing Corrected Brief and Appendix for the Appellants to be delivered by E-

Service to:

Stacey L. Anderson
Office of the Attorney General
441 4th street, NW
Washington, DC  20001
Stacey.Anderson@DC.gov


_____/s/_____

GEORGE E. RICKMAN